1

**THE HONORABLE THOMAS S. ZILLY**

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

8

| | |
|---|---|
| 9 | KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof, | **NO. CV 14-01223** |
| 11 | Plaintiffs, | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 12 | v. | **Note on Motion Calendar:** **June 19, 2015** |
| 13 | COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation, | |
| 15 | Defendant. | |

16

17

## I.   RELIEF REQUESTED AND SUMMARY

18

This is an insurance consumer protection case.

19

In this Motion Plaintiffs Karen and Keith Kroneman (the "Kronemans") seek an Order

20

finding that during the adjustment of their first party fire related insurance claim Defendant

21

Country Mutual Insurance Company ("Country Mutual") 1) wrongfully refused to pay for "like

22

kind and quality" structure repairs to their home and, 2) refused to acknowledge and respond to

23

Plaintiffs' demand for appraisal. These acts violated the Washington Administrative Code

24

("WAC") claims handling regulations and constituted insurance bad faith.

25

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 1

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

## II.   FACTS

### A.   The Kronemans' Homeowner's Insurance Policy and the Fire Loss.

On September 29, 2012 the Kronemans had in full force and effect a homeowner's insurance policy issued by Defendant Country Mutual, for their home located at 9507 149th St. E., Puyallup, Washington. Watkins Dec at ¶ 3.

The Plaintiffs' Homeowner's policy of insurance contained a promise from Country Mutual that in the event the Kronemans suffered a fire loss, it would pay to repair or replace their fire damaged property with "like kind a quality." Watkins Dec at ¶ 4.

On September 29, 2012 the Kronemans suffered a covered property loss caused by an accidental fire that damaged their home and their family's personal property. Watkins Dec at ¶ 5.

### B.   Country Mutual's Refusal to Fully Pay the Claim.

After the fire loss, the Kronemans properly submitted a claim for insurance benefits to their insurer, Defendant Country Mutual, pursuant to their Homeowner's policy of insurance. They requested insurance benefits to repair and/or rebuild their home to its original pre-loss condition and repair, clean and/or replace their and their family's damaged personal property. Watkins Dec at ¶ 6.

The Kronemans retained Step Up Construction ("Step Up") to repair their fire damaged home. Step Up directed its estimator Bernie Williams ("B. Williams") to visit the loss site, inspect the damage and prepare an estimate of repairs for the damaged structure. B. Williams Dec at ¶ 3.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 2

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

Despite the Kronemans' contractor's best efforts, a suitable replacement for the vinyl siding was no longer available. During his deposition, Gregory Herburger ("Herburger"), the owner of Step Up, testified to the following:

> Q  You, I believe, testified that the siding was replaced on two sides of the house, correct? Or pardon me. That's what was authorized by the insurance company?
>
> A  That's what I heard. They authorized two sides to see if we could match the vinyl siding. It came back to me to see if I could match the vinyl siding. And I -- **we actually brought vinyl siding out there that does not come close to matching**.
>
> Q  Okay. And did it look bad if you tried to match it?
>
> A  **It looked terrible**.
>
> (…)
>
> Q:  You testified that it came back to you to try and match the siding. What steps did you take to try and match the siding?
>
> A:  We -- we went and -- went to a siding manufacturer and -- well, distributor. I'm sorry. Not a manufacturer. A distributor. And took the pieces into try and match it. The closest pieces they had that would match it, because the company that was originally, they said -- I'm no vinyl siding specialist -- they said was not in business anymore.
>
> The only thing they had to match was somewhat the same color, somewhat the same look, but wasn't even the same -- the manufacturer, it was out of business, that originally did the house. (emphasis added)

Watkins Dec at ¶ 7.

Step Up could not install new siding on just a portion of the home because the color was impossible to match with "like kind and quality." B. Williams Dec at ¶ 4. The standard practice in the insurance industry is to pay for repairs to undamaged portions of a structure to insure

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 3

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1

2

that the colors of a home match. Howson Dec at ¶ 4, B. Williams Dec at ¶ 4, G. Williams Dec at ¶ 4.

3

4

An insured's home would significantly diminish in value if its siding was of two different colors. B. Williams Dec at ¶ 5. G. Williams Dec at ¶ 5.

5

6

7

Even though the new siding obviously could not be matched, Country Mutual's assigned adjuster, Greg Stariha ("Stariha"), refused to authorize payment to replace the siding on all sides of the Kroneman's home. B. Williams Dec at ¶ 5.

8

9

10

11

12

Specifically, Country Mutual refused to pay for replacement of the siding on all four sides of the home, arguing that because two elevations were not physically damaged, it was not obligated to replace them, even though the sides of the house would not match. B. Williams Dec at ¶ 5.

13

14

However, Stariha conceded in deposition that Country Mutual routinely pays to replace undamaged portions of a structure if there is a matching problem:

15

16

> Q:    In your experience has Country ever paid for more of the roof than was damaged because of a matching issue?

17

> A:    What do you mean by "more of a roof?"

18

19

20

> Q:    There are certain parts of the roof, a couple of shingles maybe, that were physically damaged with direct physical damage, and then-- has the company ever paid for more than just the few shingles that were damaged so that it would match?

21

22

23

> A:    We would allow for replacement of a slope of a roof, up to a ridge line or to a valley, whether -- if there's, say, 20 to 30 percent of those shingles are damaged, we would allow to replace the entire slope.

24

> Q:    So it would match?

25

> A:    What I consider a slope.

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

1

Q:      So that it would match, correct?

2

A:      I'm not sure why we do it, but that's our position.

3

4       Q:      Okay. And to be clear, you would allow for replacement of
        shingles that were not the victims of direct physical
        damage, correct?

5

6       A:      Yes.

7       Watkins Dec at ¶ 8.

8       Likewise William Hight ("Hight"), Country Mutual's retained standard of care expert,

9       opined that such an "accommodation" is dependent on the circumstances but was unable to

10      articulate those circumstances and lacked knowledge of the extent of the matching problem:

11      Q.      And I'm just asking: Do you have some idea -- or did you
                have some idea when you formed your opinions in this case
12              as to the degree of matching issue it was on the Kroneman
13              house?

14      A.      Visually, no.

15      Q.      Okay. Did you have an understanding by reading Mr.
                Herberger's deposition of how -- if they had tried to use
16              vinyl siding, what it would look like?

17
        A.      I don't recall specifically from his deposition how he
18              characterized it in his view or his perception of it.

19                                      (...)

20      Q.      Right. But you would -- if there were one or two tiles on
                the roof, you would perhaps do the entire elevation so it
21              looked to match.

22      A.      Not necessarily. It would depend on the circumstances.

23
        Q.      It would depend on the circumstances, that's correct. And
24              do you have sufficient knowledge of the Kroneman house
                as to what it would have looked like if they had only put
25              two sides of vinyl siding on it, how drastic or dramatic that

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY          LAW OFFICES OF MICHAEL T. WATKINS
JUDGMENT - 5                                     6100 219th ST SW, SUITE 480
                                                 MOUNTLAKE TERRACE, WA 98043
                                                 425/835-1619; FAX: 206/971-5080

would have looked?

A.   I think I've answered that question.

Q.   Then the answer is no, correct?

A.   You must know the answer since I've answered it several times.

Q.   Yeah. I just want —

A.   I do not know visually how they would compare. I understand that Hardie board was used in place of siding, and it was used around. And that's how the issue was solved.

Watkins Dec at ¶ 9.

During the first part of 2013 the Plaintiffs negotiated in good faith in an attempt to settle the matching dispute with their insurance company. Country Mutual continued to take the position that all amounts under the policy were fully paid and the negotiations failed. Watkins Dec at ¶ 10. On September 27, 2013, faced with an impasse and the upcoming one-year contractual limitation period, the Plaintiffs filed the instant lawsuit. Watkins Dec at ¶ 11.

## C.   Country Mutual, in Violation of the WAC, Ignored the Kroneman's Demand for Appraisal.

On July 21, 2014 seeking a speedy, efficient and inexpensive solution to the matching issue Plaintiffs' attorney sent a letter to Country Mutual's counsel and demanded Appraisal pursuant to the terms of the policy. The letter stated:

Dear Counsel :

Thank you for your July 14, 2014 email rejection of Plaintiffs' offer to settle the above referenced case for $36,681.84, inclusive of attorney fees and costs and re-offering Country Mutual's prior settlement proposal of $13,000.    I have communicated with our clients and our settlement offer is revoked and Country Mutual's $13,000 offer is rejected.

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

1

2

We regret that we were not able to settle this case at this point in the litigation. It was our hope that we could avoid the significant costs and the substantial court time associated with trying this matter.

3

4

**Due to the lack of agreement on the scope of cost of the structure repairs and the amount of the contents claim, the Kronemans are left with no alternative but to demand Appraisal on these two issues, as set forth in their policy.** (emphasis added)

5

6

7

8

We have contacted Roger Howson of Claims Dispute Resolution to represent the Kronemans as their Appraiser in this matter. Mr. Howson can be reached at (206) 676-3838. We ask that you provide us with the name and contact information of Country Mutual's Appraiser, and have him/her contact Mr. Howson directly to avoid further delay.

9

10

We make these requests pursuant to Washington Administrative Code sections 284-30-330(2) and 284-30-360(3).

11

Thank you for your attention to these matters and if you have any questions or comments, please do not hesitate to give us a call.

12

13

Sincerely,

14

Michael T. Watkins (emphasis added)

15

Watkins Dec at ¶ 12.

16

Country Mutual simply ignored the letter and did not respond to the Kronemans'

17

demand for Appraisal. Watkins Dec at ¶ 13.

18

On January 16, 2015 Plaintiffs filed a complaint with the Office of Insurance

19

20

Commissioner ("OIC") in an attempt to have Country Mutual acknowledge their demand and

appoint an appraiser. Watkins Dec at ¶ 14.

21

22

On February 13, 2015 Plaintiffs again reiterated their demand for appraisal. Watkins

Dec at ¶ 15.

23

24

On March 16, 2015 Plaintiffs received Defendant's response to the OIC complaint. In its

25

response Country Mutual incorrectly contended that under Washington law appraisal could not

be invoked after the commencement of a lawsuit and erroneously cited inapposite authority on that issue. Watkins Dec at ¶ 16. G. Williams Dec at ¶ 6.

### III.   ISSUES PRESENTED

1.  Did Country Mutual breach the insurance contract in bad faith by refusing to pay for like kind and quality repairs?

2.  Did Country Mutual violate the WAC claims handling regulations by ignoring the Kronemans' demand for appraisal?

### IV.   EVIDENCE RELIED UPON

1.  Declaration of Michael T. Watkins, and the Exhibits attached thereto;

2.  Declaration of Gary Williams, and the Exhibits attached thereto;

3.  Declaration of Roger Howson, and the Exhibits attached thereto;

4.  Declaration of Bernie Williams, and the Exhibits attached thereto.

### V.   ARGUMENT

**A.   Standard for Summary Judgment.**

A party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is a procedure for testing the sufficiency of a party's evidence and for determining whether a trial on the issue or claim is necessary. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). To avoid summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**B.   Washington Law Applies to all Substantive Issues.**

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 8

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

1
2
3
4
5
6
7
8
9

When adjudicating a claim that has been removed from state court based on diversity jurisdiction, as in this case, federal courts apply state law for all substantive issues and federal law for all procedural issues. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."); *see also Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). Therefore, federal law controls the standard for summary judgment in this case, but state law controls the issues of whether the WAC has been violated and whether Country Mutual breached the duty of good faith it owed the Kronemans.

10

### C.    Standard for Interpreting Insurance Policy Contracts.

11
12
13
14
15
16
17
18
19
20
21
22

Insurance policies must be "liberally construed in favor of a policyholder or beneficiary thereof, whenever possible, and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance." *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 64 Wn. App. 838, 855, 827 P.2d 1024 (1992), aff'd, 126 Wn.2d 50, 882 P.2d 703 (1994). The purpose of insurance is to insure, and the contract should be construed so as to make it operative rather than inoperative. *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 99 Wn.2d 65, 68, 659 P.2d 509 (1983). A construction which contradicts the general purpose of the contract or results in a hardship or absurdity is presumed to be unintended by the parties. *Id*. The terms of an insurance policy are construed as the average person buying insurance would interpret them, and are given a fair and reasonable construction. *Overton v. Consolidated Ins. Co.*, 145 Wash. 2d 417, 38 P.3d 322, (2002).

23
24
25

Where a policy is ambiguous on an issue, that ambiguity must be construed in favor of the insured. *Panorama Vill. Condo. Owners Bd. of Dirs. v. Allstate Ins. Co.*, 144 Wn.2d 130, 137, 26 P.3d 910 (2001). This rule on ambiguities applies with added force to exclusionary

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

clauses which seek to limit policy coverage. *Findlay v. United Pacific Ins. Co.*, 129 Wn.2d 368, 374, 917 P.2d 116 (1996). Likewise, when a policy term is capable to two constructions, it must be construed in favor of the insured. *Shotwell v. Transamerica Title Ins. Co.*, 91 Wn.2d 161, 167, 588 P.2d 208 (1978).

### D. Country Mutual Failed to Fully Pay the Kronemans' Claim.

Country Mutual was obligated to fully pay the Kronemans' fire claim. Because it only agreed to pay for siding on two exterior walls of the Kronemans' home, Country Mutual breached the insurance contract and its obligation to act in good faith with respect to its insureds.

### 1. Country Mutual Promised that it Would Fully Pay for "Like Kind and Quality" Repairs to Their Home.

The Country Mutual policy language provided that replacement cost would be determined based on the cost to replace "the lost or damaged property with other property . . . of *like kind and quality*." (emphasis added) The policy did not define the terms "like," "kind," and "quality" and, therefore, this Court must turn to a standard English dictionary. *Matthews v. Penn-America Ins. Co.*, 106 Wash. App. 745, 25 P.3d 451 (2001). "Like" is defined as "the same as or similar to." Webster's Third New Int'l Dictionary 640 (1976). Webster's provides that "kind" refers to "fundamental nature." Webster's, *supra*, at 1243. And "quality" is a "degree of excellence: grade, caliber." Webster's, *supra*, at 1858. In this context "like kind and quality" requires a color match. And because Country Mutual could not match the new siding to the existing siding, it was obligated to replace all of the Kroneman's siding.

In the surprisingly similar case of *Cedar Bluff Townhome Condominium Association, Inc. v. American Family Mutual Insurance Company*, __ N.W.2d__, No. A13-0124, WL

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 10

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

7156914 (Minn. Dec. 17, 2014) the Minnesota Supreme Court addressed an insurer's obligation to match replacement siding to existing siding after homes suffered storm damage. The opinion stemmed from an October 2011 hailstorm that damaged buildings in the Cedar Bluff townhome neighborhood. The roofs on all 20 of the buildings required replacement, and at least one siding panel on each building sustained damage from hail. At the time of the storm the siding was more than a decade old, and the color had faded. Replacement panels were available with the same specifications, but they were not available in the same color. There, as in this case, the insured sought coverage for complete replacement of the siding on all four exterior walls.

American Family took the same position Country Mutual has taken with the Kronemans. Both insurers stated that the policy only required replacement of the individual panels actually damaged by the storm, even though the replacement panels would not match the original panels.

An appraisal panel held that there was not a reasonable color match available for Cedar Bluff's existing materials and calculated the replacement value for a total replacement of all the siding. American Family refused to pay the award, believing it was based upon an unauthorized coverage determination. Cedar Bluff brought an action to enforce the appraisal award.

The lower court granted summary judgment to American Family, finding that the policy did not require payment for replacing property that had not experienced direct physical loss or damage. The Court of Appeals reversed. *Cedar Bluff Townhome Condominium Association, Inc. v. American Family Mutual Insurance Company*, No. A13-0124, 2013, WL 6223454 (Minn. Ct. App. Dec. 2, 2013).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 11

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

1
2
3
4
5
6
7

The Minnesota Supreme Court reviewed these determinations *de novo*. The Supreme Court cited with approval *Quade v. Secura Ins.*, 814 N.W.2d 703 (2012) and reaffirmed that the term "comparable material and quality" in a replacement cost policy means "a reasonable color match between new and existing siding." The *Cedar Bluff* court reasoned that because the color mismatch resulted in the inability to replace the fire-damaged siding with siding of "like kind and quality material and quality," the townhomes had sustained a "distinct, demonstrable, and physical alteration." Thus, it concluded that all of the siding sustained a covered loss.

8
9
10
11
12
13
14

In *National Presbyterian Church, Inc., v. Guide One Mutual Insurance Company*, Civil Action No. 13-1847 (JDB) (D.C. Feb. 11, 2015), the United States District Court for the District of Columbia was faced with the identical matching issue and "like kind and quality" language as is presented here. The court found the insurance policy to be ambiguous and ordered the insurer to replace the entire façade, including the undamaged limestone panels, so the exterior of the church would match:

15
16
17
18
19
20
21

> In August 2011, an earthquake struck Washington, D.C., damaging National Presbyterian Church. The church's exterior was comprised of hundreds of limestone panels, some of which were cracked or otherwise damaged by the earthquake. So the church filed an insurance claim to repair the damage. But the church fears that merely replacing the damaged panels would diminish the aesthetic qualities of the façade, as the new, unweathered panels could have noticeably different coloration than the remaining panels. Thus, the church believes that GuideOne, its insurer, is required to pay for repairs that not only fix the structural damage, but also create a matching façade. Both parties seek a declaratory judgment as to the matching issue. **Because the insurance policy is ambiguous, the Court must find in favor of the church: hence, matching is required.** (emphasis added)

22
23
24
25

Here, Country Mutual's homeowner's policy provides for payment of the full replacement cost, without deduction for depreciation, and insures the policyholders dwelling for all loss or damage unless the loss is excluded in the policy. Under the "Replacement Cost"

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

section of Country Mutual's policy, it undertakes the following obligation:

"Replacement cost" means:

a. Under Loss Settlements 1 and 2, and Coverage EE Additional Replacement Cost, the cost actually and necessarily incurred to repair or replace the damaged property using standard new construction materials of like kind and quality and standard new construction techniques.

Nothing in Country Mutual's policy limits the insurer's obligation, excludes coverage for matching or otherwise supports Country Mutual's refusal to fully pay the sums necessary to return the Kronemans' home to its original condition with "like kind and quality." The Kronemans had matching siding before the loss, and they are entitled to matching siding following the loss.

That matching housing materials would no longer be available for repairs over the entire useful life of a dwelling is a common and easily anticipated event. Here, Country Mutual was in a position to add an explicit exclusion or limitation language to its homeowner's policy for matching issues, but it did not.

E.    **Country Mutual Violated the WAC Claims Handling Regulations.**

Although these lawsuits are routinely termed bad faith, "The primary focus in these cases should be whether the [insurance] company has honored its obligation to observe fair claim practices." *The Law of Insurance Claim Practices Beyond Bad Faith*, Jay M. Feinman, 47 Tort Trial & Ins. Prac. L.J., Pg. 693 (2012). Here, the Kronemans, on behalf of the public who purchase insurance in the state of Washington to protect their business, homes and families from unexpected loss, ask this Court to enforce applicable WAC claims handling regulations violated by defendant Ohio Security during the adjustment of its claim. Failure to enforce WAC claim handling regulations will dis-incentivize Country Mutual as well as all

insurers in the future from complying with the regulations promulgated by the Office of the Insurance Commissioner designed to protect Washington consumers.

In violation of the WAC claims handling regulations Country Mutual failed to timely respond to the Kronemans' written demand for appraisal. By not complying with 284-30-360 (4), Country Mutual breached the good faith obligations it owed to its insureds.[1]

1.      **Defendant Country Mutual had a duty to comply with the WAC claims handling regulations during the investigation and adjustment of the Kronemans' insurance claim.**

Persons engaged in the business of insurance in Washington are prohibited from committing unfair or deceptive acts in the conduct of that business.  RCW 48.30.010(1).  The Washington State Insurance Commissioner has promulgated regulations that define minimum standards for insurance claims handling which, if violated, constitute unfair claims settlement practices.  WAC 248-30-300 through 284-30-800; *see also Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 697, 17 P.3d 1229 (2001)("The Insurance Commissioner has promulgated regulations that define specific acts and practices that constitute a breach of an insurer's duty of good faith.").

2.      **Violation of WAC 284-30-360(3):**

Country Mutual, as an insurer doing business in the state of Washington, was required to comply with "communication" regulations during the adjustment of the Kronemans' insurance claim.  The WAC states that the following conduct is an unfair or deceptive act:

WAC 284-30-360(3):          For all other pertinent communications from a claimant reasonably suggesting that a response is

---

[1] Although a single violation of any one of the fair claims practice regulations set forth in WAC 284-30-300 through 800 constitutes a breach of the insurer's duty of good faith and is arguably an unfair or deceptive act or practice under the Consumer Protection Act ("CPA"), the Kronemans do not seek in this Motion, and save for another day, findings related to Country Mutual violations of the CPA.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 14

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

> expected, an appropriate reply must be provided
> within ten working days . . .

Country Mutual was required to respond to pertinent communications from its insured, or its insured's representatives, within 10 business days. It failed to timely respond to the Kronmans' demand for appraisal.

Country Mutual violated this claims handling regulation by failing to make an appropriate reply or taking reasonably prompt action with respect to the Kronemans' demand for appraisal under the policy.

This failure to act reasonably promptly to communications arising under the policy constitutes a violation of the above quoted WAC regulation for which summary judgment should be granted.

**3.      Plaintiffs were Entitled to Appraisal under the Terms of the Insurance Contract.**

The appraisal clause in Plaintiffs' insurance policy states:

E. Appraisal

**If "you" and "we" fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other.** The two appraisers will choose an umpire, who shall be competent in the trade or skill necessary to assess the loss. If they cannot agree upon an umpire within 15 days, "you" or "we" may request that the choice of an umpire be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement between them to "us", the amount agreed upon will set the amount of loss and be final. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will then set the amount of loss and be final. (emphasis added)

Here, after a lawsuit had been filed, the Kronemans demanded appraisal and appointed Roger Howson to serve as their appraiser. Country Mutual did not acknowledge or respond to the request in any manner, in violation of WAC 284-30-330(2) (Failing to acknowledge and act

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

reasonably promptly upon communications with respect to claims arising under insurance policies) and 284-30-360(3) (For all other pertinent communications from a claimant reasonably suggesting that a response is expected, an appropriate reply must be provided within ten working days for individual insurance policies, or fifteen working days with respect to communications arising under group insurance contracts).

It also did not tell the Kronemans that appraisal was unavailable after the lawsuit was begun because its policy contains no such limitation and insurers in the state of Washington routinely participate in appraisal while litigation is ongoing.

Hearings conducted by appraisers and umpires in connection with standard appraisal provisions in insurance policies are commonplace. *American Manufacturers Mut. Ins. Co.* v. *Osborne,* 104 Wash. App. 686, 694, 17 P.3d 1229 (2001) (court noted "appraisal hearings to determine value of personal property and additional living expense claims"); *Dombrosky* v. *Farmers Ins. Co. of Washington,* 84 Wash. App. 245, 251-52, 928 P.2d 1127 (1996) (Farmers sought and obtained a court ordered appraisal hearing in connection with an insured's claims for alleged damage to property).

Washington courts also have stated that appraisal provisions are "justified in the expectation that [they] will provide a plain, inexpensive, and speedy determination of the extent of the loss." *Keesling v. Western Fire Ins. Co. of Fort Scott, Kansas,* 520 P.2d 622, 625 (Wash. Ct. App. 1974) (citing *Kavli v. Eagle Star Ins. Co.,* 288 N.W. 723 (Minn. 1939)).

More importantly, and contrary to what Country Mutual asserted to the OIC, *Keesling* stands for the proposition that the institution of litigation *does not waive a party's right to appraisal*:

" . . . an insurer's demand for appraisal has been considered timely, not withstanding that the demand was not made until eight months after receipt of a proof of loss, subsequent to the commencement of a suit by the insured, and subsequent to a Court hearing. (emphasis added)

*Keesling v. Western Fire Ins.* Co., 10 Wash.App. 841, 520 P.2d 622 (1974).

### 4. Country Mutual's Duty to Comply with the WAC Claims Handling Regulations did not End with the Commencement of Litigation.

Plaintiffs attempted in good faith for several months to settle this dispute. When those negotiations proved fruitless, they brought this lawsuit. Plaintiffs timely invoked the appraisal clause as a means to accurately determine the scope and cost of repairs.

Country Mutual violated the WAC when it wrongfully refused to acknowledge and respond to Plaintiffs' demand for appraisal. Country Mutual's assertion that upon the commencement of litigation it longer had a duty to investigate and promptly pay the Kronemans' claims or comply with the WAC regulations is simply wrong. Because the insurance claim was ongoing during the pendency of the litigation, the Kronemans and Country Mutual had continuing claim related contractual and statutory duties independent of the Court's rules. The California Supreme Court held, "[i]t is clear that the contractual relationship between insurer and the insured does not terminate with commencement of litigation." *White v. Western Title*, 40 Cal.3d 870, 885, 710 P.2d 309 (1985).[2]

---

[2] "We also note that this approach is consistent with that of almost every other jurisdiction to have addressed the issue. Those courts have consistently held that the duty of good faith, whether an inherent aspect of the insurance contract or a statutory construct, continues during any litigation that is brought to determine liability for the underlying tort. *See, e.g., White v. Western Title Ins. Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 316-17 (1985) (holding that the duty of good faith continues during litigation because the contractual relationship continues); *Haddick v. Valor Ins.*, 315 Ill. App.3d 752, 248 Ill. Dec. 812, 735 N.E.2d 132, 133 (2000) ("We reverse and hold that an insurance company has a duty to act in good faith in settling a claim against its policyholder in a timely manner both before and after suit is filed."); *Harris v. Fontenot*, 606 So.2d 72, 74 (La.Ct.App.1992) ("We first note that nowhere in either statute is there an express distinction limiting the application to the pre-litigation conduct of the insurer. . . . [W]e believe that it is clear that the statute was enacted to impose a requirement of good faith and fair dealing on the

1

2

3

4

5

6

7

Although Judge Pechman has held otherwise, See *Stegall v. Hartford Underwriters Insurance Co.,* No. C08-0668-MJP, 2009 WL 54237, at *2-3 (W.D. Wash. Jan. 7, 2009), King County Superior Court Judge Shapira rejected Judge Pechman's ruling when the case was remanded for lack of jurisdiction. Moreover Judge Jones has held that "In a case like this one, where the insured's claim remains open, the insured's decision to sue its insurer does not cut off the insurer's obligations to adjust the claim." *Tavakoli v. Allstate Property and Casualty Insurance Company,* No. C11-1587RAJ (W.D. Wash. Jan. 15, 2013).

8

9

10

11

12

13

14

15

16

If it were otherwise, all insurers would immediately file declaratory actions when their insureds filed claims so that they would no longer be bound by the Insurance Commissioner's regulations. Having filed a lawsuit, insurers would not have to comply with the promises contained in their insurance contracts and they could violate the WAC regulations with impunity. *See Knotts v. Zurich Ins. Co.,* 197 S.W.3d at 517 ("If KRS 304.12-230 were not applicable once litigation commenced, insurance companies would have the perverse incentive to spur injured parties towards litigation, whereupon the insurance company would be shielded from a claim of bad faith."); *see also White, supra,* 40 Cal.3d at 886.

17

18

19

20

21

Country Mutual would have the Court find that its good faith and regulatory obligations under the insurance contract vanished at the commencement of litigation. Such a finding is not supported by Washington law and would terminate all rights and obligations related to an existing insurance contract at the time the lawsuit was filed. Such a finding would also have a

22

23

24

25

insurer, requirements that are no less important after litigation has begun as before."); *Palmer v. Farmers Ins. Exchange,* 261 Mont. 91, 861 P.2d 895, 913 (1993) ("[A]n insurer's duty to deal fairly and not to withhold payment of valid claims does not end when an insured files a complaint against the insurer."); *O'Donnell ex rel. Mitro v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa.Super.Ct.1999) ("[W]e refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured.") *Knotts v. Zurich Ins. Co.,* 197 S.W.3d 512, 517-18 (KY 2006).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 18

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

chilling effect on litigation because insureds will hesitate to enforce a particular contract provision through a lawsuit and thereby allow a defaulting defendant to escape its remaining duties.

## VI. CONCLUSION

Country Mutual, engaged in a concerted effort to underpay the Kronemans' insurance claim by refusing to pay for siding on two elevations of their residence. The Kronemans have at all times maintained that Country Mutual's payments on their claim were insufficient and based on an inaccurate scope of repairs. This conduct constitutes bad faith.

Country Mutual's narrow reading of what constitutes covered property is untenable. Defendant would have the policy interpreted to mean that it is not the Kronemans' dwelling that is covered, but the individual shingles, siding and nails.

Despite this, Country Mutual doggedly refused to even respond to the Kronemans' demand for appraisal, even though the explicit language of the policy calls for such a procedure. This conduct constitutes violations of the WAC claims handling regulations.

Accordingly, the Court should find, as a matter of law, that Country Mutual wrongfully underpaid the Kronemans' claim, in bad faith and violated the WAC.

DATED this 28th day of May, 2015.

LAW OFFICES OF MICHAEL T. WATKINS

Michael T. Watkins, WSBA #13677
Attorney for Plaintiffs

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT - 19

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL PRESBYTERIAN CHURCH,
INC.,

      Plaintiff,

          v.

GUIDEONE MUTUAL INSURANCE
COMPANY,

      Defendant.

Civil Action No. 13-1847 (JDB)

## MEMORANDUM OPINION

In August 2011, an earthquake struck Washington, D.C., damaging National Presbyterian Church. The church's exterior is comprised of hundreds of limestone panels, some of which were cracked or otherwise damaged by the earthquake. So the church filed an insurance claim to repair the damage. But the church fears that merely replacing the damaged panels would diminish the aesthetic qualities of the façade, as the new, unweathered panels could have noticeably different coloration than the remaining panels. Thus, the church believes that GuideOne, its insurer, is required to pay for repairs that not only fix the structural damage, but also create a matching façade. Both parties seek a declaratory judgment as to the matching issue. Because the insurance policy is ambiguous, the Court must find in favor of the church: hence, matching is required.[1]

---

[1] The church has moved, in the alternative, to strike GuideOne's relevant defenses. The Court need not reach the issue—but in any event, Federal Rule of Civil Procedure 12(f) is hardly an appropriate procedural vehicle. See, e.g., Kelly v. United States, 809 F. Supp. 2d 429, 433 (E.D.N.C. 2011) ("Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." (internal quotation marks and citation omitted)). The text of the rule applies to "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); see also Bradshaw v. Hilco Receivables, LLC, 725 F. Supp. 2d 532, 535 (D. Md. 2010) (explaining that a defense is

## BACKGROUND

The parties agree that the damaged panels themselves are covered by the insurance policy—and, at least for the purposes of this motion, that fixing only those panels would not exceed the deductible. The question at issue, then, is whether the policy requires GuideOne to pay for repairs that match aesthetically, rather than repairs that merely function.[2]

The insurance policy's "Building and Personal Property Coverage Form" explains that GuideOne "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Ex. A to Compl. ("Ins. Policy") [ECF No. 17-1] at 45. "Covered Property," in turn, "means the type of property described in this section, A.1, and limited in A.2, Property Not Covered." Id. Under that designation, "Covered Property" refers in part to the "Building, meaning the building or structure described in the Declarations," including fixtures, outdoor furniture, and fences. Id.

The loss payment provision explains that:

> In the event of loss or damage covered by this Coverage Form, at our option, we will either:
> (1) Pay the value of lost or damaged property;
> (2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below [relating to ordinances regarding construction];
> (3) Take all or any part of the property at an agreed or appraised value; or
> (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.
> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

---

"insufficient . . . if it does not meet the pleading requirements of Rules 8 and 9"). The church does not even attempt to argue that any of these adjectives apply to GuideOne's well-pleaded defenses.

[2] In its complaint and briefs on this motion, the church implied that it would not be satisfied unless GuideOne were to replace all of the limestone panels, damaged and not, to ensure a perfectly matching façade. See, e.g., Mem. Supp. Pl.'s Mot. Partial J. Pleadings [ECF No. 18-1] at 4 (decrying GuideOne's refusal to replace each undamaged panel). At the December 5, 2014, motion hearing, however, the church clarified its position. It now professes to seek matching through less comprehensive means, such as cleaning the older panels to make them look new again. Indeed, the church now avers that no undamaged panels would need to be replaced.

Id. at 65.  And the Valuation Condition provides that:

> We will not pay more for loss or damage on a replacement cost basis than
> the least of (1), (2) or (3), subject to **f.** below [regarding ordinances]:
> (1) The Limit of Insurance (or when it applies, the "Increased Limit of
>     Insurance") applicable to the lost or damaged property;
> (2) The cost to replace, on the same premises, the lost or damaged
>     property with other property:
>     (a) Of comparable material and quality; and
>     (b) Used for the same purpose; or
> (3) The amount actually spent that is necessary to repair or replace the lost
>     or damaged property.

Id. at 67.  Both parties, offering competing interpretations of these provisions, now seek

partial judgment on the pleadings to determine whether the policy requires coverage of

the costs to ensure a matching façade.

## LEGAL STANDARD

A motion for judgment on the pleadings is appropriate where, as here, "the pleadings are

closed . . . but [it is] early enough not to delay trial."  Fed. R. Civ. P. 12(c).  The Court may grant

judgment where "the moving party demonstrates that no material fact is in dispute and that it is

entitled to judgment as a matter of law."  Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483,

1485 (D.C. Cir. 1992) (internal quotation marks omitted).  And "[t]he construction of terms in an

insurance contract like the one before this Court [is a] matter[] of law to be determined by the

Court."  John Akridge Co. v. Travelers Cos., 876 F. Supp. 1, 1–2 (D.D.C. 1995).  The parties

appear to agree that D.C. law applies to this dispute.  See Pl.'s Mot. at 7 n.5 (noting that the

District of Maryland had transferred GuideOne's related action to this Court because the church

property is located in D.C.).

## ANALYSIS

In determining the requirements of coverage, courts "must first look to the language of

the contract."  Cameron v. USAA Prop. & Cas. Ins. Co., 733 A.2d 965, 968 (D.C. 1999).  And

3

"unless it is obvious that the terms used in an insurance contract are intended to be used in a technical connotation, [the Court] must construe them consistently with the meaning which common speech comports." Id. (internal quotation marks, citation, and alteration omitted). "The terms of a written contract will be deemed unambiguous when a court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." Smalls v. State Farm Mut. Auto Ins. Co., 678 A.2d 32, 35 (D.C. 1996) (internal quotation marks and citation omitted).   If the language is unambiguous, it "speaks for itself and binds the parties without the necessity of extrinsic evidence." Cameron, 733 A.2d at 968 (internal quotation marks and citation omitted).

Ihe insured." Holt v. George Washington Life Ins. Co., 123 A.2d 619, 622 (D.C. 1956) (internal quotation marks omitted). A court will not, of course, "torture words to import ambiguity where the ordinary meaning leaves no room for" it. Redmond v. State Farm Ins. Co., 728 A.2d 1202, 1206 (D.C. 1999) (internal quotation marks and citations omitted). But "if there are a number of reasonable readings of a policy provision, the insured is entitled to the one favoring coverage." Continental Cas. Co. v. Beelar, 405 F.2d 377, 378 (D.C. Cir. 1968); see also M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C. 1971) ("With respect to decisions of the United States Court of Appeals rendered prior to February 1, 1971, we recognize that they ... constitute the case law of the District of Columbia.").

"Failing such unambiguous language," however, "doubt should be resolved in favor of

With those principles in mind, the Court must decide whether the language of the contract unambiguously provides for or against matching, or if the question remains ambiguous. The parties note a dearth of controlling authority, and so cite to numerous cases from other jurisdictions. Indeed, the only D.C. case deemed relevant is a landlord-tenant dispute, rather

4

than an insurance case. See Withers v. Wilson, 989 A.2d 1117 (D.C. 2010). And overall, other jurisdictions are split. Compare, e.g., Cedar Bluff Townhome Condo. Ass'n, Inc. v. Am. Family Mut. Ins. Co., 2013 WL 6223454, at *4 (Minn. Ct. App. Dec. 2, 2013) (finding ambiguity where "a reasonable person could understand that 'comparable material' means material that is the same color as the damaged property"), with, e.g., Woods Apartments, LLC v. U.S. Fire Ins. Co., 2013 WL 3929706, at *2 (W.D. Ky. July 29, 2013) ("Plaintiffs' interpretation, that they are entitled to replacement of the roof and siding of all the apartment buildings to achieve cosmetic matching, would be unduly burdensome on Defendants and would essentially result in a windfall to Plaintiffs."). Most of the cases the parties submit, however, are unilluminating. Some, for instance, rely on state statutes providing for matching, see, e.g., Dolecki v. Nationwide Mut. Ins. Co., 2005 WL 578648, at *4 (Ohio Ct. App. March 7, 2005), others relate to materially different policy language, see, e.g., Greene v. United Servs. Auto. Ass'n, 936 A.2d 1178, 1186 (Pa. Super. Ct. 2007) (policy refers to "part" of the damaged building), and some do not even discuss the policy language at all, see, e.g., Bennett v. State Farm Ins. Co., 869 So.2d 321, 326 (La. Ct. App. 2004).

As a result, none of these cases are particularly valuable to the dilemma here. Rather, the crux of the issue seems to be whether this policy's coverage of damaged property refers to the smallest unit possible (an individual panel, a single shingle, a specific patch of flooring) or to one larger (the entire façade, the whole roof, a continuous stretch of flooring). The policy defines "covered property" broadly, as a "building," inclusive of fixtures, floor coverings, and appliances. Ins. Policy at 45. But the loss payment provision could be read differently—perhaps more narrowly—referring only to "lost or damaged property," or to "property" generically, without further description. Id. at 65.

5

That loss payment provision offers four different modes of coverage, between which GuideOne is free to choose. Of the four, two refer to "lost or damaged property," and two to "property" alone. Id. GuideOne accepts that, under that loss payment provision, the "property" can be "[r]epair[ed], rebuil[t] or replace[d] . . . with other property of like kind and quality," id., and admits that such "property" is a "broader" designation. See Def.'s Mem. Opp'n [ECF No. 21] at 7. The provision certainly could be read either way, to repair a shingle or replace a roof—one of like kind and, therefore, matching. Moreover, the same provision offers an option to "[t]ake all or any part of the property at an agreed or appraised value." Ins. Policy at 65. In that context, it would be absurd to suggest that the "property" of which the insurance company could take a "part" is an apparently indivisible limestone panel.

GuideOne, however, believes that there is a meaningful difference between those provisions and the two that refer to "lost or damaged property." If one reads "property" broadly, GuideOne argues, one must read "lost or damaged property" to mean something less comprehensive. Perhaps, but this is a subtle point. And it is unclear that the qualification must designate a smaller scope. An insured reading the policy, moreover, might well surmise that there would be no meaningful difference between the insurer's choice to undertake repairs itself ("property"), rather than reimbursing the insured for repairs ("lost or damaged property"): it is hard to see how or why the repairs themselves would differ so dramatically depending on who pays. If the four options really did vary dramatically in scope, then the two referencing "property" would be meaningless, for no insurer would choose to pay more than necessary. Such surplusage presents a reading far more difficult to reconcile than one that cannot fully account for the words "lost or damaged." Therein lies ambiguity at least.

6

Moreover, a term equivalent to "like kind and quality" is referenced in <u>each</u> of the loss payment provision options (incorporating the valuation condition), those that qualify "property" and those that do not—and that phrase could, itself, be read to require matching. "[A] reasonable person could understand," for instance, "that 'comparable material'"—a description used in this policy's valuation condition, Ins. Policy at 67—"means material that is the same color as the damaged property." <u>Cedar Bluff Townhome Condo. Ass'n, Inc.</u>, 2013 WL 6223454, at *4. Similarly, "other property of like kind and quality" could be read to mandate property that looks the same. Imagine that an insurance company pays for repairs to one wall of an insured's dining room. The room's paint color—a light blue—is no longer manufactured. If the insurance company were to insist on a bright red or even dark blue paint—of the same quality and manufacture—just for that single wall, no one would feel that the insured had been made whole; only repainting the whole room would do that. Unless, that is, the policy had put forth an exclusion to that effect—which GuideOne certainly knows how to do, <u>see</u> Pl.'s Mem. at 16 (pointing out that the policy language quoted above expressly excludes costs incurred as a result of local ordinances), but declined to do here.

Hence, the policy is ambiguous. As a result, the Court must find in favor of the insured. See <u>Holt</u>, 123 A.2d at 622. Matching is therefore required.

## CONCLUSION

For the reasons set forth above, the church's motion for partial judgment on the pleadings is granted. A separate Order will issue on this date.

Dated: <u>February 11, 2015</u>

/s/
JOHN D. BATES
United States District Judge

7

# STATE OF MINNESOTA

# IN SUPREME COURT

## A13-0124

Court of Appeals

Page, J.
Took no part, Stras, J.

Cedar Bluff Townhome Condominium
Association, Inc.,

Respondent,

vs.

Filed: December 17, 2014
Office of Appellate Courts

American Family Mutual Insurance Company,

Appellant.

---

E. Curtis Roeder, Anthony T. Smith, Alexander M. Jadin, Roeder Smith Jadin, PLLC, Bloomington, Minnesota, for respondent.

Mark R. Bradford, Jeanne H. Unger, Bassford Remele, P.A., Minneapolis, Minnesota, for appellant.

William M. Hart, Katherine A. McBride, Meagher & Geer, P.L.L.P., Minneapolis, Minnesota, for amicus curiae Insurance Federation of Minnesota.

Jenneane L. Jansen, Kris E. Palmer, Erica G. Strohl, Jansen & Palmer, LLC, Minneapolis, Minnesota, for amicus curiae Minnesota Association for Justice.

Adina R. Bergstrom, Brenda M. Sauro, Sauro & Bergstorm, PLLC, Woodbury, Minnesota, for amicus curiae Minnesota Association of Public Insurance Adjusters, LLC.

Beth A. Jenson Prouty, Stephen M. Warner, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, Minnesota, for amicus curiae Property Casualty Insurers Association of America.

Christopher H. Yetka, Barnes & Thornburg, LLP, Minneapolis, Minnesota, for amicus curiae United Policyholders.

---

### SYLLABUS

The appraisal panel did not err in determining that the replacement of respondent's damaged siding panels with siding of comparable material and quality required replacement of all of the siding on respondent's buildings to achieve a reasonable color match.

Affirmed.

### OPINION

PAGE, Justice.

Appellant American Family Mutual Insurance Company (American Family) insured property managed by respondent Cedar Bluff Townhome Condominium Association (Cedar Bluff). The insurance policy covered 20 multi-unit residential buildings. Cedar Bluff filed a claim with American Family for hail damage to the siding on each of the 20 buildings. A dispute arose as to whether the policy language providing for the replacement of "damaged property with other property . . . [o]f comparable material and quality" requires the replacement of all siding, even undamaged siding, in order to provide a color match. Because the appraisal panel properly concluded that siding of comparable material and quality required a reasonable color match between the damaged and undamaged siding, we affirm the court of appeals' decision.

During a hail storm in October 2011, all 20 of Cedar Bluff's townhome buildings sustained some damage. The roofs on all of the buildings needed to be replaced, and at least one siding panel on each building sustained damage. Each siding panel is 15 square

2

feet in size. Eleven of the 20 buildings had three or fewer damaged panels. The building with the most hail damage had 10 damaged panels, and one building had only one damaged panel. At the time of the hail storm, the siding was approximately 11 years old, and the color of the panels had faded. Replacement panels were available from the same manufacturer with the same specifications, but the panels were not available in the same color.

Cedar Bluff submitted a claim under its businessowners' policy to American Family for the hail damage to the property. Under the policy, American Family was obligated to pay for "*direct physical loss of or damage to Covered Property* at the premises ... caused by or resulting from any Covered Cause of Loss." (Emphasis added.) "Covered Property" is broadly defined in the policy as the "[b]uildings, meaning the buildings and structures at the premises described in the Declarations." The policy also included a "Loss Payment" clause specifying how American Family would fulfill its obligation with respect to a covered loss or damage. Under the Loss Payment clause, American Family agreed, at its option, to:

> (1) Pay the value of lost or damaged property;
> (2) Pay the cost of repairing or replacing the lost or damaged property;
> (3) Take all or any part of the [damaged] property at an agreed or appraised value; or
> (4) Repair, rebuild or replace the property with other property of like kind and quality . . . .

3

American Family elected the second payment option under the Loss Payment clause.[1] Moreover, the policy provides that American Family was to "determine the value of Covered Property . . . [a]t replacement cost." Replacement cost is to be determined based on the cost to replace "the lost or damaged property with other property . . . [o]f *comparable material and quality*." (Emphasis added.)

American Family did not dispute that the hail storm damaged at least one panel of siding on all 20 buildings; however, a dispute arose regarding the value of the loss for purposes of calculating the replacement cost. According to Cedar Bluff, all of the siding on each building had to be replaced because there would be a color mismatch with the existing panels if only the damaged siding panels were replaced. In other words, "comparable material and quality" required a color match between the damaged and undamaged siding panels. American Family disagreed, claiming that the policy only required replacement of the individual panels actually damaged by the hail storm. American Family also noted that an exact color match was not possible even if the replacement panels were available in the original color because the color of the original siding on the buildings had faded over time. American Family offered to pay for

---

[1]   American Family chose the second payment option under the Loss Payment clause, namely to pay the replacement cost of the damaged property, based on the cost of "other property . . . [o]f comparable material and quality." American Family, however, uses the phrase "other property . . . [o]f comparable material and quality" interchangeably with the phrase "other property of like kind and quality." The latter phrase comes from the fourth option under the Loss Payment clause, which, although also presenting a replacement option, American Family did not elect to use. We therefore focus on the meaning of the phrase "other property . . . [o]f comparable material and quality" because that is the option that American Family chose to use for this coverage dispute.

4

replacement panels that were either slightly darker or slightly lighter in color than the original panels.

Because Cedar Bluff and American Family were unable to agree on the amount of the loss, Cedar Bluff demanded an appraisal, as provided for in the policy. After holding a hearing, at which it received evidence and heard arguments, and after visiting the site of the 20 buildings, the appraisal panel found that the original siding on the buildings could be " 'matched' in terms of the same siding being commercially available from the same manufacturer and with the same model name, . . . texture, size and installation methods," but "could not be matched in terms of color." Based on the color difference, the panel concluded that "there was not a reasonable match available for the existing siding materials." The panel then issued an award for "a total replacement of the siding" in the amount of $361,108 for the replacement cost of property of comparable material and quality. In making its award, the appraisal panel acknowledged that American Family's focus on the replacement cost value of the damaged siding panels "would be correct if the subject policy did not require such a color match," but that a color mismatch was "not a repair or replacement with comparable materials of like kind and quality." American Family refused to pay the appraisal award because it believed the award was based on the appraisal panel's unauthorized coverage determinations. Cedar Bluff subsequently filed an action in district court seeking to confirm the appraisal award. American Family counterclaimed, seeking a declaratory judgment that the appraisal panel exceeded its authority.

5

The district court granted summary judgment to American Family.  The court concluded that under "the plain language of the policy," American Family "is not required to pay for the cost of replacing property that has not experienced direct physical loss or damage" and therefore "is not obligated to pay for the cost of replacing the undamaged siding."  In addition, the court held that American Family was "not mandated to pay for siding that provides an exact 'color match' to the original siding" because "the term 'color match' is not contained anywhere within the policy."

The court of appeals reversed.  *Cedar Bluff Townhome Condo. Ass'n v. Am. Family Mut. Ins. Co.*, No. A13-0124, 2013 WL 6223454 (Minn. App. Dec. 2, 2013).  The court of appeals explained that the appraisal panel "necessarily interpreted the phrases 'replace . . . with other property of like kind and quality' and 'replace . . . with other property . . . [o]f comparable material and quality,' " and that under *Quade v. Secura Ins.*, 814 N.W.2d 703, 706-07 (Minn. 2012), "the appraisal panel had authority to consider the meanings of those phrases when determining the amount of loss." *Cedar Bluff*, 2013 WL 6223454, at *3.  The court of appeals concluded that "the district court erred by refusing to accept the factual determinations of the appraisal award." *Id.* at *3.  However, the court of appeals also held that the question of coverage under the policy was properly before the court because under *Quade* " 'an appraiser's liability determinations are not final and conclusive' and 'the decision of the appraisers will be subject to review.' " *Cedar Bluff*, 2013 WL 6223454, at *3 (quoting *Quade*, 814 N.W.2d at 707-08).  The court of appeals added that the value of the covered property was to be "determined based on the cost to replace the 'damaged property with other property . . . [o]f

6

comparable material and quality,' " and determined that "a reasonable person could understand that 'comparable material' means material that is the same color as the damaged property." *Id.* at *4. We granted American Family's petition for further review.

I.

Although this is an appeal from a grant of summary judgment, we granted review to determine if the appraisal panel properly concluded that American Family's obligation to replace damaged property with property of comparable material and quality required it to replace damaged and undamaged property to achieve a color match. This requires us to interpret the provisions of the insurance policy. We interpret insurance contracts de novo, *see Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012) ("The interpretation of insurance contracts is a question of law."), applying general principles of contract law, *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013). Furthermore, we have held that an appraisal panel "may not construe the [insurance] policy or decide whether the insurer should pay." *Quade*, 814 N.W.2d at 706; *see also* 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 213:44 (3d ed. 1999) ("An appraiser can make no legal determinations."). However, we have also held that " 'questions of law or fact, which are involved as mere incidents to a determination of the amount of loss or damage,' are appropriate to resolve in an appraisal in order to ascertain the 'amount of loss.' " *Quade*, 814 N.W.2d at 707 (quoting *Itasca Paper Co. v. Niagara Fire Ins. Co.*, 175 Minn. 73, 79, 220 N.W. 425, 427 (1928)).

7

Here, the appraisal panel awarded $361,108 for the replacement cost value of the damaged siding. The policy language required replacement cost to be determined based on the cost to replace "the lost or damaged property with other property ... [o]f *comparable material and quality*." (Emphasis added.) American Family argues that "comparable" means similar, not "identical," and therefore it was not obligated to replace all of the siding panels, including the ones that were undamaged, simply because it was unable to replace the damaged siding panels with panels that were an identical color match to the originally installed panels. Cedar Bluff argues that "comparable" in this context requires a color match; and because American Family could not replace the damaged siding panels to provide a color match, it was obligated to replace all of the damaged siding panels. Thus, in order to ascertain whether the appraisal panel properly awarded a replacement cost value based on the cost of replacing all the siding, we must first determine the meaning of "comparable material and quality."

When interpreting insurance contracts, the policy must be construed as a whole, beginning with the plain and ordinary meaning of the policy's terms, as well as "what a reasonable person in the position of the insured would have understood the words to mean." *Midwest Family*, 831 N.W.2d at 636 (citation omitted) (internal quotation marks omitted). The word "comparable" means "[s]imilar or equivalent." *The American Heritage Dictionary of the English Language* 375 (5th ed. 2011); *see also Webster's Third New International Dictionary* 461 (1976) (defining "comparable" as "[s]uitable for matching, coordinating, or contrasting:   Equivalent, similar"). American Family concedes that the policy requires some degree of color match, noting that it cannot "meet

8

its obligation by paying for red siding on an otherwise yellow building" because "[n]o reasonable person would conclude that red siding is comparable to yellow siding." We agree. On the other hand, the plain meaning of the phrase "comparable material and quality" is material that is *suitable* for matching. Thus, we conclude that on the spectrum of resemblance, "comparable material and quality" requires something less than an identical color match, but a reasonable color match nonetheless. This determination is consistent with case law in other jurisdictions. *See, e.g., Republic Underwriters Ins. Co. v. Mex-Tex, Inc.,* 150 S.W.3d 423, 425 (Tex. 2004) (interpreting "comparable material and quality" to "allow [ ] more leeway" than the term "identical"). *Cf. Farmers Auto. Ins. Ass'n. v. Union Pac. Ry. Co.,* 756 N.W.2d 461, 471 (Wis. Ct. App. 2008) (explaining that " 'like kind and quality' " does not require "brick-by-brick, fixture-by-fixture, or window-by-window congruence").

Therefore, in accordance with the plain meaning of the policy language, we construe the phrase "comparable material and quality" to mean a reasonable color match between new and existing siding when replacing damaged siding.

## II.

Having defined "comparable material and quality," we turn next to the question of whether the appraisal panel interpreted "comparable material and quality" to require an exact color match or merely a reasonable color match. Upon weighing the evidence, the panel found that "there was not a reasonable match available for the existing siding materials but there is a reasonable match for the existing fascia material." The panel also

9

noted that American Family's $6,800 estimate for the replacement cost value "would be correct if the subject policy did not require such a color match."

American Family contends that the appraisal panel interpreted the word "comparable" to require an "exact color match," or in essence an identical color match. To support its claim, American Family points to one of the appraisers' statements at the August 8, 2011, appraisal hearing:

> And so for me and the panel, what we have to decide is under this policy is the association required to accept a slightly lighter or slightly darker material. And we could actually issue an opinion that says the loss adjustment is correct except to the extent of a matching issue and then issue our decision on the matching. And then you guys can go to the district court and whether [sic] figure out if this witness's definition of like, kind and quality is the correct one.

According to American Family, because slightly lighter or slightly darker was not good enough in this instance, the panel, therefore, had to conclude that "comparable" meant identical.

We disagree. First, this contention is not supported by the record because neither the words "identical color match" nor "exact color match" appear in the appraisal award. In contrast, the panel used the words "reasonable match" in the appraisal award. This wording suggests that the appraisal panel did not interpret "comparable" to mean identical or "exact." Second, we believe that it was logical for the panel to conclude that it "could actually issue an opinion that says the loss adjustment is correct except to the extent of a matching issue" because the original siding on the buildings could be matched in almost every specification, except color. Model, texture, size, and installation method posed no issue in this case—the only issue was color mismatch. Third, we understand

10

the panel's reference to American Family's estimate being correct "if the subject policy did not require such a color match" to denote the panel's description of a type or degree of the color match. In particular, we note that the word "such" precedes the words "a color match." And, considering the panel's use of the words "reasonable match" throughout the appraisal award, we interpret the above sentence to mean that American Family's estimate would have been correct if the policy did not require a *reasonable* color match. Accordingly, we conclude that the appraisal panel applied the correct legal standard.

### III.

Having concluded that the appraisal panel applied the correct legal standard, we now turn to the question of what property must be replaced. American Family argues that the policy does not require it to replace the individual siding panels that did not sustain direct physical loss or damage from the hail storm. In support of this argument, American Family notes that under the policy it agreed to pay for "direct physical loss of or damage to Covered Property at the premises ... caused by or resulting from any Covered Cause of Loss." The appraisal panel concluded, and American Family concedes, that the replacement siding panels could not be matched in terms of color. Accordingly, the question to be answered is whether the color mismatch constitutes "direct physical loss of or damage to Covered Property."

The term "direct physical loss of or damage" is not defined in the policy. According to American Family, the term "physical damage" means "a distinct, demonstrable, and physical alteration," and "physical loss" means "those situations where

11

an external force has rendered the property unsafe or unusable, even though the property remains physically unchanged."[2]   Because of the color mismatch resulting from the inability to replace the hail-damaged siding panels with siding of "comparable material and quality," the covered property—Cedar Bluff's "buildings"—has sustained a "distinct, demonstrable, and physical alteration."   Thus, we conclude that the covered property sustained a covered loss.   As a result of the dispute between Cedar Bluff and American Family, the appraisal panel was selected to determine the amount of loss.   Here, the appraisal panel held a hearing at which it considered all of the evidence, heard from witnesses, and examined the damaged property in person.   Because there is a strong public policy in Minnesota favoring appraisals, *see Quade*, 814 N.W.2d at 707, we give deference to the appraisal panel's factual determination as to the amount of loss.   As noted previously, the appraisal panel determined the amount of loss to be \$361,108. Given our deferential standard of review, we conclude that the district court erred when it refused to confirm the appraisal panel's award.[3]

---

[2]   Because we conclude that American Family's arguments fail under its definition of the term "physical damage," we need not independently define that term.

[3]   As a final matter, we note that by order of April 29, 2014, we deferred consideration of a motion by Cedar Bluff to strike portions of American Family's brief. More specifically, Cedar Bluff moved to strike certain materials from American Family's appendix, including the transcript from the appraisal and a Minnesota Department of Commerce informational article. Cedar Bluff acknowledges, however, that certain pages from the transcript are a part of the trial record. To that extent, we deny Cedar Bluff's motion. As to those transcript pages and the Informational Bulletin that are not a part of the trial record, they are not properly before us on this appeal, Minn. R. Civ. App. P. 110.01, and therefore, we grant Cedar Bluff's motion to strike in part.

12

IV.

Of course, all storm-related property damage claims present their own facts. In this particular case, the spot damage to multiple siding panels on multiple buildings, along with the appraisal panel's assessment of the particular color mismatch, applied to the policy language at issue, lead to our conclusion that there is coverage. In summary, we hold that, under the terms of its insurance policy with American Family, Cedar Bluff is entitled to have all of the siding panels on each of its 20 buildings replaced. Consequently, we affirm the appraisal panel's award.

Affirmed.


STRAS, J., took no part in the consideration or decision of this case.

13

**THE HONORABLE THOMAS S. ZILLY**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>Defendant. | NO. 11-2-02316-7<br><br>**DECLARATION OF MICHAEL T. WATKINS** |

I, Michael T. Watkins, declare as follows:

1.      I am over 18 years of age and otherwise competent to make this Declaration, which is based on my personal knowledge.

2.      I am an attorney licensed in the state of Washington and I represent the Plaintiffs Keith and Karen Kroneman (the "Kronemans") in the above-captioned matter.

3.      The Kronemans had in full force and effect a homeowner's insurance policy issued by Defendant Country Mutual, for their home located at 9507 149th St. E., Puyallup, Washington.

DECLARATION OF MICHAEL T. WATKINS — 1

Attached to this Declaration as Exhibit No. 1 is a true and correct copy of the aforementioned policy of insurance that is the subject of this litigation.

4.    Attached to this Declaration as Exhibit No. 2 is a true and correct copy of the relevant policy language excerpted from the aforementioned policy.

5.    On September 29, 2012 the Kronemans suffered a covered property loss caused by an accidental fire that damaged their home and their family's personal property.

6.    After the fire loss, the Kronemans properly submitted a claim for insurance benefits to their insurer, Defendant Country Mutual, pursuant to their Homeowner's policy of insurance. They requested insurance benefits to repair and/or rebuild their home to its original pre-loss condition and repair, clean and/or replace their and their family's damaged personal property.

7.    Attached to this Declaration as Exhibit No. 3 are true and correct copy of excerpts from the deposition transcript of Greg Herburger.

8.    Attached to this Declaration as Exhibit No. 4 are true and correct copy of excerpts from the deposition transcript of Greg Stariha.

9.    Attached to this Declaration as Exhibit No. 5 are true and correct copy of excerpts from the deposition transcript of William Hight.

10.    During the first part of 2013 the Plaintiffs negotiated in good faith in an attempt to settle the dispute with their insurance company. Country Mutual continued to take the position that all amounts under the policy were paid and the negotiations failed.

11.    On September 27, 2013, faced with an impasse and the upcoming one-year contractual limitation period, the Plaintiffs filed the instant lawsuit.

DECLARATION OF MICHAEL T. WATKINS — 2

12.     Attached to this Declaration as Exhibit No. 6 is a true and correct copy of the July 21, 2014 letter sent to Country Mutual's counsel demanding appraisal pursuant to the terms of the policy.

13.     Country Mutual did not respond to the Kronemans' demand for Appraisal.

14.     Attached to this Declaration as Exhibit No. 7 is a true and correct copy of Defendant's February 10, 2015 reply to Plaintiffs' complaint filed with the Office of Insurance Commissioner.

15.     Attached to this Declaration as Exhibit No. 8 is a true and correct copy of the Plaintiffs' February 13, 2015 letter to Defendant Country Mutual.

16.     Attached to this Declaration as Exhibit No. 9 is a true and correct copy of Defendant's March 16, 2015 response to Plaintiffs' demand for appraisal.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed at Mountlake Terrace, Washington, this 28th day of May, 2015.


_____
Michael T. Watkins


DECLARATION OF MICHAEL T. WATKINS — 3

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

# Exhibit No. 1

**COUNTRY**

**FINANCIAL**

Field Claims Center
P O Box 14151
Salem, OR 97309-5069
Fax: (866) 255-7961

October 15, 2013

MTW
Michael T Watkins
2825 Eastlake Ave E #115
Seattle, WA 98102



Re:   Claim #:      185-0027057
      Policy #:     AK4374742
      Insured:      Kroneman Karen A & Keith W
      Date of Loss: 9/29/2012

Dear MTW:

Please find the enclosed certified copy of the policy. This certified copy was also issued October 24, 2012 to Mr. and Mrs. Kroneman and Kyle Grinnell at the request of Mr. Grinnell from Allwest Adjusters.

Please be informed that per your policy conditions you have one year from the date of loss to pursue your claim. As that one year time limitation has past, COUNTRY Financial has closed its claim. Please see below some important time limitations and notice provisions contained within your policy.

## Conditions– SECTIONS 2 through 6 (Includes Limitations)

**B. Duties After Loss**
In case of a loss, "we" have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to "us". These duties must be performed either by "you", an "insured" seeking coverage, or a representative of either:

1.  Give prompt notice to "us" or "our" agent;

8.  As often as "we" reasonably require:
    a.  Show the damaged property;

**10.** Notwithstanding any other provisions in **SECTIONS 2** through 6, all claims under this policy must be brought within one year of the date of "occurrence".

**G. Suit Against Us**
No action can be brought against "us" unless there has been full compliance with all of the terms under **SECTIONS 2** through 6 of this policy and the action is started within one year after the date of "occurrence".

This enumeration of defenses and exclusions under the policy is not meant to be, nor should it be construed as, a waiver of any other terms, provisions, conditions, definitions or exclusions which may now or hereafter apply to the insurance afforded under this policy.

Please contact me if you have any further question.

Sincerely,

COUNTRY Mutual Insurance Company®, Bloomington, IL


Robin Reed
Claims Representative
(253) 661-9956
Fax: (866) 255-7961
robin.reed@countryfinancial.com

It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

October 22, 2012

STATE OF OREGON )
                  ) SS
COUNTY OF MARION )

I, Melissa Roner, hereby certify that the attached is a true and correct copy of the policy number AK4374742 issued to Kroneman, Karen A & Keith W and was in effect on September 29th, 2012 as it appears in the Home Office file of COUNTRY Mutual Insurance Company®.

_____
Melissa Roner

Subscribe and sworn to before me this 22nd day of _October, 2012_

_____
Notary Public

OFFICIAL SEAL
PATTI JO IVERSON
NOTARY PUBLIC - OREGON
COMMISSION NO. 447300
MY COMMISSION EXPIRES MARCH 05, 2014

My Commission Expires  3-8-2014

**HOME INSURANCE**
**POLICY DECLARATIONS**

**COUNTRY Mutual Insurance Company®**
P.O. Box 14151, Salem, Oregon 97309-5069

| POLICY NUMBER | POLICY TERM | PAYMENT PLAN | INS. OFFICE / AGENT |
|---|---|---|---|
| A46K4374742 | 12 MONTHS | ANNUAL | 46006 BELVU/ 05733 |

To report a claim any time day or night, call **1-866-COUNTRY(1-866-266-8679).**

ACCOUNT NUMBER 9372384-001-00002

INSURED

**KRONEMAN KAREN A & KEITH W**
**9507 149TH ST E**
**PUYALLUP WA 98375**

Policy period beginning Apr 28, 2012
12:01 a.m. standard time at your address.

Declarations reason    **POLICY RENEWAL**

You have only the coverages and amounts of insurance as stated in this declarations, subject to all provisions of your policy.

**TOTAL PREMIUM AND REGULATORY CHARGES      $619.00**

DO NOT PAY THIS AMOUNT, ANY BALANCE DUE WILL BE LISTED ON A SEPARATE INVOICE.
PLEASE CONTACT YOUR FINANCIAL REPRESENTATIVE FOR ANY CHANGES.

| LOCATION OF PROPERTY COVERED |
|---|

| LCTN | STREET ADDRESS/LOT & BLOCK/PHYSICAL DESCRIPTION/QTR, SECTION, TOWNSHIP, RANGE, COUNTY AND STATE |
|---|---|
| 001 | 9507 149TH ST E PUYALLUP WA |

| $1,000 DEDUCTIBLE EACH OCCURRENCE APPLICABLE TO SECTIONS 2, 3, 5 AND 6 CC, DD, EE, HH |
|---|

| DESCRIPTION OF PROPERTY COVERED |
|---|

| ITEM | LCTN | DESCRIPTION OF COVERAGE | SEC/COV | | PERIL (Refer to policy booklet) | LOSS STLMT | LIMIT OF LIABILITY | PREMIUM |
|---|---|---|---|---|---|---|---|---|
| 001-01 | | LIABILITY | 1 | A | | | 500,000 | 69.00 |
| | | MEDICAL PAYMENTS | 1 | B | | | | |
| | | EACH PERSON | | | | | 5,000 | INCL |
| | | EACH OCCURRENCE | | | | | 25,000 | INCL |
| 095-10 | 001 | DWELLING (R) HOMEOWNERS | 2 | C | 1 | 1 | 263,200 | 549.32 |
| | | ADDITIONAL REPLACEMENT COST ** | 6 | EE | | | | INCL |
| 20 | 001 | PERSONAL PROPERTY | 2 | D | 2-19 | 3 | 197,400 | INCL |
| | | PERSONAL PROPERTY REPLACEMENT COST | 6 | DD | | | | INCL |
| 30 | 001 | ADDITIONAL LIVING EXPENSE | 2 | E | 1 | | 52,640 | INCL |
| 40 | 001 | AUXILIARY PRIVATE STRUCTURES | 2 | F | 1 | 1 | 26,320 | INCL |
| | | INFLATION | 6 | CC | | | | INCL |
| | | DISCOUNTS | | | | | | |
| | | ALARM CREDIT - 5% | | | | | | INCL |

FOR SERVICE CALL YOUR FINANCIAL REPRESENTATIVE JESSE REEVES AT (360)802-4392.
INSURED'S COPY

21303WA (00-06/08)

**HOME INSURANCE POLICY DECLARATIONS**

**COUNTRY Mutual Insurance Company®**
P.O. Box 14151, Salem, Oregon 97309-5069

| POLICY NUMBER | POLICY TERM | PAYMENT PLAN | INS. OFFICE / AGENT |
|---|---|---|---|
| A46K4374742 | 12 MONTHS | ANNUAL | 46006 BELVU/ 05733 |

| DESCRIPTION OF PROPERTY COVERED | | | | | | | |
|---|---|---|---|---|---|---|---|
| ITEM | LCTN | DESCRIPTION OF COVERAGE | SEC/COV | PERIL (Refer to policy booklet) | LOSS STLMT | LIMIT OF LIABILITY | PREMIUM |
| 999-80 | | SAFE HEAT | 5 | K | | | INCL |
| | | PACKAGE OF SPECIAL COVERAGES | | | | | INCL |
| | | REGULATORY SURCHARGE | | | | | 0.68 |
| | | POLICY DISCOUNTS | | | | | |
| | | MULTI-POLICY DISCOUNT | | | | | INCL |
| | | POLICY ENDORSEMENTS | | | | | |
| | | LENDERS LOSS PAYABLE | | | | | |
| | | WASHINGTON AMENDATORY | | | | | |

**ADDITIONAL REPLACEMENT COST - SUBJECT TO THE POLICY TERMS AND PROVISIONS, THIS COVERAGE WILL INCREASE THE COVERAGE C LIMIT OF LIABILITY SHOWN IN THE DECLARATIONS TO EQUAL THE CURRENT "REPLACEMENT COST" OF THE BUILDING.

The 2012 annual meeting for COUNTRY Mutual Insurance Company is April 18 at 1:00 pm, 1701 Towanda Ave., Bloomington, Illinois.

| ADDITIONAL INTEREST CONDITIONS | |
|---|---|
| NAME AND ADDRESS | NAME AND ADDRESS |

MORTGAGEE BILLED     BANK OF AMERICA NA
                         ITS SUCC AND/OR ASSIGNS ATIMA
                         PO BOX 961291
                         FT WORTH  TX  76161-0291
LOAN NUMBER               196352850
LIMITED TO

*Beth Taylor*

AUTHORIZED REPRESENTATIVE

3/23/2012

DATE COUNTERSIGN

# Home Insurance Policy



**COUNTRY** FINANCIAL

COUNTRY Mutual Insurance Company

441-783-05

21208 (03-12/07)

❖

**We're happy to serve you . . .**

COUNTRY® Financial is a group of companies offering you convenient insurance and comprehensive financial solutions to fit your needs. The Declarations of your Home Insurance Policy shows all your coverges, endorsements, limits and the company issuing your policy. We believe this policy provides the best solution to your home insurance needs available in the market today.

Please note the Definitions section for words you'll find in quotation marks and headings throughout your policy.

This policy explains the coverages, conditions, terms, exclusions, restrictions and limitations that apply. We urge you to read this policy carefully. Your COUNTRY Financial representative will welcome your call if you have any questions.

❖

# WHERE TO LOOK

Be sure you check your declarations page to see which of the following apply to you.

Page

**DEFINITIONS** . . . . . . . . . . . . . . . . . . .  2

**AGREEMENT** . . . . . . . . . . . . . . . . . .  4

**SECTION 1**

    Liability. . . . . . . . . . . . . . . . . . . . . .  5
    Medical Payments . . . . . . . . . . . . .  5
    Exclusions . . . . . . . . . . . . . . . . . .  5
    Additional Coverages. . . . . . . . . . .  9
    Conditions . . . . . . . . . . . . . . . . . . 10

**SECTIONS 2 THROUGH 6**

    Dwelling . . . . . . . . . . . . . . . . . . . . 11
    Personal Property . . . . . . . . . . . . . 12
    Additional Living Expense . . . . . . . 14
    Auxiliary Private Structures . . . . . . 14
    Optional Policy Coverages . . . . . . 21
    Perils . . . . . . . . . . . . . . . . . . . . . . 24
    Exclusions . . . . . . . . . . . . . . . . . . 26
    Conditions . . . . . . . . . . . . . . . . . . 29
    Additional Interests . . . . . . . . . . . 32

**GENERAL POLICY CONDITIONS** . . . 33

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

1

# HOME INSURANCE POLICY

## Definitions (Includes Limitations)

A. In this policy, "you" and "your" refer to the person shown in the Declarations as INSURED and that person's spouse if a resident of the same household. "We", "us" and "our" refer to the company providing this insurance.

B. In addition, these words and phrases in quotation marks are defined as follows:

1. "Actual cash value" means:
   a. For buildings or structures the lesser of the following, as determined by "us":
      (1) The cost actually and necessarily incurred to repair or replace the damaged property using standard new construction materials of like kind and quality and standard new construction techniques, less depreciation; or
      (2) Fair market value.
   b. For property other than buildings and structures the lesser of the following, as determined by "us":
      (1) The cost to repair or replace the damaged property using materials of like kind and quality, less depreciation; or
      (2) Fair market value.

   In determining depreciation "we" will consider wear and tear, deterioration, obsolescence, age, physical condition and reduced market value of the property. The rate of depreciation shall be the same for both labor and materials. "Actual cash value" does not include increased costs due to applicable building codes, laws or ordinances.

2. "Aircraft liability", "hovercraft liability", "motor vehicle liability" and "watercraft liability", subject to the provisions in b. below, mean any of the following:
   a. Liability for "bodily injury" or "property damage" arising out of the:
      (1) Ownership of such vehicle or craft by an "insured";
      (2) Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;
      (3) Entrustment of such vehicle or craft by an "insured" to any person;
      (4) Failure to supervise or negligent supervision by an "insured", of any person involving such vehicle or craft; or
      (5) Vicarious liability, whether or not imposed by law, for the actions of any person including a minor involving such vehicle or craft.
   b. For the purpose of this definition:
      (1) "Aircraft" means any contrivance used or designed for flight except model or hobby aircraft not used or designed to carry people or cargo;
      (2) "Hovercraft" means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flare craft and air cushion vehicles;
      (3) "Watercraft" means a craft principally designed to be propelled on or in water; and
      (4) "Motor vehicle" means a "motor vehicle" as defined in 9. below.

3. "Bodily injury" means physical injury to a person. Sickness, disease, or emotional distress that is not caused by physical injury is not "bodily injury".

4. "Business" means:
   a. A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or
   b. Any other activity engaged in for financial compensation, other compensation, or other professional purposes, except the following:
      (1) Activities for which no "insured" receives more than $2,000 in total compensation for the 12 months before the "occurrence";
      (2) Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or
      (3) The rendering of home day care services to a relative of an "insured".

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

5. "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

6. "Fungus" means any type or form of fungus, including but not limited to, mold, mildew, mycotoxins, spores, scents or by-products produced or released by fungi.

7. "Insured" means:
   a. "You" and residents of "your" household who are:
      (1) "Your" relatives; or
      (2) Other persons under the age of 21 and in the care of any person named above;
   b. A student enrolled in school full time, as defined by the school, who was a resident of "your" household before moving out to attend school, provided the student is under the age of:
      (1) 24 and "your" relative; or
      (2) 21 and in "your" care or the care of a person described in a.(1) above; or
   c. Under SECTION 1:
      (1) With respect to animals, watercraft, or "recreational motor vehicles" to which this policy applies, any person or organization legally responsible for these animals, watercraft, or "recreational motor vehicles" that are owned by "you" or any person included in a. or b. above. "Insured" does not mean a person or organization using or having custody of these animals, watercraft, or "recreational motor vehicles" in the course of any "business" or without consent of the owner; or
      (2) With respect to a "motor vehicle" to which this policy applies:
         (a) "Employees" or "residence employees" while engaged in "your" employ or that of any person included in a. or b. above;
         (b) Other persons using the vehicle on an "insured location" with "your" consent; or

   (c) A person while operating machinery with "your" permission in "your" activities covered by this policy.

   Throughout this policy, when the word "an" or "any" immediately precedes the word "insured", the words "an insured" or "any insured" mean one or more "insureds".

8. "Insured location" means:
   a. The "residence premises";
   b. Under SECTION 1 only, the part of other premises, other structures and grounds used as a residence; and
      (1) Which is shown in the Declarations; or
      (2) Which is acquired by "you" during the policy period for use as "your" principal residence;
   c. Any premises used by "you" in connection with a premises described in a. and, under SECTION 1 only, b. above;
   d. Any part of premises not owned by an "insured" where an "insured" is temporarily residing;
   e. Vacant land owned by or rented to an "insured";
   f. Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";
   g. Individual or family cemetery plots or burial vaults of an "insured";
   h. Any part of a premises occasionally rented to an "insured" for other than "business" use; or
   i. Any location shown in the Declarations.

9. "Motor vehicle" means:
   a. A self-propelled land or amphibious vehicle; or
   b. Under SECTION 1 only, any trailer or semi-trailer that is being carried on, towed by or hitched for towing by a vehicle described in a. above.

10. "Occurrence" means:
    a. Under SECTION 1, an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:
       (1) "Bodily injury"; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

(2) "Property damage".

b. Under **SECTIONS 2** through **6**, the happening of an event, or series of events closely related in time and nature that give rise to a loss.

11. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, whether indoor or outdoor, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, sewage, methane gas, manure, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

12. "Property damage" means physical injury to or destruction of tangible property, including the resulting loss of use of this property.

13. "Recreational motor vehicle" means any motorized land vehicle designed for recreational use, principally used off public roads, which is not licensed for road use. A motor vehicle designed or used for racing is not considered a "recreational motor vehicle".

14. "Replacement cost" means:

a. Under Loss Settlements 1 and 2, and **Coverage EE Additional Replacement Cost**, the cost actually and necessarily incurred to repair or replace the damaged property using standard new construction materials of like kind and quality and standard new construction techniques. "We" will not pay the additional cost to repair, replace or reproduce obsolete or antique construction. "Replacement cost" does not include any increased cost due to applicable building codes, laws or ordinances.

b. Under **Personal Property (Scheduled), Coverage I** and **Coverage DD Personal Property Replacement Cost**, the lesser of the following, as determined by "us":

(1) The cost to repair the damaged property using materials of like kind and quality; or

(2) The cost to replace the damaged property with a new article identical to it. When the identical article is no longer available, or cannot be legally manufactured or constructed, "replacement cost" means the cost of a new article similar to the one

damaged which is of comparable quality and usefulness.

15. "Residence employee" means:

a. An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

b. One who performs duties similar to those described in **a.**, above, in a different place not related to the "business" of an "insured".

A "residence employee" does not include a relative under age 18 residing in "your" household.

16. "Residence premises" means:

a. The one or two family dwelling where "you" principally reside; or

b. That part of any other building where "you" principally reside;

and which is at a location listed in the Declarations.

"Residence premises" also includes grounds and appurtenant structures at that location.

Unless otherwise stated in **SECTION 6**, the definitions in **DEFINITIONS** which apply to **SECTION 1** also apply to **Coverages AA, BB** and **GG** in **SECTION 6**.

## AGREEMENT

"We" will provide the coverages "you" have purchased through the company named in the Declarations if "you" have paid the premiums and have complied with the policy provisions. When "we" refer to the policy "we" mean this policy booklet (titled Home Insurance Policy), applications for insurance, Declarations, and any applicable endorsements. This policy booklet describes the coverages "you" have purchased and may include descriptions of other coverages "you" have not purchased. The coverages and limits of liability "you" have purchased are stated in the Declarations that are in effect at the time of any loss, injury or damage, and are subject to the limits of liability, exclusions, conditions and other terms of the policy. A coverage applies only when that coverage is listed in the "Descriptions of Coverage" column on the Declarations.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# SECTION 1
## Liability, Coverage A

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, "we" will:

1. Pay up to "our" limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

2. Provide a defense at "our" expense by counsel of "our" choice, even if the suit is groundless, false or fraudulent. "We" may investigate or settle any claim or suit as "we" decide is appropriate. "Our" duty to settle or defend ends when "our" limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

## Medical Payments, Coverage B (Includes Limitations)

"We" will pay the necessary medical expenses for services performed within two years from the date of an "occurrence" causing "bodily injury" and submitted to "us" within three years from the date of the "occurrence". Medical expenses means reasonable charges for medical, surgical, X-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to "you" or residents of "your" household except "residence employees". This coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2. To a person off the "insured location", if the "bodily injury":
   a. Arises out of a condition on the "insured location" or the ways immediately adjoining;
   b. Is caused by the activities of an "insured";
   c. Is caused by a "residence employee" in the course of the employment; or
   d. Is caused by an animal owned by or in the care of an "insured".

# Exclusions – SECTION 1
## A. Motor Vehicle Liability

1. **Liability, Coverage A and Medical Payments, Coverage B** do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence", the involved "motor vehicle":
   a. Is registered for use on public roads or property;
   b. Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the "occurrence";
   c. Is being:
      (1) Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;
      (2) Rented to others;
      (3) Used to carry persons or cargo for a charge;
      (4) Used for any "business" purpose except for a motorized golf cart while on a golfing facility; or
      (5) Used on a public road or public property, except this exclusion A.1.c.(5) does not apply to liability arising from the use of lawnmowers or walk-behind snowblowers by an "insured" away from the "residence premises" on public roads or public property; or
   d. Is insured on any other policy of insurance.

2. If exclusion A.1. does not apply, there is still no coverage for "motor vehicle liability" unless the "motor vehicle" is:
   a. In dead storage on an "insured location";
   b. Used solely to service an "insured's" residence and lawnmowers or walk-behind snowblowers when used by an "insured" away from the "residence premises" and not otherwise excluded;
   c. Designed to assist the handicapped and, at the time of an "occurrence", it is:
      (1) Being used to assist a handicapped person; or
      (2) Parked on an "insured location";
   d. A "recreational motor vehicle":
      (1) Not owned by an "insured"; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

(2) Owned by an "insured" provided the "occurrence" takes place on an "insured location" as defined in Definitions, items B.8.a., b., d., e. or h.; or

e. A motorized golf cart that is owned by an "insured", designed to carry up to 4 persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an "occurrence", is within the legal boundaries of a golfing facility, and:

(1) Is being used within the rules stated for use of a golf cart; and

(2) Is parked or stored there, or being used by an "insured" to:

(a) Play the game of golf or for other recreational or leisure activity allowed by the facility;

(b) Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

(c) Cross public roads at designated points to access other parts of the golfing facility.

**B. Watercraft Liability**

1. **Liability, Coverage A** and **Medical Payments, Coverage B** do not apply to any "watercraft liability" arising from the ownership, maintenance, operation, use, loading or unloading of any watercraft owned by or rented to an "insured" if the watercraft:

a. Has inboard or inboard-outboard motor power of more than 50 horsepower;

b. Is 26 feet or more in overall length; or

c. Is powered by one or more outboard motors totaling over 25 horsepower.

This exclusion does not apply to "bodily injury" or "property damage" occurring on the "insured location".

2. **Liability, Coverage A** and **Medical Payments, Coverage B** do not apply to "watercraft liability" if at the time of an "occurrence" the involved watercraft is being operated in, or practicing for, any prearranged or organized race, speed contest or other competition. However, this exclusion B.2. does not apply to a sailing   vessel or a predicted log cruise.

**C. Aircraft Liability**
**Liability, Coverage A** and **Medical Payments, Coverage B** do not apply to "aircraft liability".

**D. Hovercraft Liability**
**Liability, Coverage A** and **Medical Payments, Coverage B** do not apply to "hovercraft liability".

**E. Liability, Coverage A** and **Medical Payments, Coverage B** do not apply to the following:

1. **Expected Or Intended Injury**
"Bodily injury" or "property damage" that may reasonably be expected or intended to result from the intentional acts of an "insured" even if the resulting "bodily injury" or "property damage":

a. Is of a different kind, quality or degree than initially expected or intended; or

b. Is sustained by a different person, entity, real property or personal property, than initially expected or intended.

This exclusion applies regardless of whether any "insured" personally participated in or committed the alleged act and regardless of whether any "insured" subjectively intended the "bodily injury" or "property damage" for which a claim is made.

However, this exclusion E.1. does not apply to "bodily injury" resulting from the use of reasonable force by an "insured" to protect persons or property;

2. **Business**

a. "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

This exclusion E.2. applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

b. This exclusion E.2. does not apply to:

(1) The rental of living space in the "residence premises" if such rental did not exceed 90 days in the   12 months prior to the "occurrence";

(2) The rental of a private garage on the "residence premises"; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**(3)** An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no "employees";

**3. Professional Services**

"Bodily injury" or "property damage" arising out of the rendering of or failure to render professional services by an "insured";

**4. Insured's Premises Not An Insured Location**

"Bodily injury" or "property damage" arising out of a premises:

**a.** Owned by an "insured";

**b.** Rented to an "insured"; or

**c.** Rented to others by an "insured";

that is not an "insured location";

**5. War**

"Bodily injury" or "property damage" caused directly or indirectly by war, including the following and any consequence of any of the following:

**a.** Undeclared war, civil war, insurrection, rebellion or revolution;

**b.** Warlike act by a military force or military personnel; or

**c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

**6. Communicable Disease**

"Bodily injury" or "property damage" that arises out of the transmission of a communicable disease by an "insured". This exclusion applies regardless of whether any "insured" personally participated in or committed the alleged act and regardless of whether any "insured" subjectively intended the "bodily injury" or "property damage" for which a claim is made;

**7. Sexual Misconduct, Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

"Bodily injury" or "property damage" arising out of sexual misconduct, sexual molestation, corporal punishment or physical or mental abuse. This exclusion applies regardless of whether any "insured" personally participated in or committed the alleged act and regardless of whether any "insured" subjec-

tively intended the "bodily injury" or "property damage" for which a claim is made.

Sexual misconduct or sexual molestation means any activity, whether or not prosecuted, which is sexual in nature, whether permitted or unpermitted, including, but not limited to: sexual assault; sexual abuse; sexual battery; sexual relations; sexual acts; sexual activity; sexual handling; sexual massage; sexual exploitation; sexual exhibition; photographic, video, or other reproduction of sexual activity; fondling, intimacy, indecent exposure, or undue familiarity; or lewd or lascivious behavior;

**8. Controlled Substance**

"Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. This exclusion applies regardless of whether any "insured" personally participated in or committed the alleged act and regardless of whether any "insured" intended the "bodily injury" or "property damage" for which a claim is made.

However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of that person's licensed physician;

**9. Criminal Acts**

"Bodily injury" or "property damage" arising from any criminal act. Criminal act means any act or omission which is criminal in nature or for which a penal statute or ordinance permits or requires any term of imprisonment or sentence of public service duties. This exclusion applies regardless of whether any "insured" is actually charged with or convicted of a crime and regardless of whether any "insured" subjectively intended the "bodily injury" or "property damage" for which a claim is made;

**10. Pollution**

**a.** "Bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, release or escape of "pollutants".

**b.** Any loss, cost or expense resulting from any governmental direction, order or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

request that an "insured" test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to, or assess the effects of, "pollutants".

c.  Exclusions **10.a.** and **b.** do not apply to "bodily injury" or "property damage" caused by heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one that becomes uncontrollable or breaks out from where it was intended to be;

**11. Fungus or Bacteria**

a.  "Bodily injury" or "property damage" caused by, consisting of, or arising out of, either directly or indirectly, "fungus" or bacteria; or

b.  Any loss, cost or expense resulting from any governmental direction, order or request that an "insured" treat for, monitor, clean up, remove, contain, treat, detoxify, or neutralize "fungus" or bacteria; or

**12. Lead, Asbestos, Silica or Radon Gas**

a.  "Bodily injury" or "property damage" caused directly or indirectly, or arising out of lead, asbestos, silica or radon gas; or

b.  Loss, cost or expense resulting from any governmental direction, order or request that an "insured" treat for, monitor, clean up, remove, contain, treat, detoxify, or neutralize substances described in **12.a.**

Exclusions **A. Motor Vehicle Liability, B. Watercraft Liability, C. Aircraft Liability, D. Hovercraft Liability,** and **E.4. Insured's Premises Not An Insured Location** do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured".

**F.  Liability, Coverage A** does not apply to the following:

1.  Liability:

a.  For any loss assessment charged against an "insured" as a member of an association, corporation or community of property owners; or

b.  Under any contract or agreement entered into by an "insured";

2.  "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

3.  "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

4.  "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

a.  Workers' compensation law;

b.  Non-occupational disability law; or

c.  Occupational disease law;

5.  "Bodily injury" or "property damage" from any:

a.  Nuclear reaction;

b.  Nuclear radiation; or

c.  Radioactive contamination;

all whether controlled or uncontrolled or however caused;

6.  "Bodily injury" to any "insured".

This exclusion also applies to any claim made or suit brought against "you" or an "insured":

a.  To repay; or

b.  Share damages with;

another person who may be obligated to pay damages because of "bodily injury" to an "insured";

7.  "Property damage" to:

a.  Goods or products, including containers, which an "insured" manufactures, sells, handles, or distributes;

b.  Work completed by or for an "insured"; or

c.  An "insured location" arising out of the alienation (e.g. selling, leasing, separating) of that location; or

8.  Punitive or exemplary damages. These include damages that may be imposed to punish a wrongdoer or deter others from similar conduct. If a suit is brought against an "insured" seeking covered compensatory damages and punitive or exemplary dam-

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

ages, "we" will afford a defense to such action but will not pay any punitive or exemplary damages.

**G. Medical Payments, Coverage B** does not apply to "bodily injury":

1. To a "residence employee" if the "bodily injury":
   a. Occurs off the "insured location"; and
   b. Does not arise out of or in the course of the "residence employee's" employment by an "insured";

2. To any person eligible to receive benefits voluntarily provided or required to be provided under any:
   a. Workers' compensation law;
   b. Non-occupational disability law; or
   c. Occupational disease law;

3. From any:
   a. Nuclear reaction;
   b. Nuclear radiation; or
   c. Radioactive contamination;
   all whether controlled or uncontrolled or however caused; or
   d. Any consequence of any of these; or

4. To any person, other than a "residence employee" of an "insured", residing on any part of the "insured location".

## Additional Coverages – SECTION 1 (Includes Limitations)

"We" cover the following in addition to the limits of liability:

**A. Claim Expenses**

With respect to suits for covered damages, "we" pay:

1. Expenses "we" incur and costs taxed against an "insured" in any suit "we" defend;

2. Premiums on bonds required in a suit "we" defend, but not for bond amounts more than the **Liability, Coverage A** limit of liability. "We" need not apply for or furnish any bond;

3. Reasonable expenses incurred by an "insured" at "our" request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting "us" in the investigation or defense of a claim or suit;

4. Postjudgment interest that accrues before "we" pay or tender, or deposit in court that part of the judgment which is covered and

does not exceed the limit of liability that applies; and

5. Reasonable expenses incurred, other than loss of earnings, up to $250 per day for the cost of defending a claim brought against an "insured" under a workers' compensation law, if it is finally determined the workers' compensation law is not applicable.

**B. First Aid Expenses**

"We" will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. "We" will not pay for first aid to an "insured".

**C. Damage To Property Of Others**

1. "We" will pay, at "replacement cost", up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured" or animals owned by or in the care of an "insured".

2. "We" will not pay for "property damage":
   a. To property covered elsewhere in this policy;
   b. Caused intentionally by an "insured" who is 13 years of age or older;
   c. To property owned or rented by an "insured";
   d. To property owned by or rented to a tenant of an "insured" or a resident in "your" household;
   e. Arising out of:
      (1) A "business" engaged in by an "insured";
      (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or
      (3) The ownership, maintenance, occupancy, renting, loaning, entrustment, operation, use, loading or unloading of aircraft, hovercraft, watercraft or "motor vehicles".

   This exclusion e.(3) does not apply to a "motor vehicle" that: (a) Is a "recreational motor vehicle"; (b) Is not owned by an "insured"; and (c) At the time of the "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

9

f. Caused by wear and tear, latent defects (a defect not immediately apparent), or inherent vice (the quality for self-deterioration or damage).

## Conditions—SECTION 1
## (Includes Limitations)

### A. Limit Of Liability

"Our" total liability under **Liability, Coverage A** for all damages resulting from any one "occurrence" will not be more than the **Liability, Coverage A** limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", injured persons, claims made, persons liable, claimants, or policies involved. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions will be considered to be the result of one "occurrence".

"Our" total liability under **Medical Payments, Coverage B** for all medical expense payable for "bodily injury" to one person as the result of one accident will not exceed the limit of liability for each person as stated in the Declarations. "Our" liability for each "occurrence" as stated in the Declarations is limited to all medical expenses for "bodily injury" to two or more persons.

### B. Joint Obligations

The terms of this policy impose joint obligations on persons defined as an "insured" person. This means that responsibilities, acts and failures to act of a person defined as an "insured" person will be binding upon another person defined as an "insured" person.

### C. Duties After Occurrence

In case of an "occurrence", "you" or another "insured" will perform the following duties that apply. "We" have no duty to provide coverage under this policy if "you" fail to comply with the following duties:

1. Give written notice to "us" or "our" agent as soon as is practical, which sets forth:
   a. The policy number and the named insured shown under INSURED in the Declarations;
   b. Reasonably available information on the time, place and circumstances of the "occurrence"; and

   c. Names and addresses of any claimants and witnesses;
2. Cooperate with "us" and any retained legal counsel in the investigation, settlement or defense of any claim or suit;
3. Promptly forward to "us" every notice, demand, summons or other legal document relating to the "occurrence";
4. At "our" request, help "us":
   a. To effect settlement;
   b. To enforce any right of contribution or indemnity against any person or organization who may be liable for the "occurrence";
   c. With the conduct of suits and attend hearings and trials; and
   d. To secure and give evidence and obtain the attendance of witnesses;
5. Promptly give notice of an "occurrence", a claim that is made, or a suit, to any other insurer who might provide insurance for the "occurrence";
6. Promptly identify, report, and tender the defense of any claim made or suit to any other insurer that also might have available insurance for the "occurrence";
7. With respect to **C. Damage To Property Of Others** under Additional Coverages – SECTION 1 "you" must submit to "us" within 60 days after the loss, a sworn statement of loss and show the damaged property, if it is in an "insured's" control; and
8. No "insured" will, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

### D. Duties Of An Injured Person – Medical Payments, Coverage B

1. The injured person or someone acting for the injured person will:
   a. Give "us" written proof of claim, under oath if "we" so request, as soon as is practical; and
   b. Authorize "us" to obtain copies of medical reports and records when and as often as "we" request.
2. The injured person will submit to a physical exam by a doctor of "our" choice when and as often as "we" reasonably require.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

E. **Payment Of Claim – Medical Payments, Coverage B**
"We" reserve the right to make direct payment to the injured person or any individual or organization rendering medical services. That payment reduces the total amount "we" will pay for that injury. Payment under this coverage is not an admission of liability by an "insured" or "us".

F. **Suit Against Us**
1. No action can be brought against "us" unless there has been full compliance with all of the terms under this **SECTION 1**.
2. No one will have the right to join "us" as a party to any action against an "insured".
3. No action with respect to **Liability, Coverage A** can be brought against "us" until the obligation of such "insured" has been determined by final judgment or agreement signed by "us".
4. Under **Medical Payments, Coverage B** an action to collect benefits must be taken no later than 3 years after the date of the "occurrence".

G. **Bankruptcy Of An Insured**
Bankruptcy or insolvency of an "insured" will not relieve "us" of "our" obligations under this policy.

H. **Other Insurance**
This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

I. **Concealment Or Fraud**
"We" do not provide coverage where any "insured", whether before or after a loss, has:
1. Concealed or misrepresented any material fact or circumstance;
2. Engaged in fraudulent conduct; or
3. Made false statements;
relating to this insurance.

Unless otherwise stated in **SECTION 6**, definitions under **Definitions** which apply to **SECTION 1**, **Exclusions - SECTION 1** and **Conditions - SECTION 1** also apply to the following Coverages in **SECTION 6: Coverage AA Watercraft Liability, Coverage BB Additional Residence Liability,** and **Coverage GG Off Premises Recreational Motor Vehicle Liability.**

## For SECTIONS 2 through 6
Under **SECTIONS 2** through **6**, "we" insure covered property against loss. Loss means sudden, accidental direct physical damage to covered property which is a direct result of a peril that the property is insured against. Covered property is described in this policy booklet for each of the coverages "you" have purchased. Perils are described and identified by number in the **Perils Insured Against-SECTIONS 2 through 6** section of this policy. Covered property is insured against the perils identified by the corresponding peril numbers shown in the Declarations for the described coverage.

The following do not apply to **Coverages AA, BB** and **GG** in **SECTION 6:**
- Definitions under **Definitions** which apply only to **SECTIONS 2** through 6;
- **SECTIONS 2** through 5;
- **Perils Insured Against - SECTIONS 2** through 6;
- **Exclusions - SECTIONS 2** through 6; and
- **Conditions - SECTIONS 2** through 6.

**Deductible**
Subject to the limit of liability that applies and unless otherwise stated in the applicable Coverage section, "we" will pay only that part of any covered loss over any deductible that applies as stated in the Declarations. The deductible applies to each "occurrence" to which this coverage applies.

## SECTION 2
## Dwelling, Coverage C (Includes Limitations)
1. "We" cover:
   a. The dwelling on the "residence premises"; and
   b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling on the "residence premises".
2. "We" do not cover land, including;
   a. The land necessary to support any **Dwelling, Coverage C** property;
   b. Any costs required to replace, rebuild, stabilize, or otherwise restore the land; or
   c. The cost of repair techniques designed to compensate for or prevent land instability to any property, whether or not insured under **Dwelling, Coverage C.**

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

11

**Personal Property, Coverage D (Includes Limitations)**

1. **Covered Property**
   a. **Insured's Property And Property Of Others**
   "We" cover personal property owned by, or used by, an "insured" while it is anywhere in the world. After a loss and at "your" request, "we" will cover personal property owned by:
      (1) Others while the property is on the part of the "residence premises" occupied by an "insured"; or
      (2) A guest or "residence employee" while the property is in any residence occupied by an "insured".

   If "you" ask "us" to cover property under (1) or (2) above, the owner of the property is bound by all of the terms and conditions of this policy.

2. **Limit For Property At Other Residences**
   "Our" limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises", is 10% of the limit of liability for **Personal Property, Coverage D** or $1,000, whichever is greater. However, this limitation does not apply to personal property:
   a. Moved from the "residence premises" because the "residence premises" is being repaired, renovated or rebuilt and is not fit to live in or store property in; or
   b. In a newly acquired principal residence for 30 days from the time "you" begin to move the property there.

3. **Special Limits Of Liability**
   The special limit for each category shown below is the total limit for each loss for all property in that category. These special limits do not increase the **Personal Property, Coverage D** limit of liability.
   a. $200 on money, checks, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, casino chips, gift certificates, medals, scrip, stored value cards and smart cards.
   b. $1,500 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.
      This limit includes the cost to research, replace or restore the information from the lost or damaged material.
   c. $1,500 on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors. "We" do not cover loss by windstorm or hail to this property unless the property is inside a fully enclosed building. Canoes and rowboats, however, are covered outside against loss by windstorm or hail if this property is on the "insured location".
   d. $1,500 on trailers of all types except camping trailers and those used with watercraft.
   e. $2,500 on jewelry, watches, furs, and precious and semi-precious stones. This special limit does not apply to losses caused by Perils Insured Against 2 through 18, if those perils are purchased on this policy.
   f. $2,500 on firearms and related equipment. This special limit does not apply to losses caused by Perils Insured Against 2 through 18, if those perils are purchased on this policy.
   g. $2,500 on silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter. This special limit does not apply to losses caused by Perils Insured Against 2 through 18, if those perils are purchased on this policy.
   h. $2,500 on property, on the "residence premises", used or intended for use in a "business".
   i. $500 on property, away from the "residence premises", used or intended for use in a "business".
   j. $1,500 on electronic apparatus and accessories, while in or upon a "motor vehicle", but only if the apparatus is

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

equipped to be operated by power from the "motor vehicle's" electrical system while still capable of being operated by other power sources.

Accessories include antennas, tapes, wires, records, discs or other media that can be used with any apparatus described in this Category **j**.

**k.** $1,000 for electronic apparatus designed to be operated solely by power from the electrical system of a "motor vehicle" while such property is not in or upon a "motor vehicle".

**l.** $5,000 on electronic data processing equipment and the recording or storage media equipment used with that equipment. Programming time and expense is excluded.

**m.** $500 on "recreational motor vehicles" and parts.

**n.** $2,500 for trading cards and comic books, including any of these that are part of a collection.

**o.** $5,000 on any one article and $10,000 in the aggregate for loss of any rug, carpet (except wall to wall carpet), tapestry, wall-hanging or other similar articles. This special limit does not apply to losses caused by Perils Insured Against **2** through **18**, if those perils are purchased on this policy.

**p.** $1,500 on camping trailers, slide-in campers, and campers of any type.

**4. Property Not Covered**

"We" do not cover:

**a.** Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

**b.** Animals, birds or fish;

**c.** "Motor vehicles".

(1) This includes:

(a) Their accessories, equipment and parts; or

(b) Electronic apparatus and accessories designed to be operated solely by power from the electrical system of the "motor vehicle". Accessories include antennas, tapes, wires, records, discs

or other media that can be used with any apparatus described above.

The exclusion of property described in **(b)** above applies only while such property is in or upon a "motor vehicle". When not in or upon a "motor vehicle" electronic apparatus is limited to **3. Special Limits Of Liability**, item **k.**;

(2) "We" do cover "motor vehicles" not required to be registered for use on public roads which are:

(a) Used solely to service an "insured's" residence and lawn-mowers or walk-behind snow-blowers used away from the "insured's" residence;

(b) Designed to assist the handi-capped; or

(c) "Recreational motor vehicles" subject to **3. Special Limits Of Liability**, item **m.**;

**d.** Semi-trailers;

**e.** Mobile homes;

**f.** Aircraft meaning any contrivance used or designed for flight including any parts whether or not attached to the aircraft; "we" do cover model or hobby aircraft not used or designed to carry people or cargo;

**g.** Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

**h.** Property of roomers, boarders and other tenants, except property of roomers and boarders related to an "insured";

**i.** Property in a living space on the "residence premises" regularly rented or held for rental to others, for more than the amount provided by **3. Special Limits Of Liability**, item **h.**;

**j.** Property rented or held for rental to others off the "residence premises";

**k.** "Business" data, including such data stored in:

(1) Books of account, drawings or other paper records; or

(2) Computers and related equipment.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

13

"We" do cover the cost of blank record-
ing or storage media, and of pre-
recorded computer programs available
on the retail market;

l.  Credit cards, electronic fund transfer
cards or access devices used solely for
deposit, withdrawal or transfer of funds
except as provided for in **SECTION 5, B.
Special Coverages, Credit Card and
Forgery, Coverage O;**

m.  Water or steam, except for water con-
tained in a swimming pool;

n.  Radar detectors;

o.  Any controlled substance; or

p.  Trees, shrubs, plants and lawns except
as provided for in **SECTION 5, B. Spe-
cial Coverages, Trees, Shrubs, Plants
and Lawns, Coverage L.**

## Additional Living Expense – Rental Value, Coverage E (Includes Limitations)

The limit of liability shown in the Declarations is
the total limit for the coverages in **1. Additional
Living Expense, 2. Fair Rental Value** and **3.
Civil Authority Prohibits Use.**

**1.  Additional Living Expense**

If a covered loss under **SECTION 2** makes
that part of the "residence premises" where
"you" reside not fit to live in, "we" cover any
necessary increase in living expenses
incurred by "you" so that "your" household
can maintain its normal standard of living.

Payment will be for only the shortest time
reasonably required to repair or replace the
damage or, if "you" permanently relocate, the
shortest time reasonably required for "your"
household to settle elsewhere.

**2.  Fair Rental Value**

If a covered loss under **SECTION 2** makes
that part of the "residence premises" rented
to others or held for rental by "you" not fit to
live in, "we" cover the fair rental value of such
premises less any expenses that do not con-
tinue while it is not fit to live in.

Payment will be only for the shortest time
reasonably required to repair or replace that
part of the premises rented or held for rental.

**3.  Civil Authority Prohibits Use**

If a civil authority prohibits "you" from use of
the "residence premises" as a result of direct

damage to neighboring premises by a Peril
Insured Against applicable to **Dwelling,
Coverage C,** "we" cover the loss as provided
in **1. Additional Living Expense** and **2. Fair
Rental Value** above for no more than two
weeks.

**4.  Loss Or Expense Not Covered**

"We" do not cover loss or expense due to
cancellation of a lease or agreement.

The periods of time under **1. Additional Living
Expense, 2. Fair Rental Value** and **3. Civil
Authority Prohibits Use** are not limited by expi-
ration of this policy.

## Auxiliary Private Structures, Coverage F (Includes Limitations)

**1.**  "We" cover other structures on the "resi-
dence premises" set apart from the dwelling
by clear space. This includes structures con-
nected to the dwelling by only a fence, utility
line, or similar connection.

**2.**  "We" do not cover:

a.  Land, including:

(1)  The land necessary to support any
**Auxiliary Private Structures, Cov-
erage F** property;

(2)  Any costs required to replace, re-
build, stabilize, or otherwise restore
the land; or

(3)  The cost of repair techniques de-
signed to compensate for or prevent
land instability to any property,
whether or not insured under **Auxil-
iary Private Structures, Coverage
F;**

b.  Other structures rented or held for rental
unless used solely as a private garage;

c.  Other structures used in whole or in part
for any "business", ranching or farming
purposes unless the "business" is cov-
ered under **SECTION 1.**

**3.**  A structure described in the Declarations to
which **SECTION 2, Auxiliary Private Struc-
tures, Coverage F** specifically applies is
covered only for the perils, Loss Settlement
Clause and the limit of liability shown in the
Declarations. **1.** above, does not apply to
those structures.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# SECTION 3
## Recreational Motor Vehicles, Coverage G (Includes Limitations)

"We" insure "recreational motor vehicles" that are listed in the Declarations owned by an "insured". The policy territory is the United States of America, its territories or possessions, and Canada. "We" do not insure loss resulting from electrical breakdown, unless fire or explosion results and then only for direct loss caused by such fire or explosion. If "you" have this coverage, newly acquired "recreational motor vehicles" will also be insured, effective on the date of delivery, if "we" are notified within 30 days following the date of delivery.

Loss Settlement 3 - Actual Cash Value applies.

## Watercraft, Coverage H (Includes Limitations)

"We" insure watercraft, motors and trailers listed in the Declarations, owned by an "insured".

1. The policy territory is the United States of America, its territories or possessions, or Canada. This coverage applies only while the covered property is on land, inland waters, and coastal waters within 75 nautical miles of the United States, its territories or possessions or Canada.
2. The following definitions apply:
   a. Boat includes inboard motors and other equipment permanently attached;
   b. Motor means outboard motor or trolling motor, and includes remote controls, steering equipment, electric harness and pressure gas tanks, but does not include batteries;
   c. Boat accessories and equipment means anchors, extra fuel tanks, oars, oar locks, lines, paddles, cook stoves, deck chairs, flags, flagstaffs, detachable canopies, tools, batteries, battery boxes, chargers, seat cushions, boat and motor covers, tarpaulins, life preservers, spare propellers, fire extinguishers, lights, horns, and bilge pumps.
3. "We" do not insure loss or damage:
   a. To the rudder, propeller, shaft or machinery of an inboard motorboat, either inside or outside the vessel, unless caused by stranding, burning, collision with another vessel, or sinking. This

exclusion does not apply to water forced propulsion inboard motorboats; or
   b. Resulting from electrical breakdown, unless fire or explosion results and then only for direct loss caused by such fire or explosion.
4. If during the policy period the "insured" acquires ownership of a boat, motor or boat trailer, and notifies "us" within 30 days following the date of delivery, insurance under this policy applies to the newly acquired boat, motor or boat trailer, effective on the date of delivery, provided:
   a. It replaces a boat, motor or boat trailer covered by this policy. If the new acquisition replaces a boat, motor or boat trailer insured by this policy, the insurance ceases to cover the unit replaced on the date the new one is delivered; or
   b. "We" insure all boats, motors or boat trailers owned by the "insured" on the date of delivery. The limit of liability will be the "actual cash value" of the boat, motor or boat trailer, provided the "insured" pays any additional premium required. This extension does not apply to a newly acquired boat, motor or boat trailer if there is other valid or collectible insurance.
5. The deductible will not apply to the boat, motor, trailer, or accessories in the event of a total loss of the boat, motor, or trailer.
6. Coverage on an insured boat is extended to include loss to boat accessories and equipment.
7. Loss Settlement 3 — Actual Cash Value applies.

# SECTION 4
## Personal Property (Scheduled), Coverage I (Includes Limitations)

"We" insure the personal property specifically listed in the Declarations. This coverage applies to property owned by or in the custody and control of an "insured". Unless otherwise provided either in this policy or by endorsement, "we" insure the property wherever it may be located.

## Acquisition Clause

This clause is applicable only to fine arts, jewelry, watches, furs, cameras and musical instruments

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

when such property is insured under this **Coverage I.** If the "insured" **(a)** reports additional similar property acquired within 30 days from the date of acquisition, and **(b)** pays full premium on that property from the date acquired, "we" insure each separate class of such additionally acquired property for an amount not to exceed 25 percent of the limit of liability, or $10,000, whichever is less, on such class, exclusive of this provision. "We" will cease to insure such additionally acquired property if it is not reported to "us" within the stated 30 day period. This additional coverage does not apply to property of a class not already insured under this section.

**Replacement Cost Clause**
A covered loss to property insured under **Personal Property (Scheduled), Coverage I** will be settled for "replacement cost" if "you" repair or replace the damaged property. Payment will be made for the smallest of the following:

1. "Replacement cost" of the damaged property at the time of the loss; or
2. The applicable limit of liability shown in the Declarations. However, when the amount shown in the Declarations is an aggregate amount for multiple items, the limit of liability will be the specific value of the individual item as determined from information on record with "our" home or regional office prior to the loss.

If "you" do not repair or replace the damaged property, "we" will settle the loss for the "actual cash value". "You" then have one year from the date of loss to make the repair or replacement and request payment for the difference between the actual "replacement cost" and the amount "we" already paid.

"Replacement cost" will not apply to:

1. Property not maintained in good or workable condition; or
2. Property that is obsolete or unusable for the purpose originally intended.

This clause does not apply if **Special Conditions - SECTION 4, Coverage I** states another method of payment for a specific scheduled item.

**Special Conditions-SECTION 4, Coverage I**

1. **Fine Arts.** "Our" coverage of fine arts is subject to additional exclusions and special conditions. "We" do not insure:

    a. Damage sustained to and resulting from any repairing, restoration or retouching process;
    b. Breakage of art glass windows, statuary, marbles, glassware, bric-a-brac, porcelains, and similar fragile articles, unless caused by fire, lightning, aircraft, theft or attempted theft, cyclone, tornado, windstorm, earthquake, flood, explosion, malicious damage or collision, derailment or vehicle overturn; or
    c. Property on exhibition at a fairgrounds or at any national or international exposition unless such locations are specifically described in the Declarations.

    "We" will not be liable for more than the amount set opposite the respective articles listed in the Declarations. The amounts represent the agreed value of the articles.

    If there is total loss to any part of a pair or set, "we" agree to pay "you" the full value of the set as specified in the Declarations. "You" agree to surrender the remainder of the set to "us".

2. **Golfer's Equipment.** "We" insure "your" golf clubs and golf equipment (except watches, jewelry and stock for sale) wherever located. Clothing "you" have is covered if contained in a locker situated in a building (such as a club house) that is used in connection with the game of golf. "We" insure golf balls, however, only against loss by fire or burglary.

3. **Guns.** "We" do not insure loss from fouling or gradual depreciation, or caused by or during repair, refinishing, or renovation.

4. **Silverware.** This coverage does not apply to pens, pencils, flasks, smoking implements or accessories or articles of personal adornment as silverware.

5. **Stamp And Coin Collections.** This insurance on stamp and coin collections applies to:

    a. Postage stamps including due, envelope, official, revenue, match and medicine stamps, covers, locals, reprints, essays, proofs, and other philatelic property "you" own or which is in "your" custody or control, including books, pages or mountings; and

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**b.** Rare and current coins, medals, paper money, bank notes, tokens of money and other numismatic property "you" own or which is in "your" custody or control, including coin albums, containers, frames, cards and display cabinets in use with such a collection.

"We" do not insure:

**a.** Loss from fading, creasing, denting, scratching, tearing, thinning, transfer of colors, inherent vice (quality for self-deterioration or damage), dampness, extremes of temperature, gradual depreciation, or damage sustained from handling or while being actually worked upon;

**b.** Mysterious disappearance of individual stamps, coins or other individual articles insured unless specifically listed in the Declarations with a definite limit of liability. If not specifically listed, "we" will cover mysterious disappearance if the articles are mounted in a volume, and the page to which they are attached is also lost;

**c.** Loss of or damage to property in the custody of transportation companies, or shipments by mail unless by registered mail;

**d.** Loss by theft from any unattended automobile. This exclusion does not apply while the property is being shipped by registered mail; or

**e.** Loss of or damage to any property that is not an actual part of a stamp, money or coin collection.

In the event of loss or damage the amount payable will be determined in the following manner:

**a.** In case of loss of or damage to the property listed representing any one stamp, coin or other individual article insured, "we" will pay or make good the loss or damage up to the amount listed for the item in the Declarations.

**b.** In case of loss or damage to property specifically described in the Declarations as pairs, strips, blocks, series, sheets, covers, frames, cards, or the like, "we" will pay, in the event of total loss of such

an item, up to the amount set opposite the item involved. In the event of partial loss, "we" will not pay more than the cash market value of the whole set, less the cash market value of the remainder at the time of loss. It is understood and agreed, however, that in the event of the property being insured for less than the cash market value, "our" liability will not exceed the share the amount insured bears to the cash market value.

**c.** In all cases of loss of or damage to the insured property not provided for in the two previous paragraphs, "we" will not pay more than the actual cash market value of the property at the time of loss. This is subject, however, to a limit not exceeding $1,000 on unlisted numismatic property and not exceeding $250 with respect to any one stamp, coin, or other individual article or any one pair, strip, block, series, sheet, cover, frame, card or the like.

**d.** "We" will not pay a greater share of any loss on property not specifically listed than the amount the total sum insured on that unlisted property bears to the actual cash market value at the time of loss.

## SECTION 5

When **SECTION 5** is shown in the Declarations the following **Additional Coverages** and **Special Coverages** (as shown in the Declarations) apply to property covered under this policy.

**A. Additional Coverages (Includes Limitations)**

**1. Reasonable Repairs**

**a.** If a covered loss occurs, "we" will pay the reasonable and necessary cost "you" incur for temporary repairs to covered property to protect the property from further immediate damage or loss.

**b.** If the measures taken involve repair to other damaged property, "we" will only pay if that property is covered under this policy and the damage is caused by a Peril Insured Against.

This coverage does not:

**(1)** Increase the limit of liability that applies to the covered property; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

    (2) Relieve "you" of "your" duties, in case of a loss to covered property, described in **B.5.** under **Conditions – SECTIONS 2 through 6.**

**2. Collapse**

  **a.** With respect to this additional coverage:

    (1) Collapse means a member of a structure has actually fallen down or fallen into pieces. It does not include settling, cracking, shrinking, bulging, expansion, sagging or bowing.

    (2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

    (3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

    (4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

  **b.** "We" insure for loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

    (1) The Perils Insured Against that apply to the damaged property. However, if peril **1.** applies to the damaged property, then only perils **2.** through **19.** shall apply;

    (2) Weight of contents, equipment, animals or people;

    (3) Weight of rain that collects on a roof or ceiling; or

    (4) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

  **c.** Loss to an awning, gutter, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not covered under **b.(2)** through **(4)** above, unless

the loss is a direct result of the collapse of a building or any part of a building.

  **d.** This coverage does not increase the limit of liability that applies to the damaged covered property.

**3. Building Ordinance**

  **a.** Under **Dwelling, Coverage C** and item **5. Building Additions And Alterations,** below, "we" will pay for the increased costs "you" incur due to the enforcement of any ordinance or law that requires or regulates:

    (1) The construction, demolition, remodeling, renovation or repair of that part of a covered dwelling damaged by a Peril Insured Against;

    (2) The demolition and reconstruction of the undamaged part of a covered dwelling, when that dwelling must be totally demolished because of damage by a Peril Insured Against to another part of that dwelling; or

    (3) The remodeling, removal or replacement of the portion of the undamaged part of a covered dwelling necessary to complete the remodeling, repair or replacement of that part of the covered dwelling damaged by a Peril Insured Against.

This coverage provides additional insurance up to 10% of the stated applicable limit, but is not increased by **Coverage EE** or **Coverage HH,** if **Coverage EE** or **Coverage HH** is purchased.

  **b.** "You" may use all or part of this Building Ordinance coverage to pay for the increased costs "you" incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

  **c.** "We" do not cover:

    (1) The loss in value to any covered dwelling due to the requirements of any ordinance or law; or

    (2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

18

respond to, or assess the effects of "pollutants" or "fungus" in or on any covered dwelling.

4. **Grave Markers**

"We" will pay up to $5,000 for human grave markers, including mausoleums, on or away from the "residence premises" for loss caused by a Peril Insured Against applicable to **Personal Property, Coverage D.** However, if Peril 1 applies to **Coverage D,** then Perils **2.** through **19.** will apply.

Loss Settlement 3 - Actual Cash Value applies.

5. **Building Additions And Alterations**

If "you" do not own the "residence premises", "we" cover the building improvements or installations, made or acquired at "your" expense, to that part of the "residence premises" used exclusively by "you". The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to **Personal Property, Coverage D.**

6. **Lock Coverage**

"We" will pay the reasonable expenses "you" incur to re-key or replace locks on exterior doors of the "residence premises" if the keys to those locks are stolen and theft coverage is provided. "We" will pay no more than the amount necessary to replace "your" locks with like kind and quality, or re-key the existing locks whichever is less. The deductible does not apply to this coverage.

B. **Special Coverages (Includes Limitations)**

1. **Package of Special Coverages, Coverage K**

In this package "we" provide **Coverages L** through **P** subject to the agreements, conditions and limits applying to each.

2. **Trees, Shrubs, Plants and Lawns, Coverage L**

"We" will cover trees, shrubs, plants or lawns, on the "residence premises" within 250 feet of the dwelling, for loss caused by the following perils:

a. Fire or Lightning;
b. Explosion;
c. Riot or Civil Commotion;
d. Aircraft;
e. Vehicles not owned or operated by a resident of the "residence premises";
f. Vandalism or Malicious Mischief; or
g. Theft.

"We" will pay up to an additional 5% of the limit of liability that applies to **Dwelling, Coverage C** for all trees, shrubs, plants or lawns. No more than $500 of this limit will be paid for any one tree, shrub or plant, including expenses incurred for removing debris. "We" do not cover property grown for "business" purposes.

This coverage is additional insurance. Loss Settlement 3 — Actual Cash Value applies.

3. **Debris Removal, Coverage M**

a. After a covered loss occurs, "we" will pay "your" reasonable expense for the removal of debris of covered property. This expense is included in the applicable limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that applicable limit is available for such expense. This additional coverage does not apply to **Trees, Shrubs, Plants and Lawns, Coverage L.**

b. "We" will also pay "your" reasonable expense, up to $500, for the removal from the "residence premises" of tree(s) within 250 feet of the dwelling felled by windstorm, hail or weight of ice, snow or sleet, provided the tree(s):

(1) Damage(s) a covered structure; or
(2) Does not damage a covered structure, but:

(a) Block(s) a driveway on the "residence premises" which prevent(s) a "motor vehicle", that is registered for use on public roads or property, from entering or leaving the "residence premises"; or

(b) Block(s) a ramp or other fixture designed to assist a handicapped person to enter or leave the dwelling building.

The $500 limit is the most "we" will pay in any one "occurrence" regardless of the number of fallen trees.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# Exhibit No. 2

**(2)** "Property damage".

**b.** Under **SECTIONS 2** through **6**, the happening of an event, or series of events closely related in time and nature that give rise to a loss.

**11.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, whether indoor or outdoor, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, sewage, methane gas, manure, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**12.** "Property damage" means physical injury to or destruction of tangible property, including the resulting loss of use of this property.

**13.** "Recreational motor vehicle" means any motorized land vehicle designed for recreational use, principally used off public roads, which is not licensed for road use. A motor vehicle designed or used for racing is not considered a "recreational motor vehicle".

**14.** "Replacement cost" means:

**a.** Under Loss Settlements 1 and 2, and **Coverage EE Additional Replacement Cost**, the cost actually and necessarily incurred to repair or replace the damaged property using standard new construction materials of like kind and quality and standard new construction techniques. "We" will not pay the additional cost to repair, replace or reproduce obsolete or antique construction. "Replacement cost" does not include any increased cost due to applicable building codes, laws or ordinances.

**b.** Under **Personal Property (Scheduled), Coverage I** and **Coverage DD Personal Property Replacement Cost**, the lesser of the following, as determined by "us":

**(1)** The cost to repair the damaged property using materials of like kind and quality; or

**(2)** The cost to replace the damaged property with a new article identical to it. When the identical article is no longer available, or cannot be legally manufactured or constructed, "replacement cost" means the cost of a new article similar to the one damaged which is of comparable quality and usefulness.

**15.** "Residence employee" means:

**a.** An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

**b.** One who performs duties similar to those described in **a.**, above, in a different place not related to the "business" of an "insured".

A "residence employee" does not include a relative under age 18 residing in "your" household.

**16.** "Residence premises" means:

**a.** The one or two family dwelling where "you" principally reside; or

**b.** That part of any other building where "you" principally reside;

and which is at a location listed in the Declarations.

"Residence premises" also includes grounds and appurtenant structures at that location.

Unless otherwise stated in **SECTION 6**, the definitions in **DEFINITIONS** which apply to **SECTION 1** also apply to **Coverages AA, BB** and **GG** in **SECTION 6**.

## AGREEMENT

"We" will provide the coverages "you" have purchased through the company named in the Declarations if "you" have paid the premiums and have complied with the policy provisions. When "we" refer to the policy "we" mean this policy booklet (titled Home Insurance Policy), applications for insurance, Declarations, and any applicable endorsements. This policy booklet describes the coverages "you" have purchased and may include descriptions of other coverages "you" have not purchased. The coverages and limits of liability "you" have purchased are stated in the Declarations that are in effect at the time of any loss, injury or damage, and are subject to the limits of liability, exclusions, conditions and other terms of the policy. A coverage applies only when that coverage is listed in the "Descriptions of Coverage" column on the Declarations.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

4

# Exhibit No. 3

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| KAREN and KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTRY MUTUAL INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>) No. 2:14-cv-01223-TSZ<br>)<br>)<br>)<br>)<br>)<br>) |

VIDEOTAPED DEPOSITION OF GREGORY E. HERBURGER

March 4, 2015

Tacoma, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| | |
|---|---|
| One Union Square | 2208 North 30th Street, Suite 202 |
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

Serving Washington's Legal Community Since 1980

1      the engineer?

2  A   I don't remember the dispute.  It was regarding some

3      kind of bearing walls or strapping that needed to be

4      done and didn't need to be done.  I'm not an

5      engineer.  I'm not educated as an engineer.  I'm

6      educated as a worker that knows what passes

7      inspections and builds houses all the time.  That was

8      my thing.

9          And what he was stating, and I can't specifically

10     say what he was stating.  I told him it had -- there

11     had to be more things done than what he was quoting

12     to pass an inspection.

13 Q   You, I believe, testified that the siding was

14     replaced on two sides of the house, correct?  Or

15     pardon me.  That's what was authorized by the

16     insurance company?

17 A   That's what I heard.  They authorized two sides to

18     see if we could match the vinyl siding.  It came back

19     to me to see if I could match the vinyl siding.  And

20     I -- we actually brought vinyl siding out there that

21     does not come close to matching.

22 Q   Okay.  And did it look bad if you tried to match it?

23 A   It looked terrible.

24 Q   Okay.

25 A   It was like you painted a car -- a 25-year-old car

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1        maintenance on it.  That was totally incorrect.

 2        Nobody -- I have not seen anybody use a vinyl siding

 3        in a house, because it's -- it leaks, it's terrible,

 4        it cracks, it breaks, doesn't hold the paint.

 5        There's many problems with it.

 6    Q   And so, to summarize, do you believe that Hardie

 7        Board is a better product but at the same price?

 8    A   It's a much better product at the same price.

 9                        MR. WATKINS:  Very good.  Those are

10        all the questions I have.

11                        MS. MICHELI:  And I just have a

12        couple follow-up.

13

14

15                        FURTHER EXAMINATION

16        BY MS. MICHELI:

17    Q   You testified that it came back to you to try and

18        match the siding.  What steps did you take to try and

19        match the siding?

20    A   We -- we went and -- went to a siding manufacturer

21        and -- well, distributor.  I'm sorry.  Not a

22        manufacturer.  A distributor.  And took the pieces in

23        to try and match it.  The closest pieces they had

24        that would match it, because the company that was

25        originally, they said -- I'm no vinyl siding
```

Gregory E. Herburger
March 4, 2015

1    **specialist -- they said was not in business anymore.**

2    **The only thing they had to match was somewhat the**

3    **same color, somewhat the same look, but wasn't even**

4    **the same -- the manufacturer, it was out of business,**

5    **that originally did the house.**

6  Q  And do you remember the name of the distributor that

7    you went to?

8  **A**  **I have no idea.**

9  Q  And do you --

10  **A**  **It's -- I know where they're at.  I don't know their**

11    **name.  It's off of 112th off of Steele Street in**

12    **Tacoma.**

13  Q  Okay.  And do you recall the name of the manufacturer

14    of the siding?

15  **A**  **No.**

16              MS. MICHELI:  Okay.  That's all the

17    questions I have now.  I'm going to put on the

18    record, in case something is discovered later in

19    discovery that we may need to ask you about, I'm

20    going to leave the deposition open and reserve our

21    right to continue later.

22              THE WITNESS:  Okay.

23              MS. MICHELI:  But I hope you have a

24    great day.  And thank you --

25              THE WITNESS:  I will.

1    STATE OF WASHINGTON )    I, John M.S. Botelho, CCR, RPR,
                         ) ss a certified court reporter
2    County of Pierce    )    in the State of Washington,
                              do hereby certify:

3

4

5            That the foregoing deposition of GREGORY E.
     HERBURGER was taken before me and completed on March 4,
     2015, and thereafter was transcribed under my direction;
6    that the deposition is a full, true and complete transcript
     of the testimony of said witness, including all questions,
7    answers, objections, motions and exceptions;

8            That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature;

10

11           That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
     of any such attorney or counsel and that I am not
12   financially interested in the said action or the outcome
     thereof;

13

14           That I am herewith securely sealing the said
     deposition and promptly delivering the same to
     Attorney Allison L. Micheli.

15

16           IN WITNESS WHEREOF, I have hereunto set my hand
     this 11th day of March, 2015.

17

18

19

20

21

22           _____John M S Botelho_____
             John M.S. Botelho, CCR, RPR
23           Certified Court Reporter No. 2976
             (Certification expires 5/26/15.)

24

25

# Exhibit No. 4

Transcript of the Testimony of

**Greg J. Stariha**
April 6, 2015

**Kroneman v. Country Mutual**
No. 2:14-cv-01223-TSZ



**Byers & Anderson**

**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316** Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Taccoma, WA 98403-3360
Tacoma: **253 627-6401** Fax: **253 383-4884**

```
 1      matching is because the other siding was not damaged

 2      physically, correct?

 3   A  I believe so.

 4   Q  Okay.  Have you ever had any other matching issues in

 5      your 30 years of experience?

 6   A  Yes.

 7   Q  And have companies that you have been involved with paid,

 8      for instance, to match more of the roof that was not

 9      physically damaged?

10                    MR. THENELL:  I will object to the

11      form of the question.

12          Can you rephrase that too?

13                    MR. WATKINS:  Let me try and rephrase

14      it.

15   Q  (By Mr. Watkins)  Have you ever had a matching issue with

16      respect to a roof?

17   A  Yes.

18   Q  In your experience has Country ever paid for more of the

19      roof than was damaged because of a matching issue?

20   A  What do you mean by "more of a roof"?

21   Q  There are certain parts of the roof, a couple of shingles

22      maybe, that were physically damaged with direct physical

23      damage, and then-- has the company ever paid for more

24      than just the few shingles that were damaged so that it

25      would match?
```

| 1 | A | **We would allow for replacement of a slope of a roof, up** |
| 2 | | **to a ridge line or to a valley, whether-- if there's,** |
| 3 | | **say, 20 to 30 percent of those shingles are damaged, we** |
| 4 | | **would allow to replace the entire slope.** |
| 5 | Q | So it would match? |
| 6 | A | **What I consider a slope.** |
| 7 | Q | So that it would match, correct? |
| 8 | A | **I'm not sure why we do it, but that's our position.** |
| 9 | Q | Okay. And to be clear, you would allow for replacement |
| 10 | | of shingles that were not the victims of direct physical |
| 11 | | damage, correct? |
| 12 | A | **Yes.** |
| 13 | Q | Okay. Did the adjustment of the Kronemans' claim stop |
| 14 | | once litigation was instituted? |
| 15 | A | **I don't understand what you mean by that.** |
| 16 | Q | Have you been told or received information from any |
| 17 | | source that not all of the Kronemans' claim has been |
| 18 | | paid? |
| 19 | | MR. THENELL: I am going to object to |
| 20 | | the form of the question. |
| 21 | | To the extent that the answer relies on |
| 22 | | attorney-client communication with my office, I am |
| 23 | | instructing you not to answer or reveal any |
| 24 | | attorney-client communications. |
| 25 | Q | (By Mr. Watkins) Do you have knowledge that some of the |

```
 1      STATE OF WASHINGTON )      I, Terilynn Pritchard, RMR, CRR,
                            ) ss CLR, a certified court reporter
 2      County of Pierce    )      in the State of Washington, do
                                   hereby certify:
 3

 4
                That the foregoing deposition of GREG J. STARIHA
 5      was taken before me and completed on April 6, 2015, and
        thereafter was transcribed under my direction; that the
 6      deposition is a full, true and complete transcript of the
        testimony of said witness, including all questions, answers,
 7      objections, motions and exceptions;

 8              That the witness, before examination, was by me
        duly sworn to testify the truth, the whole truth, and
 9      nothing but the truth, and that the witness reserved the
        right of signature;
10
                That I am not a relative, employee, attorney or
11      counsel of any party to this action or relative or employee
        of any such attorney or counsel and that I am not
12      financially interested in the said action or the outcome
        thereof;
13
                That I am herewith securely sealing the said
14      deposition and promptly delivering the same to
        Attorney Michael T. Watkins.
15
                IN WITNESS WHEREOF, I have hereunto set my
16      signature on the 7th day of April, 2015.

17

18

19

20

21

22
        _____
23      Terilynn Pritchard, CCR, RMR, CRR, CLR
        Certified Court Reporter No. 2047.
24

25
```

# Exhibit No. 5

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | | |
|---|---|---|
| KAREN and KEITH KRONEMAN, husband and wife, and the marital community thereof, | ) ) ) ) | |
| Plaintiffs, | ) | No. 2:14-cv-01223-TSZ |
| vs. | ) ) ) | |
| COUNTRY MUTUAL INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

DEPOSITION OF WILLIAM P. HIGHT

MAY 13, 2015

TACOMA, WASHINGTON

BYERS & ANDERSON, INC.

COURT REPORTERS/VIDEO/VIDEOCONFERENCING

ONE UNION SQUARE
600 UNIVERSITY ST.
SUITE 2300
SEATTLE, WA 98101
(206) 340-1316
(800) 649-2034

2208 NORTH 30TH STREET, SUITE 202
TACOMA, WA 98403
(253) 627-6401
(253) 383-4884 FAX
SCHEDULING@BYERSANDERSON.COM
WWW.BYERSANDERSON.COM

SERVING WASHINGTON'S LEGAL COMMUNITY SINCE 1980

1   house would have looked like if you had just replaced

2   the vinyl siding on two sides?

3                   MR. THENELL:  I'll object to the form

4   of the question to the extent it calls for speculation

5   and to the extent it assumes facts not in evidence.

6       Counsel, do you have --

7                   MR. WATKINS:  I'm just asking if he

8   knows.  I'm not asking anything about --

9                   MR. THENELL:  And I'm asking if you

10  have photographs that show what the house would have

11  looked like if only two sides were repaired.

12                  MR. WATKINS:  How is that relevant to

13  my question?  I'm just asking if he knows based on

14  anything.

15                  THE WITNESS:  Well, I think I've

16  answered that question.

17      I have not seen anything which would show a

18  comparative basis for the different sides of the damaged

19  sides versus the other side.  I operated it on what I

20  understood to be a shared opinion by all concerned that

21  it was a matching issue; that is to say it was an issue

22  as to the appearance of the other two sides which comes

23  with the tacit, at least understanding that there wasn't

24  physical damage to the other two sides.

25  Q   (By Mr. Watkins)  And I'm just asking: Do you have some

| 1  |   | idea -- or did you have some idea when you formed your |
|----|---|---|
| 2  |   | opinions in this case as to the degree of matching issue |
| 3  |   | it was on the Kroneman house? |
| 4  | A | Visually, no. |
| 5  | Q | Okay.  Did you have an understanding by reading |
| 6  |   | Mr. Herberger's deposition of how -- if they had tried |
| 7  |   | to use vinyl siding, what it would look like? |
| 8  | A | I don't recall specifically from his deposition how he |
| 9  |   | characterized it in his view or his perception of it. |
| 10 | Q | Okay. |
| 11 | A | I stopped at the point where I understood what the |
| 12 |   | parties agreed to; and that was that the painting of the |
| 13 |   | other two sides would be for -- rather than damage, |
| 14 |   | would be for appearance-sake. |
| 15 | Q | Right.  I mean, I don't think that's being contested. |
| 16 |   | What I'm asking is: When you have, as an appraiser, |
| 17 |   | allowed additional repairs to be made on parts of a |
| 18 |   | structure that weren't physically damaged, what was the |
| 19 |   | criterion that you used to allow that? |
| 20 | A | Limited accommodation. |
| 21 | Q | Okay.  And when you say "limited," how much is limited? |
| 22 | A | Well, I gave you examples earlier when I talked about a |
| 23 |   | particular side.  You wouldn't paint just going up to |
| 24 |   | the window, you'd carry it up so that on a particular |
| 25 |   | facade, you don't have paint stopping in some particular |

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1      area.

 2           That doesn't translate to, for example, fitting out

 3      an entirely new roof because there's damage on a certain

 4      facet of the roof.   That's the distinction I'm drawing.

 5   Q  Right.  But you would -- if there were one or two tiles

 6      on the roof, you would perhaps do the entire elevation

 7      so it looked to match.

 8   A  Not necessarily.  It would depend on the circumstances.

 9   Q  It would depend on the circumstances, that's correct.

10           And do you have sufficient knowledge of the

11      Kroneman house as to what it would have looked like if

12      they had only put two sides of vinyl siding on it, how

13      drastic or dramatic that would have looked?

14   A  I think I've answered that question.

15   Q  Then the answer is no, correct?

16   A  You must know the answer since I've answered it several

17      times.

18   Q  Yeah.  I just want --

19   A  I do not know visually how they would compare.  I

20      understand that Hardie board was used in place of

21      siding, and it was used around.  And that's how the

22      issue was solved.

23   Q  Right.  But Country Mutual didn't pay for the use of

24      Hardie board on all sides, correct?

25   A  I'm not sure what the dollars were.  I believe that it
```

# Exhibit No. 6



# MTW

Law Offices Of Michael T. Watkins

**Michael T. Watkins**
Michael@mtwlawfirm.com

**Sonia S. Chakalo**
**(Paralegal)**
Soniac@mtwlawfirm.com

July 21, 2014

Dannielle Booth
Dan Thenell
Thenell Law Group, P.C
12909 SW 68th Parkway, Suite 320
Portland, OR 97223

RE: *Kroneman v. Country Mutual*

Dear Counsel:

Thank you for your July 14, 2014 email rejection of Plaintiffs' offer to settle the above referenced case for $36,681.84, inclusive of attorney fees and costs and re-offering Country Mutual's prior settlement proposal of $13,000. I have communicated with our clients and our settlement offer is revoked and Country Mutual's $13,000 offer is rejected.

We regret that we were not able to settle this case at this point in the litigation. It was our hope that we could avoid the significant costs and the substantial court time associated with trying this matter.

Due to the lack of agreement on the scope of cost of the structure repairs and the amount of the contents claim, the Kronemans are left with no alternative but to demand Appraisal on these two issues, as set forth in their policy.

We have contacted Roger Howson of Claims Dispute Resolution to represent the Kronemans as their Appraiser in this matter. Mr. Howson can be reached at (206) 676-3838. We ask that you provide us with the name and contact information of

1

Country Mutual's Appraiser, and have him/her contact Mr. Howson directly to avoid further delay.

We make these requests pursuant to Washington Administrative Code sections 284-30-330(2) and 284-30-360(3).

Thank you for your attention to these matters and if you have any questions or comments, please do not hesitate to give us a call.

Sincerely,

Michael T. Watkins

Cc:   Mr. and Mrs. Kroneman
      Mr. Roger Howson

2

# Exhibit No. 7

**STATE OF WASHINGTON**

**MIKE KREIDLER**
STATE INSURANCE COMMISSIONER



Phone: (360) 725-7000
WWW.INSURANCE.WA.GOV

**OFFICE OF
INSURANCE COMMISSIONER**

2/18/2015

Michael Watkins
6100 219th St SW Suite 480
Mountlake Terrace, WA 98043

RE: Country Mutual Insurance Company
Our Case: 1252925

Dear Michael,

I received a response to my inquiry on your behalf.  I reviewed the response and believe you will find that it explains the company's position regarding Keith and Karen Kroneman's request for appraisal.

The company explains that they have denied the Kroneman's request for appraisal as the matter is pending litigation.

Your case information is important and may be used in the future to analyze trends regarding this company. Should you have any questions, please feel free to contact me at 1-800-562-6900.

Sincerely,


*Andy Swokowski*  Analyst

Property & Casualty Consumer Advocacy Program

1-800-562-6900    360-725-7080    FAX 360 586-2018    CAP.MAILBOX@OIC.WA.GOV


**Want to learn more about the Office of the Insurance Commissioner and our services?  Go online to:**
Read our WAinsuranceblog:  http://wainsurance.blogspot.com/
Follow our consumer updates on Twitter:  http://twitter.com/WAinsuranceblog
Get our news releases and updates on new laws:  http://listserv.wa.gov/cgi-bin/wa?A0=OIC-REGULATIONS

Want to learn more about the Office of the Insurance Commissioner and our services?  Go online to:
Read our WAinsuranceblog:  http://wainsurance.blogspot.com/
Follow our consumer updates on Twitter:  http://twitter.com/WAinsuranceblog
Get our news releases and updates on new laws:  http://listserv.wa.gov/cgi-bin/wa?A0=OIC-REGULATIONS



**THENELL LAW GROUP, P.C.**
First and Third Party SIU
Bad Faith and Coverage Defense
Portland ≍ Seattle

**Daniel E. Thenell, Partner**
Admitted in Oregon, Washington,
Idaho, & Alaska
dan@thenelllawgroup.com
www.thenelllawgroup.com
P (503) 372-6450
F: (503) 372-6496

February 10, 2015

83 1395

<u>**VIA CERTIFIED MAIL, RETURN RECEIPT**</u>
Andy Swokowski
Compliance Analyst
Consumer Advocacy
P O. Box 40256
Olympia, WA 98504-0256

**RECEIVED**

FEB 13 2015

OFFICE INSURANCE COMMISSIONER
CONSUMER ADVOCACY

Re:   OIC File Number·     1252925
      Complainant:        Michael Watkins
      Claim Number.       185-0027057
      Date of Loss:       September 29, 2012
      NAIC Number:        20990

Dear Mr. Swokowski:

Thank you for sending the complaint filed by Mr. Michael Watkins on behalf of his clients, the Kronemans, which we received on January 30, 2015.  I represent the interests of Country Mutual in connection with the above referenced claim.  We understand that Mr. Watkins feels Country Mutual has failed to acknowledge a request for appraisal in processing the above-referenced claim.  We appreciate the opportunity to respond to these concerns.

Your letter dated January 20, 2015 requested we respond to the following specifics:

-   All documentation supporting our position.
-   The name and NAIC number of the issuing company and the specific type of contract involved in this complaint.
-   Whether the plan is a Qualified Health Plan purchased through the Washington Health Insurance Exchange, the plan name and applicable metal level.

The Policy is a residential homeowner's policy and is not a Qualified Health Plan purchased through the Washington Health Insurance Exchange.  A true and accurate copy of the policy is attached hereto as Exhibit A.

We offer the following response on behalf of Country Mutual in order to address the complaint and your correspondence.

Please send all correspondence to Portland office

PORTLAND OFFICE
12909 SW 68ᵗʰ Parkway, Suite 320
Portland, OR 97223

SEATTLE OFFICE
701 SW 5ᵗʰ Avenue, Suite 4015
Seattle, WA 98104

February 10, 2015
Page 2

## BACKGROUND

On or about September 29, 2012, a fire caused damage to the Kronemans' residence. The Kronemans submitted a claim to Country Mutual pursuant to the homeowner's policy issued by Country Mutual. During the course of the adjustment process, the Kronemans retained a public adjuster ("PA") to represent them in the processing of their claim.

Country Mutual worked with the Kroneman's PA to coordinate and agree to the scope and cost of repairs to the home. Additionally, Country Mutual worked with the PA for the adjustment of the Kronemans' personal property inventory. This involved a back and forth and exchange of information between the parties.

A dispute arose between the parties regarding the amounts due under the policy Country Mutual requested information to properly evaluate the claim presented by the Kronemans, including the age of the items submitted in their inventory. The exchange of information proved unfruitful to resolving the dispute. Ultimately, the Kronemans retained counsel and filed an Amended Complaint in the Superior Court of the State of Washington in and for King County under Case Number 13-2-33725-8 SEA on October 2, 2013. A copy of the amended complaint is attached hereto as Exhibit B.

The parties engaged in confidential settlement discussions in early 2014. The letter which Mr. Watkins has included in the current complaint, dated July 21, 2014, contains portions of that confidential settlement discussion. The parties were unable to reach a resolution through these discussions.

The parties have subsequently engaged in discovery through the litigation filed by the Kronemans. Country Mutual removed the case to the Western District of Washington under case number 2:14-cv-01223-TSZ on August 8, 2014. Mr. Watkins filed this current complaint with the Washington Insurance Commissioner's Office on January 16, 2015. On February 9, 2015, Country Mutual's counsel requested by phone and by written letter that Mr. Watkins withdraw the confidential settlement discussion letter included as an exhibit and submit a redacted version in its place. A true and accurate copy of this request letter is attached hereto as Exhibit C

## DISCUSSION

Washington case law supports that, in most circumstances, once suit is commenced, the appraisal clause of an insurance policy may not be invoked. In *Keesling v. Western Fire Ins. Co. of Fort Scott, Kansas,* the Washington Court of Appeals examined the question of how a lawsuit may affect the appraisal clause of an insurance policy. *Keesling v. Western Fire Ins. Co. of Fort Scott, Kansas,* 10 Wash.App. 841, 520 P.2d 622 (1974) The Court of Appeals held that the examination requires inquiry into several circumstances including: (1) whether the inconvenience of bringing a suit justifies a refusal to proceed under the appraisal provision of the policy; and (2) the timeliness of the demand. *Id.*19 Wash.App. at 849-50, 520 P.2d at 627. Timeliness is examined under two factors: (1) prejudice resulting from the delay; and (2) the

breakdown of good-faith negotiations." *Id.* (quoting *Ciapanna v. Lincoln Fire Ins. Co.*, 153 Or. 395, 56 P.2d 1113 (1936); *Nat'l Fire Ins. Co. v. Pinnell*, 199 Ky. 624, 251 S.W. 651 (1923)).

The Court of Appeals in *Keesling* further looked to other case law as authority regarding the invocation of the appraisal clause after suit has been filed. In *Littrell v. Allemania Fire Ins. Co. of Pittsburgh, Pa.*, Chief Judge Cardozo and the New York Court of Appeals held that an insurance policy's appraisal provision may not be invoked after suit has been filed. *Littrel v. Allemania Fire Ins. Co. of Pittsburgh, Pa.*, 250 N.Y. 628, 629, 166 N.E. 350 (1929). In *Davis v. Imperial Ins. Co.*, the Supreme Court of Washington also held that once suit has commenced, the demand for appraisal is too late:

> Upon receiving notice of the intention of the plaintiff to dismiss the first suit, counsel for the appellant served upon respondent's attorneys a demand for an appraisement under the terms and conditions of the policy. This was nearly a year after the fire occurred, and, as already noticed, was subsequent to the commencement of suit upon the policy. We think that it came too late.
> *Davis v. Imperial Ins. Co.*, 16 Wash. 241, 242, 47 P. 439 (1896)

In the current case, suit was filed on October 2, 2013. The appraisal demand was made on July 21, 2014, nearly two years after the fire. The suit brought a great inconvenience for Country Mutual, as it was then forced to prepare and continue forward in litigation which includes the large task of producing its claims file and materials for discovery. Country Mutual is further prejudiced by the delay in requesting appraisal as it has already engaged in lengthy litigation efforts because the demand was made nine (9) months after suit was filed, and nearly two (2) years after the loss occurred. Thus, the demand for appraisal was made too late and Country Mutual was not unreasonable in refusing to proceed through the appraisal clause of the insurance policy

## CONCLUSION

Mr. Watkins' complaint on behalf of the Kronemans seeks to have the OIC intervene in a litigated matter which is pending before the United States District Court for the Western District of Washington. There is sufficient case law and evidence to support that Country Mutual was not unreasonable in refusing to invoke the appraisal clause of the insurance policy a substantial amount of time after suit was filed. Further, the Kronemans have chosen to seek judicial resolution for this matter by filing suit. While Country Mutual is happy to respond to any concerns forwarded to the OIC, it is not the proper remedy for a litigated matter pending before the court.

Finally, Mr. Watkins has violated the spirit of the Washington and Federal Rules of Evidence which do not permit confidential settlement discussions, or the contents thereof, from being produced. Mr. Watkins has provided a letter to the OIC with contents of confidential settlement discussions without redactions thereof. This is in violation of the Rules of Evidence and Country Mutual has requested that Mr. Watkins withdraw the exhibit and provide a redacted version thereof in accordance with the Rules of Evidence. Country Mutual further requests that

February 10, 2015
Page 4

the OIC seal the July 21, 2014, letter as confidential so as not to publish the settlement discussions between the parties.

    If you have any questions about this information, please do not hesitate to contact me.

Very Truly Yours,

Daniel E. Thenell

DET:DNB:AHH/jr
Enclosures
OIC 01

# Exhibit No. 8



# MTW

Law Offices Of Michael T. Watkins

**Michael T. Watkins**
Michael@mtwlawfirm.com

**Sonia S. Chakalo**
**(Paralegal)**
Soniac@mtwlawfirm.com

February 13, 2015

Dannielle Booth
Dan Thenell
Thenell Law Group, P.C
12909 SW 68th Parkway, Suite 320
Portland, OR 97223

RE: *Kroneman v. Country Mutual*

Dear Counsel:

Thank you for your correspondence of recent date. With respect to your assertions that the subject letter submitted to the Office of the Insurance Commissioner ("OIC") is "confidential" we respectfully disagree. We also note that you cited no pertinent authority for that proposition.

As you are aware ER 408 states in relevant part:

> In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is **not admissible to prove liability for or invalidity of the claim or its amount**. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another

1

purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

We have not submitted this letter to the Court. Moreover, the letter demonstrates to the OIC our good faith attempts to resolve this dispute and the necessity of invoking the appraisal provision of the subject insurance policy.

We communicated in good faith in an attempt achieve early settlement. Those settlement demands were shared with you under the same evidentiary rule that you now seek to invoke on behalf of your client. Instead of maintaining those discussions confidential, you used them as the basis for removal to Federal jurisdiction. Furthermore, you misrepresented to the Court the amount in controversy for that same purpose. Stating, in contravention of the plain language of that letter, that plaintiff was seeking trebling of $36,681.84. Quite frankly we find your assertions disingenuous.

As such, we will not withdraw the letter submitted.

Moreover, your client has (208 days since the demand for appraisal) failed to acknowledge our request and provide us with the name of your appraiser. Please provide us with that information. Your handling of this relatively small procedural bad faith case has substantially and unnecessarily increased the cost of litigation.

Thank you for your attention to these matters and if you have any questions or comments, please do not hesitate to give us a call.

Sincerely,

Michael T. Watkins

Cc:   Mr. and Mrs. Kroneman
      Mr. Roger Howson

# Exhibit No. 9



**THENELL LAW GROUP, P.C.**
First and Third Party SIU
Bad Faith and Coverage Defense

Portland ⋈ Seattle

**Dannielle Booth, Partner**
Admitted in Oregon, Washington,
dannielle@thenelllawgroup.com
www.thenelllawgroup.com
P: (503) 372-6450
F: (503) 372-6496

March 16, 2015

83 I 395

Michael T. Watkins
Law Offices of Michael T. Watkins
6100 219th St SW, Suite 480
Mountlake Terrace, WA 98043

Re:   *Karen and Keith Kroneman v. Country Mutual Insurance Company*
      United States District Court, Western District of Washington, at Seattle
      Case No. 2:14-cv-01223

Dear Mr. Watkins:

Thank you for your letter of February 13, 2015, acknowledging our discussion and correspondence. Please allow this letter to supplement my response which was provided to you on February 10, 2015. With regard to my request that you redact the confidential settlement negotiations from your recent correspondence to the Office of the Insurance Commissioner, you are correct in that I am aware of the rules of evidence and the admissibility of settlement negotiations. My request was of a professional nature and not under the rules of evidence, because you did not publish the letter to a trier of fact, but rather a third party. You will recall that on behalf of my client, I have been encouraging us to have fruitful settlement negotiations in this very simple coverage dispute, which have been met by demands for extra-contractual damages and attorney fees. My handling of this matter has been with an eye towards early settlement and resolution at a reasonable amount to settle a coverage dispute, and it has been met by unbending allegations of bad faith.

You will also recall that the only documents submitted to the court in seeking removal were heavily redacted revealing only the demanded amount and allegation that your client was seeking trebling of this amount. These communications provided the first notice to my client that this matter fell within diversity jurisdiction. Furthermore, I only provided this limited documentation to the court in light of your motion to remand, and only after speaking with you and informing you that if you had no intention of seeking amounts over $75,000 and would assure me of such in writing, that I would withdraw the notice of removal. I specifically informed you that my intent was not to create issue where there was none.

Please send all correspondence to Portland office

**PORTLAND OFFICE**
12909 SW 68th Parkway, Suite 320
Portland, OR  97223

**SEATTLE OFFICE**
701 SW 5th Avenue, Suite 4105
Seattle, WA  98104

March 16, 2015
Page 2

     With regard to the appraisal demand sent on behalf of your client on July 21, 2014, that demand was sent more than eight months after the litigation was filed and served on my client, and after my client filed affirmative defense to IFCA on the basis that the procedural notice was not properly followed. It also came after several settlement communications and your notice that the amount claimed could exceed $75,000. The invocation of appraisal provision was untimely. Your clients had already elected to seek remedy through litigation. Furthermore, even if the demand for appraisal had been timely, the appraisal provision would not apply. The appraisal provision provides in relevant part: "If "you" and "we" fail to agree on the amount of the loss." The issues in this case are not about the amount of the loss, but about what the insurance policy covers. There is no dispute as to the value of the items claimed, but rather whether there is coverage under the insurance policy, and whether your clients complied with conditions precedent to receive payment of benefits. An appraiser cannot determine coverage under a policy of insurance. I understand, based on the content of your recently received expert report, that you disagree with this position. As these are matters of contract interpretation and therefore law, we will present the issues to the court to resolve the dispute in advance of any trial in this matter.

     Thank you as always for your courtesies, and I welcome any discussions to resolve this matter.

                    Sincerely,

                    Dannielle N. Booth

DNB/ap
Watkins.14

**THE HONORABLE THOMAS S. ZILLY**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>Defendant. | NO. 11-2-02316-7<br><br>**DECLARATION OF ROGER HOWSON** |

I, Roger Howson, declare as follows:

1.      I am over 18 years of age and otherwise competent to make this Declaration, which is based on my personal knowledge.

2.      I am an insurance professional.  Attached as Exhibit No. 1 to this Declaration a true and correct copy of my curriculum vitae.

3.      I am the owner of ICDR, Inc ("CDR"), an insurance services corporation.  CDR was retained by the Plaintiffs to serve as their appraiser when they demanded appraisal under their homeowner's insurance policy. I understand that their insurer, Country Mutual, never responded to

DECLARATION OF ROGER HOWSON — 1

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

their appraisal demand.

4.    I have been involved with insurance matching issues for 30 years. Because the Kroneman's home had vinyl siding, Step Up could not install new siding on just a portion of the home because the color could not currently be matched with "like kind and quality." The standard practice in the insurance industry is to pay for repairs to undamaged portions of a structure to insure that the colors of a home match.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Signed at Seattle, Washington, this 28th day of May, 2015.

Roger Howson

DECLARATION OF ROGER HOWSON — 2

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

# EXHIBIT No.1

**ROGER HOWSON**
CDR: Claims Dispute Resolution
1100 Dexter Avenue North, Seattle, WA 98109
206.676.3838
rogerhowson@claimsdispute.com

## EXPERIENCE

**CDR: Claims Dispute Resolution,** *CEO and President*                                   2001-Present
  Appraisals, arbitrations, mediation, Fast-Track Appraisals, public adjusting, and adjusting services.

**Career Improvement Group,** *Director of Career Services*                               1999-2001
  Counselor, Trainer, Educator, Radio Host of KVI's "It's Your Job"

**Adjusters International,** *Vice President*                                             1994-2000
  Public adjusting services on residential and commercial claims.

**Kaye Company, Inc.,** *Vice President*                                                 1982-1994
  Public adjusting services on residential and commercial claims.

**Magnoni and Howson Claims Consultants,** *Public Adjuster*                             1981-1982
  Public adjusting services on residential and commercial claims.

**Arrowsmith Public Adjusters,** *Public Adjuster*                                        1980
  Public adjusting services on residential and commercial claims.

**State Farm Fire and Casualty Insurance Company,** *Field Claims Representative*        1977-1980
  Property and casualty, auto (property and bodily injury), and commercial claims.

## EDUCATION

| | | |
|---|---|---|
| **Master of Arts: Whole Systems Design** | Antioch University | 1999 |
| **Certified in Adult Development** | Hudson Institute of Santa Barbara | 1999 |
| **Bachelor of Arts: English** | University of Washington | 1977 |

## LICENSES

**Independent & Public Adjuster –** Washington

**Adjuster –** Oregon

## ASSOCIATIONS

**Puget Sound Adjusters Association**
  *Education/Editor*                                                                     2011-Present
**Tacoma Claims Adjusters Association**
  *President*                                                                           2008-2010
  *Education/Editor*                                                                     2005-Present
**Seattle Claims Adjusters Association,** *Education Chair*                               2005-Present
**Puget Sound Career Development Association**
  *President*                                                                           2007-2008
  *Board*                                                                               2005-2008
**International Career Development Conference,** *Associate/Sponsor*                       2002-2008
**Property Loss Research Bureau,** *Associate/Sponsor*                                     2008

**ROGER HOWSON – page 2**

## TESTIMONIAL: DEPOSITION / TRIAL

*Martin Manglona v Allstate Insurance.* Trial Testimony 1995

*Evelyn Layco v Allied/Nationwide Insurance.* Trial Testimony 2008

*Grace Missionary Baptist Church v Guide One Insurance.* Deposition 2008/Trial Testimony 2009

*Barbara & Jerry Kelly v Allstate Insurance.* Deposition 2009

*Michael Scott v Esurance.* Deposition 2009

*Scott McGowan v PEMCO Insurance.* Deposition 2009

*McClincy Brothers Floor Covering, Inc. v Truck Insurance Exchange.* King County Superior Court No. 08-2-38848-4 SEA. Deposition 5/26/10

*Janet & Roger Stegall v Hartford Insurance.* King County Superior Court No.07-2-39457-5 SEA. Trial testimony 7/21/10

*James & Erica Jamir v Travelers Insurance.* Deposition 2010

*Saesere & Saechao v Liberty Mutual.* King County Superior Court No. 09-2-21794-7 SEA. Trial testimony 11/29/10

*MK Lim, Inc. dba Best Lynnwood Motor Inn v Greenwich Insurance Company.* United States District Court Western District of Washington at Seattle No. CV10-00374 MJP. Trial testimony 6/22/11

*Joel Johnson v Mount Vernon Insurance.* King County Superior Court No.10-2-03695-4SEA. Trial testimony 10/10/11

*Barbara Dove v Farmers Insurance Company.* Deposition 2011

*Hayes v Safeco Insurance Company.* Deposition 2012

*Evergreen Restoration Inc. v Estate of Edward Seldon Thayer.* Deposition 2012

*Alki Condominium Association v Farmers Insurance Company.* Deposition 2012

*Elizabeth & Scott Yancey v. The Automobile Insurance Company of Hartford.* US District Court Western District of Washington at Seattle No. 11-01329RAJ. Trial testimony 12/6/12

*Washington Federal, Inc. v USAA Casualty Insurance Company.* Deposition 1/30/2013

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>                   Plaintiffs,<br><br>     v.<br><br>COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>                   Defendant. | **NO. CV 14-01223**<br><br>**DECLARATION OF GARY WILLIAMS** |

I, Gary Williams, declare under penalty of perjury as follows:

1.    I am over 18 years of age and otherwise competent to make this Declaration, which is based on my personal knowledge.

2.    I am an attorney licensed in the state of Washington. I was retained as an expert by Plaintiffs in the above-captioned matter to form and express opinions regarding Defendant, Country Mutual's handling of the Kroneman claim. All opinions herein are based on and expressed on a more probable than not basis.

**DECLARATION OF GARY WILLIAMS-1**

**WILLIAMS LAW OFFICE**
252 Blueberry Hill Drive
Quilcene, WA 98376
360.765.0729
gw@areyoucovered.com

3.      Attached to this Declaration is a true and correct copy of the expert report that I authored for this case. My report accurately sets forth my opinions, conclusions, my qualifications, the materials and data I reviewed in this case, and contains a true and correct copy of my then current curriculum vitae. My report accurately describes the Country Mutual claims file, which was produced in discovery. I hereby incorporate here by this reference all facts, opinions, and conclusions expressed in my report.

4.      The fire melted vinyl siding on the Kroneman home, but only on two sides. The claims file documents that Country Mutual only paid for the rear and right sides of the house to be resided, despite the fact that the new vinyl siding did not match the old. This is not an uncommon issue. I have personally been involved in appraisals where matching issues were at the heart of the dispute, usually resolved by siding the entire house, not just the walls which were melted. The same goes for replacing an entire slope of a damaged roof, or replacing an entire roof, or replacing several rooms of carpet when only one is damaged, or painting a whole house when painting only the damaged portion will not match. Vinyl siding cannot be painted so it often presents this issue. I obtained one summary judgment ruling where an insurer refused to side all four walls until it lost this precise issue.

5.      I have personally seen matching issues arise in property insurance cases many times over the years. Common matching issues involve vinyl siding, flooring, carpets, paint, cabinets, windows and doors, hardware and lighting. Indeed, matching issues are handled by adjusters and appraisers in many, perhaps most, substantial fire claims. Insurance companies complain, but usually understand that they have a duty to pay for repairs to bring the house back to its pre-fire condition. This includes, among other things, having four walls which are the same color. An insured's home would diminish in value if its siding was of two different colors

**DECLARATION OF GARY WILLIAMS-2**

**WILLIAMS LAW OFFICE**
252 Blueberry Hill Drive
Quilcene, WA 98376
360.765.0729
gw@areyoucovered.com

6.     Country Mutual refused to participate in appraisal. Country Mutual leaned heavily on the fact that the claim is in litigation, but failed to mention that no stay of appraisal was either sought or entered.

7.     Country Mutual could have obtained a stay of the litigation by agreement or motion, not by simply ignoring the insured's request for appraisal. Ignoring an appraisal demand for months waives any right to object to appraisal. The duty of good faith implied in every insurance policy requires the insurer to communicate promptly and meaningfully with the insured.

8.     I have worked as an insurance adjuster, appraiser, or insurance lawyer since 1968. I have been involved in many appraisals in Washington State, either as adjuster, counsel for a party or as one of the appraisers. In many of those appraisals (probably around 50%) there has been ongoing, parallel litigation. Often, the appraisal demand will come after litigation is initiated. There is no rule which disfavors appraisal on that basis. I have never before seen an insurer simply ignore an appraisal demand, as Country Mutual did here. I have never seen an appraisal stopped solely on the basis that litigation was pending.

9.     Property insurance policies have included appraisal clauses since at least the middle of the 19th century. There is no general rule or local custom which prevents parallel litigation in appraisal, or prevents parallel appraisal in litigation. Appraisal removes difficult damages issues from litigation, and thus helps resolve lawsuits. It can also be very helpful to the appraisal process to have parallel litigation, because the parties can, and often do, ask the court to resolve appraisal-related legal issues. Trial court judges can and do set and enforce hearing dates, remove unqualified appraisers, or rule on coverage issues which impact the amount of loss being appraised.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct:

**DECLARATION OF GARY WILLIAMS-3**

**WILLIAMS LAW OFFICE**
**252 Blueberry Hill Drive**
**Quilcene, WA 98376**
**360.765.0729**
**gw@areyoucovered.com**

1
2
Signed at Quilcene, Jefferson County, Washington, this 27th day of May, 2015.
3
4
5
GARY WILLIAMS WSBA # 9580
Attorney for Plaintiffs
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26   **DECLARATION OF GARY WILLIAMS-4**

**WILLIAMS LAW OFFICE**
252 Blueberry Hill Drive
27   Quilcene, WA 98376
360.765.0729
28   gw@areyoucovered.com

# EXHIBIT No.1

## GARY WILLIAMS
### 252 Blueberry Hill Drive - Quilcene, Washington 98376
### (360)765-0729 - gw@areyoucovered.com

# KRONEMAN v. COUNTRY MUTUAL INSURANCE COMPANY
## Western District of Washington, No. 2:14-cv-01223 - TSZ

### I. Qualifications

I have qualified as a claim handling expert and have testified in both state and Federal courts in Washington. My qualifications include:

1. Claims adjuster/supervisor from 1968 through 1975, for Safeco, American States. Independent insurance adjuster from 1975 to 1981.
2. Insurance law practice since 1979, both as defense and policyholder's counsel.
3. Designed and taught a program in insurance adjusting at Pierce College.
4. Lecture at continuing legal education seminars on insurance law, claim handling and litigation.
5. Published both locally and nationally on claim handling, appraisal, and related insurance claim subjects.

Please see Exhibit A, my attached curriculum vitae for more detail.

### II. Assignment

Counsel asked me to review the claim file and related documents and provide any opinions on whether Country Mutual Insurance Company (hereinafter "Country Mutual") adjusted this first party property claim within the standards and practices for claim handling in Washington.

## III. Materials Reviewed and Data Considered

I considered the insurance company's claim files, the insurance policy, documents obtained in discovery, and the Washington Unfair Claims Settlement Practices Regulations. I also relied upon my forty six years of experience as an insurance adjuster, teacher and lawyer. I am very familiar with Washington's standards of care and practice in the adjustment of insurance claims.

My assignment here is not to form or apply legal conclusions to the facts of the adjustment, but to discuss standards of care and conduct in the insurance claim industry, and to consider whether those standards were met by Country Mutual in this claim.

## IV. Standards of Good Faith Claim Handling[1]

1. Washington has clear standards of good faith claim handling. Claim professionals know these standards and know they are required to meet them. Claim handling standards include those found in the common law, those found in the form of statutes and administrative regulations, and standards described in case law. The claims handling regulations, for example, are clear, mandatory guidelines for insurers to follow, particularly in first party claims. These principles are neither complex nor highly technical.

2. The essence of good faith claim service is to remember always that the claims professional's job is to help, not hurt the damaged insured. A first party claim should not be an adversarial proceeding. The money which pays for an insurer's investigation and adjustment comes from premium dollars. Premium dollars come from policyholders, so the insurer's investigation and adjustment should benefit the policyholder who paid for it.

3. Equal consideration is a key standard. Insurers have fiduciary or quasi-fiduciary duties to their customers, which has motivated courts to find standards within fiduciary models. One such standard is that the insurer must give at least equal consideration in all matters to the policyholder. This standard, more than any

---

[1]This section has appeared in prior reports on similar subjects.

March 2, 2015
Kroneman v. Country Mutual Insurance Company
Report of Gary Williams-2

other, defines many aspects of the insurer-insured relationship.

4. The standards of care and practice in claim handling don't vary much across the country. Industry standards are nationwide and apply regardless of fair claims acts or regulations, which do vary from state to state. Our Unfair Claims Settlement Practices Regulations (usually called "the WACs") are a set of minimum standards promulgated by our Insurance Commissioner. They are taken from a national set of standards developed by the National Association of Insurance Commissioners. The WACs describe many of the industry standards for good faith claim handling.

5. Some of these principles are not generally known or appreciated by the general public, who often believe an adjuster's job is to pay as little as possible. To the contrary, an adjuster's job is to pay what is owed according to the policy, no more and no less, and to do it as soon as possible. Insurance claim adjusting is a service profession.

## V. Violations of Standards of Good Faith Claim Handling

1. The fire melted vinyl siding on the home, on two sides. The claims file documents that the insurer only paid for the rear and right sides of the house to be resided, despite the fact that the new vinyl siding did not match the old. This is not an uncommon issue. It comes up often and is resolved by siding the entire house, not just the walls which were melted. In one local case, an insurer refused to side all four walls until it lost this issue on summary judgment.[2]

2. I have personally seen matching issues arise in property insurance cases many times over the years. Insurance companies complain, but usually understand that they have a duty to pay for repairs to bring the house back to its prefire condition. This includes, among other things, having four walls which are the same color.

3. WAC 284-30-330(4) prohibits insurers from refusing to pay claims without conducting a reasonable investigation. It is an outgrowth of the principle that the insurer should carefully investigate the claim, in a balanced, objective

---

[2]*Bromley v. Foremost Insurance Co.*, Jefferson County Superior Court, # 08 2 00258 5.

fashion. The insurer must treat the insured's interest at least equal to its own.

4. WAC 284-30-330(2) forbids "[F]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." See, also, WAC 284-30-360(3), which requires an answer within ten working days to a pertinent communication. Despite this clear directive, Country Mutual ignored its insured's appraisal demand, even though policy required Country Mutual to appoint an appraiser and notify Kroneman within 20 days of notice.

5. WAC 284-30-360(3) grew from the universal need for prompt and meaningful communication between insurer and insured. The absence of meaningful communications is never a good thing in the context of an insurance claim.

6. WAC 284-30-330(7) prohibits insurers from compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings. This regulation is based on the principle that insurers should avoid delay, and must investigate and pay claims as soon as reasonably possible.

7. Country Mutual refused to participate in appraisal. On July 21, 2014, Kroneman demanded appraisal in writing. Country Mutual then failed to respond to the appraisal demand. Country Mutual's failure to respond to an insured's appraisal demand was in violation of WAC 284-30-360(3).

8. Having no response from Country Mutual, on January 16, 2015, Kroneman filed a complaint with the Washington Insurance Commissioner. On February 10, 2015, Country Mutual's lawyer wrote to the Commissioner explaining that Country Mutual refused to participate in appraisal, and citing a very old case in support of its position. Country Mutual leaned heavily on the fact that the claim is in litigation, but failed to mention that no stay of appraisal was entered. If Country Mutual wanted to avoid appraisal, it should have asked the Court for a stay. Simply ignoring an appraisal demand constitutes a waiver to object to appraisal.

9. The following is the appraisal clause in the policy. Note that it has no "litigation" exception. Upon receipt of the insured's appraisal demand, Country Mutual was required to choose its own appraiser within 20 days of the insured's demand. This was not done. Instead, Country Mutual ignored the appraisal demand

March 2, 2015
Kroneman v. Country Mutual Insurance Company
Report of Gary Williams-4

until the Insurance commissioner forced Country Mutual to respond.

E. Appraisal
If "you" and "we" fail to agree on the amount of
loss, either may demand an appraisal of the loss.
In this event, each party will choose a competent
and impartial appraiser within 20 days after
receiving a written request from the other. The
two appraisers will choose an umpire, who shall
be competent in the trade or skill necessary to
assess the loss. If they cannot agree upon an
umpire within 15 days, "you" or "we" may request
that the choice of an umpire be made by a judge
of a court of record in the state where the "residence
premises" is located. The appraisers will
separately set the amount of loss. If the appraisers
submit a written report of an agreement
between them to "us", the amount agreed upon
will set the amount of loss and be final. If they fail
to agree, they will submit their differences to the
umpire. A decision agreed to by any two will then
set the amount of loss and be final.
Each party will:
1. Pay its own appraiser; and
2. Bear the other expenses of the appraisal and
umpire equally.

10. Appraisal is voluntary until one party demands it. Once that happens,
appraisal becomes mandatory. Absent a stay, Country Mutual had a clear,
*contractual duty* to participate in appraisal. When it chose to ignore the demand, it
breached the policy contract.

11. The mere fact that the parties are in litigation does not mean that an
appraisal should not proceed. I have personally participated in many litigated cases
where appraisal and litigation went forward concurrently. In its response to the
Insurance Commissioner, Country Mutual stated, "Washington case law supports
that, in most circumstances, once suit is commenced, the appraisal clause of an
insurance policy may not be invoked." That statement is simply not true, not as a
matter of law nor of local practice.

12. WAC 284-30-340 requires insurers to keep claim files which contain all
notes and work papers pertaining to the claim in enough detail that pertinent events
and dates of the events can be reconstructed. Country Mutual failed to do that here,

March 2, 2015
Kroneman v. Country Mutual Insurance Company
Report of Gary Williams-5

because its claim file produced does not include anything which developed after the suit was filed. The claim file is thus incomplete.

13. WAC 284-30-330(5) addresses [F]ailing to affirm or deny coverage of claims within a reasonable time after fully completed proof of loss documentation has been submitted. This regulation reflects industry standards which address promptness and the need for claim resolution.

14. Insurers have a duty to conduct a reasonable claim investigation. Insurance company investigations are funded with premium money, so the investigation must be balanced and objective. See WAC 284-30-330(4), which forbids "[R]efusing to pay claims without conducting a reasonable investigation." Here, Country Mutual conducted a faulty investigation and concluded that there was no coverage to properly repair the Kroneman's home.

15. Country Mutual was slow in paying a number of items. These included utilities for the rental house, personal property actual cash value and replacement costs, bills from First Choice Restoration, and repairs to the house. Country Mutual refused to pay for a necessary hygienist.

16. Additional living expense (ALE) is an important coverage. It allows insureds to lead a relatively normal life while recovering from a loss. ALE covers the necessary additional expense for the insured family to maintain its lifestyle during restoration of their home and contents. The Kronemans had pets and children, both of which complicated their ALE claim. The Kronemans were living in a hotel because nobody could find a decent furnished rental house within the school district, which would accept pets. This is not an uncommon problem.

17. Country Mutual's solution to the problem was unique. After finding a house which Country Mutual favored, the company applied some pressure. On October 25, 2012, Country Mutual decided it would only approve the hotel expense for one more day if the insureds rejected Country Mutual's choice of a rental house.[3]

18. The Kronemans received an eviction notice in December, 2012, because Country Mutual was late paying the rent.

19. Good faith claim handling does not include threatening to cut off benefits if the insured does not do exactly what the insurance company desires.

_____

[3]See claim Notes 000468-9.

March 2, 2015
Kroneman v. Country Mutual Insurance Company
Report of Gary Williams-6

Unfortunately, ALE coverage is often a pressure point – it gives the insurer a vehicle to coerce the insureds. Coercion is not good faith claims handling.

## VI. CONCLUSION

This claim was, and continues to be poorly handled by Country Mutual. The problems described above were not complex, but showed that the insurer considered its interests above those of the insureds. Competent claims professionals would have resolved each of these issues in favor of the insureds.

*Gary Williams*

_____

GARY WILLIAMS WSBA 9580

**March 2, 2015**
**Kroneman v. Country Mutual Insurance Company**
**Report of Gary Williams-7**

# EXHIBIT A

March 2, 2015
Kroneman v. Country Mutual Insurance Company
Report of Gary Williams-8

.

**GARY WILLIAMS**
**252 Blueberry Hill Drive, Quilcene, WA 98376**
**360-765-0729 - areyoucovered.com**

## Education

Juris Doctor, 1979, University of Puget Sound School of Law, Tacoma, WA
Bachelor of Arts, English, 1967, Central Washington University, Ellensburg, WA
Associate in Claims, 1975, Insurance Institute of America.

### Law Practice
- Partner, Smith and Williams, Tacoma, Washington, 1979-1984. General trial practice, with focus on insurance defense.
- Partner, Williams and Cushing, Tacoma, Washington, 1984-1987. Small litigation firm with insurance defense focus. Represented many insurers and their policyholders in auto, miscellaneous liability, coverage matters.
- Williams Law Office, Port Angeles, Washington, 1987-2002. Plaintiff and defense insurance and bad faith practice. Expert witness, mediator, appraiser.
- Williams & Tassie, Port Angeles, Washington, 2002-2005. Plaintiff and defense insurance and bad faith practice. Expert witness, mediator, appraiser.
- Williams Law Office, Quilcene, Washington, 2005-present. Plaintiff insurance and bad faith practice. Expert witness, mediator, appraiser.

Admitted to practice in Washington State courts since 1979, Eastern and Western District Federal courts, Court of Appeals.

Expert witness, 1990-present. Serve as forensic expert in insurance coverage, bad faith, legal and insurance related professional liability cases.

Martindale-Hubbell rating Av.

### Insurance Claims Professional
- Adjuster, then Adjuster in Charge, Safeco Insurance Company, 1968-1971. Multiple line insurance claims handling. Attended Safeco claim school.
- Adjuster, American States Insurance Company, 1971-1975. Handled fire claims, casualty claims.
- Independent Adjuster, Western States Adjustment Services, 1975-1981. Larger fire and property claims, casualty claims for various insurance

companies and self-insured entities. Attended law school during this period of time.

## Teaching
Pierce College, Tacoma, Washington, 1981-1983. Consulted to develop curriculum and taught courses in Insurance Claims Adjusting program.

University of Puget Sound School of Law, Tacoma, Washington. 1984-1987. Adjunct Instructor.
- Taught Legal Writing II, a second year appellate writing and oral argument course.
- Taught Comprehensive Trial Advocacy, a year long civil and criminal trial practice course.
- Coached National and Frederick Douglas moot court teams.

Peoples Law School, Washington State Trial Lawyers Association community outreach program. Taught insurance law, history of insurance.

Lecturer, Continuing legal education seminars. Trial practice, insurance law, claim practices and related topics. 1985 - present.

Chair, WSTLA Annual Insurance Law Seminar in Seattle and Spokane, Washington, 2001, 2010. Co-chair 2011.

Faculty, National Institute for Trial Advocacy, 2003.

## Dispute Resolution
- Judge Pro-tem, Clallam County District Court, Port Angeles, Washington, 1993-1996.
- Arbitrator, in Clallam County Mandatory Arbitration Program, and in private insurance disputes, particularly underinsured motorist claims. 1984-present.
- Appraiser. Serve as appraiser in property insurance appraisal proceedings. 1985-present. These usually involve damage to homes or businesses, and business interruption claims.

## Pro Bono Work
- Chair, Pro Bono Committee, Pierce County Bar Association, Tacoma, Washington, 1983-1986.
- Founding Chair, Clallam County Pro Bono Program, 1991.

## Affiliations
Washington State Bar Association, 1979-present.

Washington Association for Justice, 1979-present.
- Chair, Insurance Law Section, 2000-2001
- Member, Technology Committee, 1999-2004
- Member, Judicial Relations Committee, 2002-2005
- Teacher, Peoples Law School

American Bar Association, 1979-present. Tort and Insurance Practice Section.
American Association for Justice, 1979-present.
Defense Research Institute, 1980-1988.
Clallam County Bar Association, 1987-present. Past president.
Jefferson County Bar Association, 2007-present.

## Writings

*Appraisal: Frequently Asked Questions.* Trial News, November, 2008.
Property insurance appraisal clauses are often misunderstood and
misinterpreted. Common questions and issues.

*Proving Value in Homeowners Loss Claims: Strategies and Techniques for
First Party Appraisals on Homeowners Coverage.* Written for WSAJ
Insurance Law Seminar, 2010.

*Avoiding Exclusion Pitfalls: The Purpose of Insurance Is to Insure.*
Washington State Trial Lawyers Association, Insurance Law Seminar,
January, 2008. Policy interpretation and construction can help the
policyholder work around some common exclusions.

*How to Read an Insurance Policy.* Trial News, December, 2000. Practical
and legal tips on reading and understanding insurance policies.

*Litigating the Bad Faith Case.* A basic, beginner-level paper on
prosecuting an insurance bad faith case in Washington state. Presented to
a King County Bar Association seminar.

*The Coventry Decision: A Sword for First Party Benefits?* Discussion of
*Coventry Associates v. American States Insurance Company*, 136 Wn.2d
269, 961 P.2d 933 (1998). Written for a Washington Trial Lawyers
Association seminar in 1999.

*The Good Claim File.* A tongue in cheek look at claim file mistakes.
Written for the Fifth Annual Reed McClure Insurance Law Seminar.
*Fire Insurance Claims: Combating the Arson Defense.* Protecting the
innocent insured from a false accusation of arson. Written for WSTLA
Insurance Law Seminar, 2001.

*Examination Under Oath: Investigative Tool or Weapon of Mass Destruction?* Written for the auto insurance lawyer, this paper addresses the use of the examination under oath in UIM and PIP claims. 2001.

*Combating the Insurer's Fraud Defense*, an article published in TRIAL Magazine, in October, 1998.

*Winning the Property Insurance Appraisal.* Trial Magazine, October 2009. Appraisal, from the standpoint of policyholder's counsel.

*Is the Denial Reasonable Under IFCA? Read the Policy for the Answer.* Addresses the new Washington Insurance Fair Conduct Act in the context of penalties for unreasonably denying claims. Written for WSAJ Insurance Law Seminar, 2010.

## Prior Testimony
This list represents my best effort at listing cases in which I have testified, at trial or deposition, as a retained expert witness, during the last five years. I may have forgotten one or two.

*McKenna Water District v. Chicago Title*, Pierce County Superior Court No. 03-2-138873. Deposition 4/24/2004. Trial testimony 3/2/2005.

*Lim v. Greenwich Insurance Co.*, United States District Court, Western District of Washington No. CIO-cv-00374 MJP. Deposition 3/18/2011. Trial testimony 6/21/2011.

*Homchick v. Allstate.* United States District Court, Western District of Washington, No. CO-5639-RJB. Deposition 8/19/2005.

*Zander v. New Hampshire Indemnity*, United States District Court, Western District of Washington, No. CO5-5154FDB. Deposition 5/3/2006.

*Grace Missionary Baptist Church v. GuideOne Insurance Co.*, Pierce County Superior Court No. 06-2-11029-9. Deposition May 28, 2008. Trial testimony January 20, 21, 2009.

*Walker vs. Metropolitan*, Western District of Washington, No. Cv-12-00173JLR. Deposition November 5, 2012.

*Wade vs. American Motorists Insurance*, King County Superior Court No. 08-2-26835-7. Deposition December 11, 2009.

*Johnson v Safeco*, King County Superior Court, No.10-2-03695-4 SEA, Deposition   September 20, 2011.

*Consemiu v. Allstate Insurance Company*, King County Superior Court, No. 10-2-10480-1 KNT. Deposition, January 3, 2013.

*Dove v. Farmers Insurance Company of Washington*, King County Superior Court, No. 10-2-18979-3 SEA, Deposition September 28, 2011.

*America Best Foods v. Alea London*, King County Superior Court, No. 05-2-07173,  Deposition November 7, 2011.

*Isilon Systems v. Twin City Insurance*, United States District Court, Western District of Washington. Deposition  March 16, 2012.

*Espinoza v. American Commerce Insurance Company*, Yakima County Superior Court, No. 11-2-02316-7   Deposition July 30, 2012.

*Harmon v. State Farm Insurance Company*, King County Superior Court No. 2:14-CV-00033, deposition January 21, 2015.

## Compensation

$375 per hour for consultation, research, court or deposition time.
$200 per hour travel time, plus direct expenses.

THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>            Plaintiffs,<br><br>v.<br><br>COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>            Defendant. | NO. CV 14-01223<br><br>**DECLARATION OF BERNIE WILLIAMS** |

I, Bernie Williams, declare as follows:

1.    I am over 18 years of age and otherwise competent to make this Declaration, which is based on my personal knowledge.

2.    Attached as Exhibit No. 1 to this Declaration is a true and correct copy of my curriculum vitae. I have extensive experience in the construction industry and I have prepared numerous estimates of repair for fire damaged homes. Over my career I have worked on behalf of insurance companies and policy holders.

DECLARATION OF BERNIE WILLIAMS — 1

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

3.    During the pendency of the Kronemans' claim, I functioned as the senior insurance restoration estimator for Step Up Construction.

4.    The Kronemans retained Step Up Construction ("Step Up") to repair their fire damaged home. As the functioning senior insurance restoration estimator for Step Up, I visited the loss site, inspected the damage and prepared an estimate of repairs for the damaged structure.

5.    Because the home had vinyl siding, Step Up could not install new siding on just a portion of the home because the color was impossible to match with "like kind and quality." Vinyl siding is produced using colors that come from dye lots. Those dye lots change over time. Vinyl siding is also subject and vulnerable to weathering and fading from the sun. As a result it is impossible to match after its been on a home for any extended period of time. The standard practice in the insurance industry is to pay for repairs to undamaged portions of a structure to ensure that the colors of a home match.

6.    Country Mutual refused to pay for replacement of the siding on all four sides of the home, arguing that because two elevations were not physically damaged, it was not obligated to replace them. An insured's home would significantly diminish in value if its siding was of two different colors.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DECLARATION OF BERNIE WILLIAMS  — 2

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425/835-1619; FAX: 206/971-5080

1    Signed at _____1:17PM_____, Washington, this 27th day of May, 2015.

2

3

4                                    _____
                                     Bernie Williams

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   DECLARATION OF BERNIE WILLIAMS — 3                    LAW OFFICES OF MICHAEL T. WATKINS
                                                          6100 219th ST SW, SUITE 480
                                                          MOUNTLAKE TERRACE, WA  98043
                                                          425/835-1619; FAX: 206/971-5080

# EXHIBIT No.1

# BERNIE WILLIAMS

EMAIL: bernie@aspirantconsulting.com
TELEPHONE: 206.422.7821

## QUALIFICATIONS

### Commercial Construction Superintendant:

Summary:

- The Construction Superintendent coordinates all site construction activities and supervises all field personnel as required to successfully complete a project on schedule and within budget. This includes maintaining the highest quality, supervising all trade and field personnel, while administering good construction safety practices with all on-site activities. Maintains the job site office and closes out projects. Reports to Vice President.

Core Responsibilities:

- Coordinates and supervises all construction activities.
- Directs all field personnel to achieve completion of a project on schedule, within budget, with quality workmanship that conforms to original plans and specifications.
- Maintains construction schedule, identifies and solves problems.
- Orders materials and schedules inspections as necessary throughout the construction process.
- Understands the project plans, specifications and construction systems.
- Maintains positive relationships with customers, contractors, suppliers and other employees.
- Prepares, schedules and supervises completion of a final punch list.
- Promotes job site safety, encourages safe work practices and rectifies job site hazards immediately.
- Ensures all company employees and contractors are adhering to the company safety policy.
- Maintains an organized job site, including the construction office.

Core Competencies:

- Organization: Utilizes strong organizational skills.
- Communication: Displays strong written and oral communication skills and employs effective listening skills.
- Problem Solving: Analyzes problems and makes sound decisions in a timely manner based on objectives, risks, implications and costs.
- Interpersonal Skills: Tactful and mature demeanor with well developed interpersonal skills including the ability to work well with diverse personalities.

**Restoration/Remodel Project manager**

Summary:

- The function of a Restoration/Remodel PM is to plan, direct, coordinate, or budget, usually through subordinate supervisory personnel, activities concerned with the construction and maintenance of structures, facilities, and systems. Participate in the conceptual development of a construction project and oversee its organization, scheduling, and implementation.

Core Responsibilities:

- The PM looks over a proposed project to determine how and when the work will be performed, including prep work that must be completed before the building starts.
- The PM develops a deliverables schedule to provide a road map that the construction team must stick to in order to finish the job in a timely and cost-effective manner.
- The construction project manager is responsible for planning the work. That requires coordinating and directing the efforts of the construction workers.
- The PM must obtain the equipment and supplies -- from nails to bulldozers -- necessary to complete the project and find a place to store it and implement a method for tracking inventory. It
- The PM sets specific project goals after the contract with the owner (client) is signed. The PM reviews the contractual conditions of performance - requirements and deliverables - to determine precisely the work that must be accomplished in order to satisfy the contract. He or she then determines cost and time goals as well as "micro-goals" for accomplishing different phases of the construction. Based on these goals, the PM sets out the number of workers and types of supplies and materials necessary to reach them
- The PM sets a trade specific schedule with a number of deadlines for the various projects that must be completed. The PM must also review the work on a daily basis to ensure that it's timely progressing. If there's a slow down - whether because of weather, an accident or simply a task that takes longer than expected - the PM must make changes.
- Before the work begins, the PM runs cost estimates - considering wages, equipment and materials - to help establish a budget. Cost-projection is a crucial aspect of construction project management because it determines the parameters under which not only the work will be done, but also on which the project's financial success will be determined [source: Shaker].
- The PM must ensure that his crew doesn't overrun the budget. Thus, he or she oversees costs on a daily or at least weekly basis, comparing costs incurred to the estimates and limiting or eliminating costs as necessary to stay under budget.

Core Competencies:

- Organization: Utilizes strong organizational skills.
- Communication: Displays strong written and oral communication skills and employs effective listening skills.
- Problem Solving: Analyzes problems and makes sound decisions in a timely manner based on objectives, risks, implications and costs.
- Interpersonal Skills: Tactful and mature demeanor with well developed interpersonal skills including the ability to work well with diverse personalities.

**Construction Estimator**

Summary:

- An estimator in the construction industry is responsible for compiling estimates of how much it will cost to provide a client or potential client with products or services. He or she will do this by working out how much a project is likely to cost and create budgets accordingly. The job involves assessing material, labor and equipment required and analyzing different quotes from sub-contractors and suppliers. An estimator is concerned with getting the best price that will win the contract in a competitive bidding situation, while ensuring that the contract can be carried out profitably.

Core Responsibilities:

- Prepares and maintains status of plan reproduction
- Solicits and maintains communication with subcontractors and vendors
- Prepares subcontractor bid packages
- Transmits addenda and other bid information to subcontractors
- Ensures that the company has the proper coverage from subcontractors on bid day
- Contacts supply houses to obtain additional subcontractor bids
- Shows creativity and resourcefulness to gain better pricing from subcontractors
- Submits bids and budgets by the bid deadline
- Enters all relevant information into Xactimate and/or other estimating software.
- Review bid requirements thoroughly and asks follow-up question on every bid
- Has a thorough understanding of the scope for specific trades assigned
- Develops RFI's and clarifications and ensure adequate subcontractor coverage.
- Performs a comprehensive "bid day" analysis and scoping of specific assigned trades
- Understands how to fit subs to the size/scope of project
- Creates bid lists that fit scope of job, ensuring that the company has the right subs for the project
- Minimize and clearly identifies exclusions.
- Include value-engineering ideas on every bid.

Core Competencies:

- Organization: Utilizes strong organizational skills.
- Communication: Displays strong written and oral communication skills and employs effective listening skills.
- Problem Solving: Analyzes problems and makes sound decisions in a timely manner based on objectives, risks, implications and costs.
- Interpersonal Skills: Tactful and mature demeanor with well developed interpersonal skills including the ability to work well with diverse personalities.
- Comprehensive mastery of estimating software

## EDUCATION

Victoria Community College
National Registered Paramedic (NREMT-P)

Xactimate Training Center
Expert Certification

PMI
CAPM Course
(Certified Associate in Project management)

## PROFESSIONAL EXPERIENCE

- Aspirant Consulting Group, LLC
  Principal Member

- Step Up Construction: DBA Berg Restoration
  Senior Insurance Restoration Estimator

- GCR
  Estimator

- Sterling Group DKI
  Senior Estimator
  Estimator/Commercial loss

- Kencade Construction, Inc.
  Senior Estimator

- Forge Construction
  Owner/Estimator/Project Manager

- McBride Construction Resources, Inc.
  Large Loss Project Superintendant

- McBride Construction Resources, Inc.
  Construction Defect Superintendant

The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT
OF WASHINGTON AT SEATTLE

KAREN AND KEITH KRONEMAN,
husband and wife, and the marital community
thereof,

                            Plaintiffs,

        v.

COUNTRY MUTUAL INSURANCE
COMPANY,

                            Defendant.

NO. CV 14-01223 TSZ

CERTIFICATE OF SERVICE

        Under penalty of perjury under the laws of the State of Washington, I declare that on this

28th day of May, 2015, I electronically filed the foregoing with the Clerk of the Court using the

CM/ECF system with which will send notification of such filing to the following:

Daniel Thenell, WSBA#37297
Kirsten Curtis, WSBA#48985
Thenell Law Group
12909 SW 68th Parkway, Suite 320
Portland, OR 97223
Telephone: (503) 372-6450
dan@thenelllawgroup.com
Kirsten@thenelllawgroup.com

Sonia Chakalo

CERTIFICATE OF SERVICE — 1

LAW OFFICES OF
MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE,
WA 98043
425/835-1619; FAX: 206/971-5080