THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>Defendant. | NO. CV 14-01223<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Note on Motion Calendar: June 19, 2015** |

## I.    RELIEF REQUESTED AND SUMMARY

Plaintiffs Keith and Karen Kroneman (the "Kronemans") respectfully request that Country Mutual Insurance Company's ("Country")  Motion for Summary Judgment be denied and their Motion for Partial Summary Judgment be granted.

During the adjustment of the Kroneman's covered fire claim, a dispute arose as to whether the policy language providing for the replacement of " . . . damaged property using standard new construction materials of like kind and quality . . . " required Country to replace

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 1

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1  all four sides of the home in order to provide a reasonable color match between the damaged

2  and undamaged siding.[1]

3      In addition to its refusal to replace two sides of the Kronemans' home, Country, in bad

4  faith, unreasonably refused to pay for some of the Kronemans' damaged personal property, did

5  not respond to the Kronemans' demand for appraisal and violated several Washington

6  Administrative Code claims handling regulations. See Gary Williams' Expert Report attached

7  to his Declaration.

8  ## II.   FACTS

9      To avoid duplication, Plaintiffs incorporate by this reference all facts, Declarations, legal

10  authority and arguments presented in their Motion for Partial Summary Judgment filed on May

11  28, 2015. Dkt. # 24.

12

13      On September 29, 2012 the Kronemans suffered a covered loss at their residence located

14  at 9507 149th St East, Puyallup, WA. Watkins Dec at ¶ 3.

15      The Kronemans timely submitted a claim to their insurer, Country, for benefits to repair

16  their real property with "like kind and quality" materials, replace their damaged personal

17  property, and provide additional living expenses ("ALE"). Watkins Dec at ¶ 4.

18

19      The Kronemans retained the services of a public adjuster Kyle Grinell ("Grinell") to

20  assist the Kronemans in presenting their claim to Country Mutual. Watkins Dec at ¶ 5.

21      Country Mutual assigned Greg Stariha ("Stariha") an adjuster located in the state of

22  Washington, to investigate and adjust the Kronemans' claim. Watkins Dec at ¶ 6.

23

24  [1] Country's unreasonable refusal to pay for replacement of two sides of the Kronemans' went against the policy language, the industry standard, its customary adjusting procedures, and had the

25  potential to diminish the value of its insureds' home.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 2

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

**A.     Violation of WAC 284-30-330((14) unfairly discriminating against claimants because they were represented by a public adjuster.**

Because the Kronemans retained the services of Grinnell, Stariha took an adversarial position and discriminated against them during the adjustment of their claim in violation of WAC 284-30-330(14). As Grinnell testified in his deposition:

Q.     Okay. At that first meeting where the representatives for Country were present, do you recall anything about the conversation at that meeting?

A.     One thing I recall pretty specifically. Two – two things I recall pretty specifically.

Q What do you recall?

A One was Greg Stariha just flat saying that he was going to treat the insureds different; he was going to be tighter on them because I was involved. And another thing was Greg just saying -- Greg Stariha saying that there was no way he was going to pay for the other two elevations of siding. And I told him, if it was my home, I would sue him right then. I think that surprised him that someone would say that.

Q.     With regard to the first statement that you recall that I believe -- and correct me if I'm paraphrasing this incorrectly. You said that Mr. Stariha said that he was going to be tighter on the insureds. Were those the actual words he used?

A.     I don't remember if that's the actual word that he used.

Q.     Okay.

A.     But that was definitely the gist of it.

Q.     And what do you mean by that? "Tighter": What does that mean?

A.     Essentially that he was going to punish them for having a representative.

Q.     Did he use the word "punish"?

A.     No, I don't believe so. But that was the intent. That was what was communicated and conveyed.

Deposition of Kyle Grinnell ("Grinnell Dep) pages 75-76. Watkins Dec at ¶ 7.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 3

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

The fact that Stariha was discriminatory was corroborated in deposition by Bernie Williams ("B. Williams") Senior Estimator for the Kronemans' contractor, Step Up Construction ("Step Up"):

Q.     It's – it's an issue that was brought up by Mr. Grinnell. And I just wanted to ask if you had been present. I am paraphrasing, and counsel will correct me if I'm wrong, but I believe that Mr. Grinnell indicated that at some point Mr. Stariha had indicated that he would discriminate against the Kronemans because they used a PA, a public adjustor. I'm not sure I said it exactly right. But he said -- I don't recall the words, but he indicated that the claim would be harder, tougher, something like that. The only question I have is: Were you present when that statement or that conversation occurred?

A.     I was.

Q.     And could you please tell us your best recollection of that conversation? I know it's been a while.

A.     I remember -- and I think I'm paraphrasing here. **Kyle Grinnell said, Are you treating the Kronemans differently because I'm involved? And I remember Greg Stariha said, "Yes, I am," or "Yes," or something to that effect.** And if I remember correctly after that, Kyle Grinnell made some gesture of, I'd be happy to pull out, or something to that effect. I'm -- I'm sorry. I don't want to say anything I'm not specifically clear on, but...(Pause.)

Q.     Was it to the -- the affect, I'm sorry -- was it your understanding that Mr. Grinnell made an offer that he would pull out and no longer be the PA if things would go better with Mr. Stariha with the Kronemans, something like that?

A.     That's correct.

(emphasis added) Deposition of Bernie Williams ("B. Williams Dep.") pages 47-48. Watkins Dec at ¶ 8.

**B.     Bad faith claim handling of ALE.**

After the fire, the Kronemans were allowed to stay in a hotel until more suitable temporary housing could be located while repairs were completed on the fire-damaged home. Watkins Dec at ¶ 9. DMA Insurance Housing Assistants ("DMA") was tasked with finding the

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 4

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1   Kronemans suitable accommodations while the loss was being adjusted. Watkins Dec at ¶ 10.

2       On October 11, 2012 Stariha was annoyed that the Kronemans had not chosen to accept

3   one of the unacceptable rental homes they had been shown and he sent the following email to

4   Grinell:

5       Kyle,

6
7       I'd like to make sure we are clear on the ALE issue. The Kronemans are currently
    in the Holiday Inn Express. The rate is $294.84/night. DMA housing has found
8   two homes that are closer to their home than the Holiday Inn Express. One option
    is $2850/month and the other is $3,295/month. Both homes are furnished. Both
9   homes are available for immediate occupation. DMA has indicated that the
    Kronemans have refused at least the first option because the home is off the bus
10  route for the children. While I understand this would be an inconvenience, I do
    not feel it to be a valid reason to continue the stay in the Holiday Inn or for
11  Country to pay that increased cost. If you have another option you would like to
    run by us, please do so. We are open to suggestions.

12
13      **However, we do feel that the amount Country would owe to reimburse the
    Kronemans under ALE coverage should be capped at the cost of the monthly
    rent at the either of the options provided by DMA**. I would like to resolve this
14  issue prior to the weekend.

15      Greg Stariha, AIC, CPCU

16      (emphasis added) Watkins Dec at ¶ 11.

17      Still frustrated by the Kronemans' proper refusal to accept a home that would not allow

18
19  pets, on October 17, 2012 Stariha threatened to cut off payment for additional living expenses:

20      Kyle,

21      We are not able to consider your request for a buyout on the ALE coverage. In
    order to be covered, the expenses must be incurred. **We are willing to give DMA
22  housing one more week to find a house that the Kronemans will accept. We
    will terminate the hotel direct bill as of October 26.** Per DMA, it will take
23  about a week for them to get into a house after signing a lease. If you or your
    clients come up with another solution, please contact me to discuss. Please have
24  them forward the invoices and meal receipts at any time for reimbursement.
    Sincerely,
25

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION            LAW OFFICES OF MICHAEL T. WATKINS
FOR SUMMARY JUDGMENT - 5                                 6100 219th ST SW, SUITE 480
                                               MOUNTLAKE TERRACE, WA  98043
                                               425/835-1619; FAX: 206/971-5080

Greg Stariha, AIC, CPCU

(emphasis added) Watkins Dec at ¶ 12.

On October 24, 2012 Stariha reiterated his threat.

Kyle,

I would be willing to extend the hotel to Nov. 2 if this property is a go. **If not, we will have to stand by our decision to cut off the hotel on October 26 as previously noted.** Again, if you have any other housing possibilities or options you would like for us to consider, please let me know.

Greg Stariha, AIC, CPCU

(emphasis added) Watkins Dec at ¶ 13.

**C.      Country attempted, in bad faith, to underpay the structure claim.**

On October 16, 2012 Country attempted to significantly underpay the Kronemans' structure claim when its adjustor, Tim Foederer ("Foederer") prepared an impossibly low estimate of repairs in the amount of $36,453.36 RCV. This estimate was insufficient to return the Kroneman home to its pre-loss condition. Watkins Dec at ¶ 14. The Kronemans refused to accept Country's low-ball offer and Country finally agreed to pay a significantly higher structure settlement of $58,926.18. Watkins Dec at ¶ 15.

**D.      Country refused, in bad faith, to pay for incurred hygienic work.**

Stariha also refused to pay for the necessary retention of an engineer/hygienist that was retained by Step Up as a safety issue for the Kronemans' children. The contractor's Senior Estimator testified as to the need for the hygienist's work :

Q.      Okay. Skipping ahead -- bear with me -- to Page 30, I see an estimate for air clearance testing. Can you explain to me what that is?

A.      Air clearance testing, as part of a fire, is important because of the

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 6

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1    materials not just that were burnt in the fire that have off-gassed chemicals, but
     also as the result of new construction or repairs when adhesives and those types of
2    things are used. **In this case, I believe Ms. Kroneman and one of her children
     had asthma, pretty significant asthma, which is part of the reason that we
3    recommended air testing**.

4    Q.    Do you know if air testing was performed?

5    A.    It was.

6    Q.    And do you know what the results of that air testing were?

7    A.    I do.

8    Q.    And what were those?

9
     A.    I believe the industrial hygienist found pockets of unacceptable gases in
10   areas of the home. I recommend -- I know he recommended cycling of the air in
     the home. I don't remember how many cycling -- cyclings. I just don't recall that
11   amount. But it was -- it was excessive, in order to clear the home of gases.

12   (emphasis added) B. Williams Dep. pages 24-25. Watkins Dec at ¶ 16.

13   On February 21, 2013 Reed sent the following correspondence to the Kronemans'
14
     representative:
15
     Good Morning,
16
     I have reviewed this billing with Greg Stariha. We did not agree to this testing
17   prior to it being done. It is not usually and customary for these fees to be incurred.
     **At this time, we are unable to issue payment for this testing.**
18
19   Thank you,

20   Robin Reed

21   (emphasis added) Watkins Dec at ¶ 17.

22   Country never did pay the hygienist's fees. Watkins Dec at ¶ 18.
23
     **E.    Country, in bad faith, refused to pay for the Kroneman's personal
24         property.**
25

1    On June 27, 2013 the Kronemans timely submitted an additional claim to their insurer's

2    attorneys for damaged personal property. Watkins Dec at ¶ 19. Presumably, this was another

3    pertinent communication that slipped through the cracks because Country did not acknowledge

4    or respond to the Kronemans' request for payment. It still has not paid these items of personal

5    property in violation of the insurance contact. Watkins Dec at ¶ 20.

6         On September 27, 2013 faced with the suit limitation clause, this litigation commenced.

7    Watkins Dec at ¶ 21.

8         On October 25, 2013 despite the fact that the Kronemans had an open claim for

9    damaged personal property, Country closed its file. Watkins Dec at ¶ 22.

10

11        Thereafter, Country wrongfully refused to adjust the Kronemans' claim. Watkins Dec at

12   ¶ 23.

13                         **III.    ISSUES PRESENTED**

14   1.     Do genuine issues of fact exist to support Plaintiffs' breach of contract and
            CPA claims?
15

16   2.     Is an insurer relieved of its duty of good faith, its obligations under the
            insurance contract and its duty's to comply with the WAC claims handling
17          regulations after the commencement of litigation?

18                         **IV.    EVIDENCE RELIED UPON**

19   1.     Declaration of Michael T. Watkins, and the Exhibits attached thereto;

20   2.     Declaration of Gary Williams, and the Exhibits attached thereto;

21                         **V.    ARGUMENT**

22   **A.     Standard for summary judgment.**

23
     A party is entitled to summary judgment if the "pleadings, depositions, answers to
24
     interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

25

1    genuine issue as to any material fact and that the moving party is entitled to a judgment as a
2    matter of law." Fed. R. Civ. P. 56(c).

3        Because genuine issues of material fact exist as to whether 1) Country breached the
4    terms of the insuring agreement, 2) Country violated certain WAC claims handing regulations
5    that resulted in damage to the Plaintiffs, 3) Country committed *per se* violations of the CPA,
6    and 4) Country breached its duty of good faith, Country's Motion for Summary Judgment
7    should be denied.

8        **B.      Washington law applies to all substantive issues.**
9
10       When adjudicating a claim that has been removed from state court based on diversity
11   jurisdiction, as in this case, federal courts apply state law for all substantive issues and federal
12   law for all procedural issues. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)
13   ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and
14   federal procedural law."); *see also Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). Therefore,
15   federal law controls the standard for summary judgment in this case, but state law controls the
16   issues of whether the WAC, CPA and IFCA have been violated, whether as well as whether
17   Country Mutual breached the duty of good faith it owed the Kronemans.

18       **C.      Country breached the insurance contract.**
19
20       Recently, Country has advanced the argument that its contractual duties and statutory
21   obligations ceased at the time 1) the one-year contractual limitation ran, and/or 2) when
22   litigation was commenced. This is not an accurate statement of the law.

23       **1.      The expiration of the one-year contractual limitation period did not
                  relieve Country of its duty to pay the Kronemans' claim.**
24
25

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 9

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

By September 27, 2013, one year after the fire had occurred at the Kronemans' home, Country had yet to conclude its adjustment of the claim. It had made payments for the damage to the home, for the Kronemans' personal property, and for their additional living expenses. It had not, as Defendant concedes, paid the actual cash value for six items of personal property even though as early as June 28, 2013 Defendant was on notice that the Kronemans had submitted a claim for those items. The policy states that its one-year limitation only applies to obtaining withheld depreciation, not to the payment of the actual cash value of the insureds' losses:

> "You" may make a claim under this policy on a (sic) "actual cash value" basis, and have **one year from the date of loss to make the repair or replacement and request payment** for the difference between the reasonable cost of repair or replacement and the amount "we" have already paid. (emphasis added)

Country misstates its policy arguing that the passage of a year (and/or the institution of litigation) extinguished Country's obligation to pay the Kronemans the actual cash value for their personal property.

Neither the one-year limitation for the recovery of withheld depreciation, nor the one-year suit limitation period, extinguish Country's statutory or contractual obligations. The time limit for recovery of withheld depreciation does not apply to, or bar, payment of the actual cash value on contents. Likewise, the suit limitation merely provides that "[n]o action can be brought unless there has been full compliance with all of terms under sections 2 through 6 of this policy and the action is started within one year after the date of occurrence." Policy at 31. The policy does not state that Country's contractual and statutory obligations end one year after the date of loss. If Country Mutual wished to have such a clause, it could have stated: "If we manage to delay payment for the actual cash value of your personal property for more than

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 10

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

one year after your loss, we do not have to pay you anything." And such a clause would be void as against public policy.

Neither the policy's suit limitation clause nor any other replacement cost recovery contract provision places an expiration date on Country's contractual duties to pay the Kronemans' the actual cash value of their personal property claim and adjust their claim.

**2.    Country, in bad faith, refused to pay for like kind and quality repairs.**

A direct physical loss connotes some change in the structure or condition of the property. However, it is clear that property does not necessarily have to be consumed, destroyed or subject to physical damage in the traditional sense in order to constitute "direct physical loss or damage."

In short, Defendant asserts that Plaintiffs were making a claim for "undamaged" property. This is not true. It is unconverted that the exterior of the Kronemans' home had suffered a tangible alteration and the replaced exterior walls could not be matched to the existing walls.

As noted in Plaintiffs' Motion for Partial Summary Judgment the case of *Cedar Bluff Townhome Condominium Association, Inc. v. American Family Mutual Insurance Company*, __ N.W.2d__, No. A13-0124, WL 7156914 (Minn. Dec. 17, 2014) addressed the identical issue presented here. In *Cedar Bluff*, replacement siding panels were available with the same specifications, but they were not available in the same color. There, as in this case, the insured sought coverage for complete replacement of the siding on all four exterior walls.

The Minnesota Supreme Court reaffirmed that the term "comparable material and quality" in a replacement cost policy means "a reasonable color match between new and

existing siding." The *Cedar Bluff* court reasoned that because the color mismatch resulted in the inability to replace the fire-damaged siding with siding of "like kind and quality material and quality," the townhomes had sustained a "distinct, demonstrable, and physical alteration." Thus, it concluded that <u>all</u> of the siding sustained a covered loss.

In *Mellin v. N. Sec. Ins. Co., Inc.*, No. 2014-020, 2015 N.H. LEXIS 32 (Apr. 24, 2015) the insureds' condo suffered a distinct, demonstrable physical loss as the result of a smell. Shortly after renting the upstairs unit, a tenant moved out complaining of a cat urine odor, which had come through an open plumbing chase from the downstairs unit where another tenant owned multiple cats. After the insureds moved into the unit themselves and noticed the odor, a health inspector advised them to move out temporarily while the units were cleaned. Unfortunately, the landlords could not rid the condo of the smell. They ultimately sold the condo at a significant loss.

The insureds sought coverage under their homeowner's insurance policy due to the "direct physical loss" caused by the cat urine odor. The insurer said coverage did not apply because the smell did not constitute a "physical loss" and, even if it did, the damage caused by the smell was specifically barred under the policy's pollution exclusion. The lower court agreed with the insurer but the New Hampshire Supreme Court reversed finding in favor of the insureds. The insurer argued that "direct" and "physical loss," though undefined in the policy, indicated coverage only for a tangible change to the property—altering the appearance, color, or shape of the unit. But the New Hampshire Supreme Court held that "physical loss" need not be limited to changes that could be seen or touched, but could also include changes perceived by smell. The Court found support for its ruling in a "substantial body of case law" holding

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 12

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1  that "a variety of contaminating conditions, including odors, have been held to constitute a
2  physical loss to property."

3  Similarly, a New Jersey court concluded that an ammonia spill constituted a physical
4  loss as it "physically changed the air" and rendered the building temporarily unfit for
5  occupancy. *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 2:12-cv-04418,
6  2014 U.S. Dist. LEXIS 165232 (D.N.J. Nov. 25, 2014).

7  The Colorado Supreme Court found that gasoline vapors rendered a building
8  uninhabitable and were a "direct physical loss." *Western Fire Ins. Co. v. First Presbyterian*
9  *Church*, 437 P.2d 52 (Colo. 1968). And a pervasive odor from a methamphetamine lab was
10  found by an Oregon court to be "physical loss." *Farmers Ins. Co. v. Trutanich*, 858 P.2d 1332
11  (Or. Ct. App. 1993). All of these cases concluded that a "distinct and demonstrable alteration
12  of the insured property" had occurred.

13  

14  **3.      Country wrongfully refused to submit to appraisal.**

15  Country would have the Court find that it met its obligation of good faith when it
16  violated the insurance contract and violated the WAC claims handling regulations by not
17  responding to the Kronemans' demand for appraisal. Such a finding is not supported by
18  Washington law, and if followed to its logical conclusion, would allow an insurer to terminate
19  all contractual rights and obligations related to an existing insurance contract at the time the
20  lawsuit was filed. Such a finding would not only have a chilling effect on litigation (because
21  insureds will hesitate to enforce a particular contract provision through a lawsuit) but it would
22  allow a defaulting insurance defendant to refuse to pay its insureds' claims by simply filing a
23  lawsuit.

24  

25  

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 13

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

The insurance claim was ongoing during the pendency of the litigation and the Kronemans and Country had continuing claim related contractual and statutory duties. Country's suggestion that it no longer had to adjust or pay the Kronemans' claim (or comply with the appraisal clause) is simply wrong.

The California Supreme Court held, "[i]t is clear that the contractual relationship between insurer and the insured does not terminate with commencement of litigation." *White v. Western Title*, 40 Cal.3d 870, 885, 710 P.2d 309 (1985).[2]

If it were otherwise, all insurers would immediately file declaratory actions when their insureds filed claims so that they would no longer be bound by the Insurance Commissioner's regulations and they would not have to pay the claims. After the filing of a lawsuit, insurers would not have to comply with the promises contained in their insurance contracts and they

---

[2] "We also note that this approach is consistent with that of almost every other jurisdiction to have addressed the issue. Those courts have consistently held that the duty of good faith, whether an inherent aspect of the insurance contract or a statutory construct, continues during any litigation that is brought to determine liability for the underlying tort. *See, e.g., White v. Western Title Ins. Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 316-17 (1985) (holding that the duty of good faith continues during litigation because the contractual relationship continues); *Haddick v. Valor Ins.*, 315 Ill. App.3d 752, 248 Ill. Dec. 812, 735 N.E.2d 132, 133 (2000) ("We reverse and hold that an insurance company has a duty to act in good faith in settling a claim against its policyholder in a timely manner both before and after suit is filed."); *Harris v. Fontenot,* 606 So.2d 72, 74 (La.Ct.App.1992) ("We first note that nowhere in either statute is there an express distinction limiting the application to the pre-litigation conduct of the insurer. . . . [W]e believe that it is clear that the statute was enacted to impose a requirement of good faith and fair dealing on the insurer, requirements that are no less important after litigation has begun as before."); *Palmer v. Farmers Ins. Exchange,* 261 Mont. 91, 861 P.2d 895, 913 (1993) ("[A]n insurer's duty to deal fairly and not to withhold payment of valid claims does not end when an insured files a complaint against the insurer."); *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.Ct.1999) ("[W]e refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured.") *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 517-18 (KY 2006).

---

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 14

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

could violate the Washington Administrative Code regulations with impunity.  *See Knotts v.*
*Zurich Ins. Co.,* 197 S.W.3d at 517 ("If KRS 304.12-230 were not applicable once litigation commenced, insurance companies would have the perverse incentive to spur injured parties towards litigation, whereupon the insurance company would be shielded from a claim of bad faith."); *see also White*, *supra*, 40 Cal.3d at 886.

It is well settled that "an insurance regulatory statute becomes a part of the policy of insurance."  *Britton v. Safeco Ins. Co. of America*, 104 Wn.2d 518, 526 707 P.2d 125 (1985) (citing *Touchette v. Northwestern Mut. Ins. Co.*, 80 Wn.2d 327, 332, 494 P.2d 479 (1972)). Again, Country was required to comply with the WAC claims handling regulations regardless of whether a lawsuit had been filed or not.

More importantly, Country wrongfully asserted to the OIC that *Keesling* stands for the proposition that the institution of litigation *waives a party's right to appraisal*. However, the actual language of the case shows that Country misrepresented the holding of *Keesling* to the OIC:

> "  .  .  . **an insurer's demand for appraisal has been considered timely, not withstanding that the demand was not made until eight months after receipt of a proof of loss, subsequent to the commencement of a suit by the insured, and subsequent to a Court hearing**. (emphasis added)

*Keesling v. Western Fire Ins.* Co., 10 Wash.App. 841, 520 P.2d 622 (1974).

As Gary Williams states in his Report:

> The mere fact that the parties are in litigation does not mean that an appraisal should not proceed. I have personally participated in many litigated cases where appraisal and litigation went forward concurrently. In its response to the Insurance Commissioner, Country Mutual stated, "Washington case law supports that, in most circumstances, once suit is commenced, the appraisal clause of an insurance policy may not be invoked." That statement is simply not true, not as a matter of law nor of local practice. Williams Report at ¶ 11.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 15

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1

2      **1.      Plaintiffs did not "waive" nor were they estopped from demanding appraisal.**

3

4      Defendant argues, without authority, that when Plaintiffs' counsel participated in the

5      preparation of a Joint Status Report in this litigation, pursuant to court rule, the Plaintiffs

6      waived their right to seek appraisal. Plaintiffs simply checked the box stating that mediation

7      was the "preferred" form of alternative dispute resolution.

8      LCR 39 states in relevant part:

9          (4) *Participation in ADR Is Voluntary*. **Participation in ADR is**
           **voluntary unless the court orders the parties to participate.** As set
10         forth in LCR 26(f), parties are expected to advise the court in their joint
           status report regarding whether they plan to engage in ADR and if so,
11         when and what type. (emphasis added)

12     Voluntary participation in mediation does not bar Plaintiffs from asserting their

13     contractual rights under the policy. Moreover, Defendant's position is contrary to the very

14     language of its appraisal clause, which contemplates judicial involvement:

15

16         Appraisal

17         If "you" and "'we'" fail to agree on the amount of loss, either may demand
           an appraisal of the loss.
18
           In this event, each party will choose a competent and impartial appraiser
19         within 20 days after receiving a written request from the other. The two
           appraisers will choose an umpire, who shall be competent in the trade or
20         skill necessary to assess the loss. If they cannot agree upon an umpire
           within 15 days, **"you" or "we' may request that the choice of an**
21         **umpire be made by a judge of a court of record in the state where the**
           **"residence premises" is located.** The appraisers will separately set the
22         amount of loss. If the appraisers submit a written report of an agreement
           between them to "us", the amount agreed upon will set the amount of loss
23         and be final. If they fail to agree, they will submit their differences to the
           umpire. A decision agreed to by any two will then set the amount of loss
24         and be final.

25

1
2

**D.      Country breached its duty of good faith by putting its interests above those of its insured.**

3      Washington's insurance bad faith law derives from statutory and regulatory provisions,

4  and the common law. The insurance code begins with recognition that "[t]he business of

5  insurance is one affected by the public interest, requiring that all persons be actuated by good

6  faith, abstain from deception, and practice honesty and equity in all insurance matters." RCW

7  48.01.030. The insurance code permits the insurance commissioner to promulgate

8  administrative regulations governing the claims-handling process. RCW 48.30.010.

9

10     Washington regulations define specific acts and practices that breach an insurer's duty

of good faith. *Am. Mfrs. Mut. Ins. Co. v. Osborn,* 104 Wash. App. 686, 17 P.3d 1229, 1234

11  (2001) (citing Wash. Rev. Code § 48.30.010; Wash. Admin. Code §§ 284-30-300 to -800;

12  *Tank v. State Farm Fire & Cas. Co.,* 105 Wash.2d 381, 715 P.2d 1133, 1136 (1986)); *Rizzuti v.*

13  *Basin Travel Service of Othello, Inc.,* 125 Wash. App. 602, 105 P. 3d 1012 (2005).

14

15     As our Supreme Court held in *Tank v. State Farm Fire and Casualty Co.*, 105 Wn.2d

16  381 (1986), "Thus, an insurance company's duty of good faith rises to an even higher level

17  than that of honesty and lawfulness of purpose toward its policyholders: an insurer must deal

18  fairly with an insured, giving equal consideration *in all matters* to the insured's interests.

19  (emphasis in the original)

20

21     In each of its decisions (preparing a low-ball estimate of repairs, refusing to cooperate

22  with Step Up to reach an agreed scope and cost of repairs, refusing to submit to appraisal,

23  failing to respond to the Kronemans' appraisal demand, refusing to adjust the Kronemans'

24  contents claim, threatening to cut off the Kroneman's ALE benefits, refusing to pay the costs

25

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 17

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1    incurred by the Kronemans for contents reset, exposing them to litigation, and refusing to pay

2    for necessary air testing), Country put its interests above those of its insureds. Each violation of

3    this rule constitutes bad faith.

4    **E.    Defendant's assertion that Plaintiffs have no evidence of proximately**
       **caused damages to support their CPA claim is without merit.**

5

6         Country seeks dismissal of Plaintiffs' CPA claims for failure to provide evidence that

7    the Kronemans suffered harm to their business or property.  Dkt. #25 Defendant's violations of

8    the WAC, and the resulting injuries, were pervasive throughout the handling of the claim.[3]

9         Any violation of WAC 284-30-330 meets the first three elements of the *Hangman Ridge*

10   test for a CPA claim. Here, the only remaining elements to be proven are causation and injury

11   to business or property.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105

12   Wn.2d 778, 780, 719 P.2d 531 (1986).

13        This rule extends to all the regulations enumerated in WAC 284-30-300 through 800,

14   and is not limited to WAC 284-30-330.  As a matter of law, a violation of any one of the fair

15   claims practice regulations set forth in WAC 284-30-300 through 800 constitutes a breach of

16   the insurer's duty of good faith.  *Rizzuti v. Basin Travel Service of Othello, Inc.*, 125 Wn. App.

17   602, 615-16, 105 P.3d 1012 (2005) (citing *Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wn. App.

18   686, 697, 17 P.3d 1229 (2001)).  Also as a matter of law, a single violation of any one of the

19   regulations under WAC-284-30 is an unfair or deceptive act or practice under the CPA.

20   *Anderson v. State Farm Mut. Ins. Co.*, 101 Wn. App. 323, 331, 2 P.3d 1029 (2000); *Industrial*

21   *Indem. Co. v. Kallevig*, 114 Wn.2d 907, 924, 792 P.2d 520 (1990).

22

23

24   _____

25   [3] See Williams Decl./Report

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 18

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

During the adjustment of the Kronemans' claim Country violated the following:

284-30-330 (1) Misrepresenting pertinent facts or insurance policy provisions. Country misrepresented the holding of Keesling to the OIC in response to the Kronemans' OIC complaint for its failure to respond to their demand for appraisal.

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

Country refused to timely (or at all) respond to the Plaintiffs' pertinent communications with respect to the demand for Appraisal or valuation of their Personal Property Claims and unreasonably denied Plaintiffs' their contractual right to the appraisal process.

(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

Country failed to promptly investigate the Plaintiffs' Structure and Personal Property Claims. It unreasonably refused to adjust the Kronemans' claim after one year.

(4) Refusing to pay claims without conducting a reasonable investigation.

Country throughout the adjustment of the claim, refused to fully pay the Plaintiffs' Structure and Personal Property Claims without conducting a reasonable investigation.

(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

Country throughout the adjustment of the claim, did not attempt in good faith to effectuate prompt, fair or equitable settlements of the Plaintiffs' Structure and Personal Property Claims, even though liability had become reasonably clear.

(13) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Country failed to provide any reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for its refusal to provide for the repair of the Kroneman residence with like kind and quality materials. Stariha flatly refused to pay to reside all four elevations of the Kroneman

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 19

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1
2

property. Telling the insured they were stupid and should read their policy. Country also failed to provide any explanation to its insureds for its failure to respond to the Kronemans' appraisal demand until an OIC complaint was filed.

3
4

(14) Unfairly discriminating against claimants because they are represented by a public adjuster.

5

Country discriminated against the Plaintiffs once it learned that they were represented by Mr. Grinell.

6
7
8
9

284-30-360 (3) For all other pertinent communications from a claimant reasonably suggesting that a response is expected, an appropriate reply must be provided within ten working days for individual insurance policies, or fifteen working days with respect to communications arising under group insurance contracts.

10
11
12

Country refused to timely respond to the Plaintiffs' pertinent communications with respect to the demand for Appraisal or valuation of their Personal Property Claims and unreasonably denied Plaintiffs' their contractual right to the appraisal process.

13
14

(4) Upon receiving notification of a claim, every insurer must promptly provide necessary claim forms, instructions, and reasonable assistance so that first party claimants can comply with the policy conditions and the insurer's reasonable requirements.

15
16

Country failed to provide any reasonable assistance to the Plaintiffs to help them comply with the policy conditions.

17
18

284-30-370 Every insurer must complete its investigation of a claim within thirty days after notification of claim, unless the investigation cannot reasonably be completed within that time.

19
20
21

It is uncontroverted that Country failed to complete the investigation of the Plaintiffs' Structure and Personal Property Claims within 30 days after notification of the claims, even though it could have been reasonably completed within that time.

22
23

284-30-380 (7) Insurers are responsible for the accuracy of evaluations to determine actual cash value.

24
25

Country refused to make any actual cash evaluation of the Plaintiffs' claims for Personal Property.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 20

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1    Unquestionably there are genuine issues of material fact as to whether Country violated
2    the above listed WAC claims handling regulations during the pendency of the Kronemans'
3    insurance claims.[4] The only issue to be resolved by the Court is whether Plaintiffs suffered any
4    injury or harm as a result of Country's many WAC violations.

5    For a successful claim under the CPA, "no monetary damages need be proven, and that
6    non-quantifiable injuries, such as loss of goodwill would suffice for this element of the
7    *Hangman Ridge* test." *Mason v. Mortgage America, Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142
8    (1990).   "The injury element will be met if the consumer's property interest or money is
9    diminished because of the unlawful conduct, even if the expenses caused by the statutory
10    violation are minimal." *Id*. The temporary loss of use of property is also injury under the CPA.
11    *Mason v. Mortgage Am., Inc.*, 114 Wn.2d 842, 854, 792 P.2d 142 (1990) (temporary loss of
12    use of property while brokerage company improperly withheld title constituted sufficient injury
13    to support attorney fee award under the CPA); *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists,*
14    *Inc.*, 64 Wn. App. 553, 825 P.2d 714 (1992) (taking time away from business to respond to
15    unfair or deceptive collection activity satisfies injury requirement when loss of business
16    results).

17    The Kronemans have been damaged because Country refused to pay for their personal
18    property. The Kronemans have been damaged because Country refused to pay for repairs to
19    two sides of their home. The Kronemans have been damaged because Country refused to pay
20    the costs incurred for their contents reset. The Kronemans have been damaged because

---

[4] See Williams Decl./Report.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 21

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1  Country refused to repay them for the hygienist and the necessary air testing. The Kronemans
2  have been damaged because Country did not complete its investigation within 30 days.

3      The CPA provides the Kronemans with a remedy for damage to their "business or
4  property" as a result of unfair practices, including violations of Washington's insurance
5  regulations. RCW § 19.86.090; *see also* RCW § 48.01.030 (declaring that "[t]he business of
6  insurance is one affected by the public interest"). Country declined to pay the Kronemans
7  benefits for their personal property asserting that the passage of a year meant it had no further
8  obligation to pay. Country would now have the Court conclude that it is "reasonable" to
9  require the insured to incur the cost to repair / replace personal property without the
10 expectation of receiving an actual cash value payment. Defendant concedes: "Plaintiffs chose
11 to use money paid by Country Mutual for interior painting and decking to replace the siding on
12 the undamaged portions of the home, and did the interior painting on their own." Dkt. # 25 at
13 pg. 5.
14

15              **VI.    CONCLUSION**
16
17     Plaintiffs' have demonstrated that genuine issues of material fact exist to allow a jury to
18 decide if Country wrongly breached the insurance contract, violated the CPA and violated its
19 obligations of good faith.
20     For the reasons outlined above the Kronemans respectfully request that Country's
21 Motion for Summary Judgment be denied and their Motion for Partial Summary Judgment be
22 granted.

23

24

25

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 22

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1

2

3

4

5

6  DATED this 15th  day of June, 2015.

7                                              LAW OFFICES OF MICHAEL T. WATKINS

8

9

10                                             _____
                                               Michael T. Watkins, WSBA #13677
11                                             Attorney for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **THE HONORABLE THOMAS S. ZILLY**

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7            WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| 8  KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof, | **NO. CV 14-01223** |
| 9 | |
| 10                        Plaintiffs, | **DECLARATION OF MICHAEL T. WATKINS** |
| 11          v. | |
| 12  COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation, | |
| 13 | |
| 14                        Defendant. | |

15        I, Michael T. Watkins, declare as follows:

16        1.      I am over 18 years of age and otherwise competent to make this Declaration, which is

17

18   based on my personal knowledge.

19        2.      I am an attorney licensed in the state of Washington and I represent the Plaintiffs Keith

20   and Karen Kroneman (the "Kronemans") in the above-captioned matter.

21        3.      On September 29, 2012 the Kronemans suffered a covered loss at their residence

22   located at 9507 149th St East, Puyallup, WA.

23

24

25   DECLARATION OF MICHAEL T. WATKINS — 1                  LAW OFFICES OF MICHAEL T. WATKINS
                                                              6100 219th ST SW, SUITE 480
                                                           MOUNTLAKE TERRACE, WA  98043
                                                           425/835-1619; FAX: 206/971-5080

4.     The Kronemans timely submitted a claim to their insurer, Country, for benefits to repair their real property with "like kind and quality" materials, replace their damaged personal property, and provide additional living expenses ("ALE").

5.     The Kronemans retained the services of a public adjuster Kyle Grinnell ("Grinnell") to assist the Kronemans in presenting their claim to Country Mutual.

6.     Country Mutual assigned Greg Stariha ("Stariha") an adjuster located in the state of Washington, to investigate and adjust the Kronemans' claim.

**A.     Violation of WAC 284-30-330((14) Unfairly discriminating against claimants because they are represented by a public adjuster.**

7.     Because the Kronemans retained the services of Grinnell, Stariha took an adversarial position with the Kronemans in violation of WAC 284-30-330(14) of the claims handling regulations. Attached to this Declaration as Exhibit No. 1 is a true and correct copy of excerpted portions from the Deposition of Kyle Grinnell.

8.     The fact that Stariha was discriminatory was corroborated in deposition testimony by Bernie Williams ("B. Williams") Senior Estimator for the Kronemans' contractor, Step Up Construction ("Step Up"). Attached to this Declaration as Exhibit No. 2 is a true and correct copy of excerpted portions from the Deposition of Bernie Williams.

**B.     Bad Faith Handling of ALE.**

9.     After the fire, the Kronemans were relocated to a hotel until more suitable temporary housing could be located while repairs were completed on the fire-damaged home.

10.     DMA Insurance Housing Assistants ("DMA") was tasked with finding the Kronemans suitable accommodations while the loss was being adjusted.

DECLARATION OF MICHAEL T. WATKINS — 2

11.     Attached to this Declaration as Exhibit No. 3 is a true and correct copy of Stariha's October 11, 2012 email to Kyle Grinnell.

12.     Attached to this Declaration as Exhibit No. 4 is a true and correct copy of Stariha's October 17, 2012 email to Grinnell.

13.     Attached to this Declaration as Exhibit No. 5 is a true and correct copy of Stariha's October 24, 2012 email to Grinnell.

**C.     Country's Bad Faith Attempt to Underpay the Structure Claim.**

14.     Attached to this Declaration as Exhibit No. 6 is a true and correct copy of Foederer's October 16, 2012 estimate of repairs in the amount of $36,453.36 RCV.

15.     Attached to this Declaration as Exhibit No. 7 is a true and correct copy of the estimate of repair generated by Williams in the amount of $58,926.18.

**D.     Country's Bad Faith Refusal to Pay for Incurred Hygienic Work.**

16.     Attached to this Declaration as Exhibit No. 2 is a true and correct copy of excerpted portions from the Deposition of Bernie Williams.

17.     Attached to this Declaration as Exhibit No. 8 is a true and correct copy of Robin Reed's ("Reed") February 21, 2013 email to Grinnell.

18.     Attached to this Declaration as Exhibit No. 9 is a true and correct copy of the Environmental Specialties Invoice in the amount of $797.00

**E.     Country's Bad Faith Refusal to Pay for Personal Property.**

19.     On June 27, 2013 the Kronemans timely submitted an additional claim to their insurer for damaged personal property. Country refused to pay for these items of personal property in

DECLARATION OF MICHAEL T. WATKINS — 3

LAW OFFICES OF MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE, WA  98043
425/835-1619; FAX: 206/971-5080

1    violation of the insurance contact. Attached to this Declaration as Exhibit No. 10 is a true and correct

2    copy of the June 27, 2013 supplemental claim letter submitted to Country Mutual.

3         20.    Country still has not paid these items of personal property in violation of the insurance

4    contact.

5         21.    On September 27, 2013 faced with the suit limitation clause, this litigation

6    commenced. Attached to this Declaration as Exhibit No. 11 is a true and correct copy to Plaintiffs'

7    Complaint and Summons filed in King County Superior Court.

8         22.    Attached to this Declaration as Exhibit No. 12 is a true and correct copy of Country's

9    October 25, 2013 letter to Plaintiffs.

10        23.    Thereafter, Country wrongfully refused to adjust the claim.

11        24.    I was stunned to learn that Country was now arguing that my participation in preparing

12   the Joint Status Report in this case somehow was a waiver of my clients' rights to appraisal. Country

13   simply did not respond in anyway to my clients' appraisal demand in direct violation of the WAC

14   claims handling regulations.

15        I declare under penalty of perjury under the laws of the State of Washington that the foregoing

16   is true and correct.

17        Signed at Mountlake Terrace, Washington, this 15th day of June, 2015.

18

19

20

21

22        Michael T. Watkins

23

24

25

DECLARATION OF MICHAEL T. WATKINS  — 4                          LAW OFFICES OF MICHAEL T. WATKINS
                                                                6100 219th ST SW, SUITE 480
                                                                MOUNTLAKE TERRACE, WA  98043
                                                                425/835-1619; FAX: 206/971-5080

# Exhibit No. 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

| | |
|---|---|
| KAREN and KEITH KRONEMAN, husband and wife, and the marital community thereof, | ) ) ) ) |
| Plaintiffs, | ) No. 2:14-cv-01223-TSZ |
| vs. | ) ) ) |
| COUNTRY MUTUAL INSURANCE COMPANY, | ) ) |
| Defendant. | ) |

---

VIDEOTAPED DEPOSITION OF KYLE T. GRINNELL

March 4, 2015

Tacoma, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com

Serving Washington's Legal Community Since 1980

1  A  I'll tell you, without specific recollections, that
2     in general, it seemed like Greg Stariha was trying to
3     force them out of the hotel and into any rental house
4     prematurely.  And if I recall right, he was putting
5     them on a very, very short leash and trying to compel
6     them out of a motel.
7  Q  Why did you have that impression?
8  A  Because that's what he was doing.
9  Q  Okay.  But what did you observe that gave you that
10    impression?
11 A  I would have to refresh my memory to give you
12    specific answers by reviewing my e-mails with Greg
13    Stariha.  But the tone of them was, They've got to
14    get out of the hotel.  Why didn't they take the very
15    first house that was available to them?
16       I think that Greg was assuming things that were
17    inaccurate.  And he -- he was assuming that they
18    wanted to be in the hotel instead of in a house.
19    This is my thought, that he was assuming that.  He
20    didn't tell me he was assuming that.
21 Q  Okay.  Did Greg Stariha tell you that he was trying
22    to get them out of the hotel?
23 A  I don't remember specifically.  My general impression
24    was -- I didn't know Greg before that.  My general
25    impression was that he was being a bully.

Page 70

1  Q  Why was your impression that he was being a bully?
2  A  You know, without putting a definition to "bully," he
3     fit it in that role right then.  He was acting like a
4     bully.
5  Q  What dose --
6  A  And I think I called him on it.
7  Q  What does acting like a bully mean to you?
8  A  Throwing his weight around, trying to compel people
9     to do things.
10 Q  So what did you observe or hear that led you to
11    believe that he was throwing his weight around and
12    trying to compel people to do things?
13 A  I think that my e-mails were pretty good about this
14    point.  The e-mails that I shared with you, I think,
15    were pretty good about this point.  If I could show
16    them to you right now, it would be a pretty accurate
17    representation of what was going on.  For me to
18    paraphrase and recollect, I think there's room for
19    more error than just what the e-mails are right
20    there.
21 Q  Okay.
22 A  And I can --
23 Q  So the e-mails that you produced to me in this matter
24    are the sole recollection that you have of that
25    impression?

Page 71

1  A  Truthfully, I handle a number of claims.
2  Q  Mm-hmm.
3  A  I'd kind of forgotten about this one.
4  Q  Mm-hmm.
5  A  You know, it's behind me.  And when I saw those
6     e-mails, it all kind of came back:  "Oh, yeah."
7  Q  Okay.
8  A  "Oh, yeah."
9  Q  Okay.  So those e-mails represent the basis of your
10    recollection of that impression?
11 A  Yes.
12 Q  Okay.
13 A  They're the reminders for me.  There were a few phone
14    conversations with Greg, but I don't have notes from
15    them.  When I say "Greg," I mean Greg Stariha.
16 Q  Okay.  So you got the impression that he was being a
17    bully from the phone calls as well or just the
18    e-mails?
19 A  Both.
20 Q  Okay.  Do you recall contacting Mr. Stariha in order to
21    resolve the notices to vacate from the hotel?
22 A  I recall communication.  I don't remember if it was
23    phone calls or e-mails or both.
24 Q  Okay.  Do you recall whether or not that situation
25    was resolved?

Page 72

1  A  Yes.
2  Q  Okay.
3  A  It was resolved.
4  Q  Was it resolved promptly, upon notice?
5  A  Well, they weren't kicked out of a hotel, if that's
6     what you're asking.
7  Q  Okay.  Did you ask why they had received a notice to
8     vacate?
9  A  Ask whom?
10 Q  Anyone.
11 A  I don't recall specifically asking why they received
12    one.
13 Q  Did you -- did you ask the hotel why --
14 A  I didn't --
15 Q  -- they received a notice to vacate?
16 A  I did not talk to the hotel.
17 Q  Okay.
18 A  It's pretty clear why they receive those.  It's when
19    the insurance company says, I'm only approving
20    payment through this day.
21 Q  Do you know of any conversation that Country stopped
22    payment to the hotel?
23 A  Well, I know they did when they moved out.  If you're
24    talking about prior to that, I don't remember.
25 Q  Okay.

Page 73

19 (Pages 70 to 73)

1  A  They just had them on a very short time frame and
2     were putting undue pressure on the insureds to just
3     take any open house that they could move into.
4  Q  What do you mean "undue pressure"?
5  A  Well, putting pressure on them. In the first -- you
6     know, if you can't -- you're already removed from
7     your home. You're staying in a hotel, which is darn
8     inconvenient. They had pets. I don't think the pets
9     were in the hotel with them. The hotel was a long
10    way from the kids' school district. Their lives were
11    disrupted. And they were actively trying to find a
12    rental home that fit their parameters to live in.
13    They wanted to be somewhat close to where they lived.
14    They wanted to be in the same general school district
15    that their kids attended. And they didn't want the
16    house to be a dump or dangerous.
17       You know, so there's some criteria there. Most
18    people are not just going to move into anything
19    that's available to them. They're going to have some
20    reason to question, Do I really want to be in this
21    house or not? And my recollection is, is that Greg
22    wanted them -- Greg Stariha -- wanted the Kronemans
23    to take the first address that was offered up by the
24    housing company.
25  Q  After you were retained, did Mr. Stariha have

Page 74

1     communications with the insureds?
2  A  I don't believe he had direct communication, no.
3  Q  All of the communications went through you?
4  A  I think so.
5  Q  Okay. At that first meeting where the
6     representatives for Country were present, do you
7     recall anything about the conversation at that
8     meeting?
9  A  One thing I recall pretty specifically. Two -- two
10    things I recall pretty specifically.
11  Q  What do you recall?
12  A  One was Greg Stariha just flat saying that he was
13    going to treat the insureds different; he was going
14    to be tighter on them because I was involved. And
15    another thing was Greg just saying -- Greg Stariha
16    saying that there was no way he was going to pay for
17    the other two elevations of siding. And I told him,
18    if it was my home, I would sue him right then. I
19    think that surprised him that someone would say that.
20  Q  With regard to the first statement that you recall
21    that I believe -- and correct me if I'm paraphrasing
22    this incorrectly. You said that Mr. Stariha said
23    that he was going to be tighter on the insureds.
24    Were those the actual words he used?
25  A  I don't remember if that's the actual word that he

Page 75

1     used.
2  Q  Okay.
3  A  But that was definitely the gist of it.
4  Q  And what do you mean by that? "Tighter": What does
5     that mean?
6  A  Essentially that he was going to punish them for
7     having a representative.
8  Q  Did he use the word "punish"?
9  A  No, I don't believe so. But that was the intent.
10    That was what was communicated and conveyed.
11       There was one other thing that I remember, that
12    I'd never heard anybody in the claims world tell me
13    before. And that was that he had just recently paid
14    Robin Reed, I think, like, a $35,000 bonus. And I
15    thought that very unusual that he would tell me that,
16    and that there's no point in telling me. And it also
17    seems like an unusual amount to pay to a claims
18    adjustor. But his point in doing it and his
19    inference of it was that he paid her to be frugal. I
20    found Robin Reed to be very pleasant.
21  Q  Was Ms. Reed present during that conversation?
22  A  I don't remember if she was or not. She might not
23    have been right there right then.
24  Q  Do you recall any of the statements that the
25    representatives of Country's made to the Kroneman [sic]

Page 76

1     at that first meeting?
2  A  I do not.
3  Q  Did you take notes of that meeting anywhere?
4  A  I don't think so.
5  Q  Do you recall any of the exact words of those
6     conversations?
7  A  Yes.
8  Q  What exact words do you remember?
9  A  When I told Greg Stariha, if this were my house, I
10    would sue you right now.
11  Q  Did the Kronemans hear you tell him that?
12  A  I don't think so. I don't know.
13       And, you know, I have to correct something here.
14    I think you're asking me if this was all at the first
15    meeting. And I don't remember the order of all of
16    this. I met with Greg Stariha at the house more than
17    one time. It may not have been at this first
18    meeting. It may have been at a subsequent meeting.
19    So I want to be clear on that, that I could be wrong
20    on when that happened.
21  Q  Okay.
22  A  And when any of those conversational elements
23    happened.
24  Q  But you know that they happened in person?
25  A  Yes.

Page 77

20 (Pages 74 to 77)

1    STATE OF WASHINGTON )    I, John M.S. Botelho, CCR, RPR,
                          ) ss a certified court reporter
2    County of Pierce    )    in the State of Washington,
                do hereby certify:

3

4
          That the foregoing deposition of KYLE T. GRINNELL
5    was taken before me and completed on March 4, 2015, and
     thereafter was transcribed under my direction; that the
6    deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
7    objections, motions and exceptions;
8         That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature;
10
          That I am not a relative, employee, attorney or
11   counsel of any party to this action or relative or employee
     of any such attorney or counsel and that I am not
12   financially interested in the said action or the outcome
     thereof;
13
          That I am herewith securely sealing the said
14   deposition and promptly delivering the same to
     Attorney Dannielle N. Booth.
15
          IN WITNESS WHEREOF, I have hereunto set my hand
16   this 11th day of March, 2015.
17
18
19
20
21
22
     John M.S. Botelho, CCR, RPR
23   Certified Court Reporter No. 2976
     (Certification expires 5/26/15.)
24
25

Kyle T. Grinnell
March 4, 2015

# Exhibit No. 2

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

| | |
|---|---|
| KAREN and KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>COUNTRY MUTUAL INSURANCE COMPANY,<br><br>                    Defendant. | )<br>)<br>)<br>)<br>) No. 2:14-cv-01223-TSZ<br>)<br>)<br>)<br>)<br>)<br>) |

---

VIDEOTAPED DEPOSITION OF BERNIE O. WILLIAMS

March 4, 2015

Tacoma, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| | |
|---|---|
| One Union Square | 2208 North 30th Street, Suite 202 |
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

Serving Washington's Legal Community Since 1980

1      correspondence.   I don't recall.

2  Q   How many times did you meet with Mr. Stariha in

3      person?

4  A   I don't recall.

5  Q   Was it more than once?

6  A   Yes.

7  Q   And was the purpose of those meetings simply to

8      resolve the scope of repairs?

9  A   I believe so.

10 Q   Did you meet with Mr. Stariha for any other reason

11     other than to discuss the scope of repair?

12 A   Not in person.

13 Q   Do you recall how long you were involved?

14 A   I don't.

15 Q   Okay.   Continuing on to Page 27, is this a

16     continuation of the estimate for exterior siding?

17 A   It appears to be.

18 Q   Okay.   Skipping ahead -- bear with me -- to Page 30,

19     I see an estimate for air clearance testing.   Can you

20     explain to me what that is?

21 A   Air clearance testing, as part of a fire, is

22     important because of the materials not just that were

23     burnt in the fire that have off-gassed chemicals, but

24     also as the result of new construction or repairs

25     when adhesives and those types of things are used.

1       In this case, I believe Ms. Kroneman and one of her
2       children had asthma, pretty significant asthma, which
3       is part of the reason that we recommended air
4       testing.
5    Q  Do you know if air testing was performed?
6    A  It was.
7    Q  And do you know what the results of that air testing
8       were?
9    A  I do.
10   Q  And what were those?
11   A  I believe the industrial hygienist found pockets of
12      unacceptable gases in areas of the home.  I
13      recommend -- I know he recommended cycling of the air
14      in the home.  I don't remember how many cycling --
15      cyclings.  I just don't recall that amount.  But it
16      was -- it was excessive, in order to clear the home
17      of gases.
18   Q  Forgive me for my ignorance, but can you explain to
19      me what air cycling is?
20   A  It's where you have a negative air system in the home
21      and air is being cycled through the home.  You're
22      just -- you're moving, you're causing the air in the
23      home to move and become turbulent, and you're
24      bringing new air in and -- and getting the old air
25      out.

1   Q   And when you said the industrial hygienist

2       recommended excessive air cycling, what do you mean

3       by "excessive"?

4   A   **Well, I just remember -- I may have put that the**

5       **wrong way.  It was more of a personal feeling.  I've**

6       **had air cycling in homes before.  And I don't**

7       **remember the exact number of times that that air had**

8       **to be cycled, but I remember thinking at the time, it**

9       **seems like a lot of times.**

10  Q   On the bottom of Page 30, I see a note indicating

11      that Mr. Stariha did not agree to VOC testing.  Do

12      you remember discussing this with him?

13  A   **I do.**

14  Q   And do you remember the content of those discussions?

15  A   **I do.  It -- I remember -- I remember that the main**

16      **content of those discussions was the family's asthma.**

17  Q   Do you remember Mr. Stariha ever providing you a

18      reason why he would not pay for the VOC testing?

19  A   **I don't.**

20  Q   Did you provide Mr. Stariha any information about the

21      VOC testing outside what's contained in this

22      estimate?

23  A   **Yes.**

24  Q   And what information was that?

25  A   **The actual report from the industrial hygienist.**

```
 1                         EXAMINATION

 2        BY MR. WATKINS:

 3   Q    It's -- it's an issue that was brought up by

 4        Mr. Grinnell.  And I just wanted to ask if you had

 5        been present.

 6             I am paraphrasing, and counsel will correct me if

 7        I'm wrong, but I believe that Mr. Grinnell indicated

 8        that at some point Mr. Stariha had indicated that he

 9        would discriminate against the Kronemans because they

10        used a PA, a public adjustor.  I'm not sure I said it

11        exactly right.  But he said -- I don't recall the

12        words, but he indicated that the claim would be

13        harder, tougher, something like that.

14             The only question I have is:  Were you present

15        when that statement or that conversation occurred?

16   A    I was.

17   Q    And could you please tell us your best recollection

18        of that conversation?  I know it's been a while.

19   A    I remember -- and I think I'm paraphrasing here.

20        Kyle Grinnell said, Are you treating the Kronemans

21        differently because I'm involved?  And I remember

22        Greg Stariha said, "Yes, I am," or "Yes," or

23        something to that effect.  And if I remember

24        correctly after that, Kyle Grinnell made some gesture

25        of, I'd be happy to pull out, or something to that
```

1        effect.  I'm -- I'm sorry.  I don't want to say

2        anything I'm not specifically clear on,

3        but...(Pause.)

4    Q   Was it to the -- the affect, I'm sorry -- was it your

5        understanding that Mr. Grinnell made an offer that he

6        would pull out and no longer be the PA if things

7        would go better with Mr. Stariha with the Kronemans,

8        something like that?

9    A   That's correct.

10                        MR. WATKINS:  Okay.  Those are all

11       the questions I have.  Thank you.

12

13

14                        FURTHER EXAMINATION

15       BY MS. MICHELI:

16   Q   Can I clear up on just one thing?  So is your

17       recollection of that conversation that Kyle initiated

18       the conversation with Mr. Stariha?

19   A   Yes.

20   Q   And do you recall Mr. Stariha specifically stating

21       that he would discriminate against the Kronemans

22       because they had a public adjustor?

23   A   The only thing I remember him saying was, "Yes"

24       or "Yes, I am," something to that extent.  No --

25       nothing beyond that.

```
1      STATE OF WASHINGTON )      I, John M.S. Botelho, CCR, RPR,
                           ) ss a certified court reporter
2      County of Pierce    )      in the State of Washington,
                                  do hereby certify:
3

4
                That the foregoing deposition of BERNIE O.
5      WILLIAMS was taken before me and completed on March 4, 2015,
       and thereafter was transcribed under my direction; that the
6      deposition is a full, true and complete transcript of the
       testimony of said witness, including all questions, answers,
7      objections, motions and exceptions;

8               That the witness, before examination, was by me
       duly sworn to testify the truth, the whole truth, and
9      nothing but the truth, and that the witness reserved the
       right of signature;
10
                That I am not a relative, employee, attorney or
11     counsel of any party to this action or relative or employee
       of any such attorney or counsel and that I am not
12     financially interested in the said action or the outcome
       thereof;
13
                That I am herewith securely sealing the said
14     deposition and promptly delivering the same to
       Attorney Allison L. Micheli.
15
                IN WITNESS WHEREOF, I have hereunto set my hand
16     this 11th day of March, 2015.

17

18

19

20

21

22     _____
       John M.S. Botelho, CCR, RPR
23     Certified Court Reporter No. 2976
       (Certification expires 5/26/15.)
24

25
```

# Exhibit No. 3

From: Stariha, Greg
Sent: Thursday, October 11, 2012 9:24 AM
To: 'Kyle Grinnell'
Subject: RE: Kroneman/185-0027057

Kyle,

I'd like to make sure we are clear on the ALE issue.   The Kronemans are
currently in the the Holiday Inn Express.   The rate is $294.84/night.   DMA
housing has found two homes that are closer to their home than the Holiday Inn
Express.   One option is $2850/month and the other is $3,295/month.   Both homes
are furnished.   Both homes are available for immediate occupation.   DMA has
indicated that the Kronemans have refused at least the first option because the
home is off the bus route for the children.   While I understand this would be
an inconvenience, I do not feel it to be a valid reason to continue the stay in
the Holiday Inn or for Country to pay that increased cost.   If you have another
option you would like to run by us, please do so.   We are open to suggestions.
However, we do feel that the amount Country would owe to reimburse the
Kronemans under ALE coverage should be capped at the cost of the monthly rent at
the either of the options provided by DMA.   I would like to resolve this issue
prior to the weekend.

Also, please keep me updated on the progress of the repair estimate from Bernie
Williams.

Please give me a call to discuss today when you get a chance.   I look forward
to hearing from you.

Greg Stariha, AIC, CPCU
Seattle Claims Supervisor
COUNTRY FINANCIAL
ph: 253-661-9957    fax:  888-281-4512
greg.stariha@countryfinancial.com

---------------------------------------------------------------------
From: Kyle Grinnell [mailto:kyle@allwestadjusters.com]
Sent: Wednesday, October 10, 2012 12:32 PM
To: Stariha, Greg
Cc: Kyle Grinnell
Subject: Re: Kroneman/185-0027057

I heard from DMA that they found one house but it was rejected as it was in a
different school district. I think that they are okay for the incidentals, but I
will ask them again about that.

I spoke with Bernie this morning. He was meeting a couple of subs out there
today and thought he would have his sheet done soon.

I did not ask First Choice for an estimate. I have always dealt with cleaners on
a T&M basis.

I hope Robin has a blast on her trip. It sounded like a great adventure.
Kyle

On Oct 10, 2012, at 11:46 AM, "Stariha, Greg"
<greg.stariha@countryfinancial.com> wrote:

  Hello Kyle,

Robin Reed is out this week and next so I will be point man for that duration.

   Can you update me on the status of the Kroneman's ALE claim?   Have they been in touch with DMA Housing and have they found a suitable home to stay in during the repairs?   Also, do they have any reciepts/invoices they would like us to process for incurred costs to date?   If so, if they could submit the receipts along with an itemization that would be great and assist us in getting a payment to them quickly.

   I spoke briefly with Bernie Williams last week regarding the estimate.   Does he have a completed estimate at this time for us to review?

   What is the current status of the packout of the personal property?   Does First Choice have an estimate for us yet on the personal property packout/cleaing as well as the dwelling cleaning?

   Thanks for the update.   Please let me know if our customers have any questions or needs at this time that have not been met.

   Greg Stariha, AIC, CPCU
   Seattle Claims Supervisor
   COUNTRY FINANCIAL
   ph: 253-661-9957   fax: 888-281-4512
   greg.stariha@countryfinancial.com

   Kyle T. Grinnell, President
   Allwest Adjusters, Inc.
   4108 57th St. Ct. East
   Tacoma, WA 98443
   (253)896-3700
   fax: (253)896-3702
   www.allwestadjusters.com

CMIC_000021

Exhibit No. 4

From: Stariha, Greg
Sent: Wednesday, October 17, 2012 7:58 AM
To: 'Kyle Grinnell'
Subject: RE: ALE

Kyle,

We are not able to consider your request for a buy out on the ALE coverage.   In
order to be covered, the expenses must be incurred.   We are willing to give DMA
housing one more week to find a house that the Kronemans will accept.   We will
terminate the hotel direct bill as of October 26.   Per DMA, it will take about
a week for them to get into a house after signing a lease.   If you or your
clients come up with another solution, please contact me to discuss.   Please
have them forward the invoices and meal receipts at any time for reimbursement.

Sincerely,

Greg Stariha, AIC, CPCU
Seattle Claims Supervisor
COUNTRY FINANCIAL
ph:  253-661-9957    fax:  888-281-4512
greg.stariha@countryfinancial.com

--------------------------------------------------------------------------------
From: Kyle Grinnell [mailto:kyle@allwestadjusters.com]
Sent: Tuesday, October 16, 2012 5:28 PM
To: Stariha, Greg
Cc: Kyle Grinnell
Subject: ALE

Greg,
I spoke with Mr. Insured right after leaving. I asked him about those other
homes and I received the same response regarding the dogs being refused. I don't
know if you are hearing the same story. I asked him if he would be willing to
board the dogs. He checked with his wife and that idea was promptly shot down.

I did broach the subject of possibly doing a fair rental value situation and it
seemed favorably received.

There hotel is only approved through Wednesday morning. Please extend that.
Kindest Regards,
Kyle

Kyle T. Grinnell, President
Allwest Adjusters, Inc.
4108 57th St. Ct. East
Tacoma, WA 98443
(253)896-3700
fax: (253)896-3702
www.allwestadjusters.com

CMIC_000086

# Exhibit No. 5

From: Kyle Grinnell [kyle@allwestadjusters.com]
Sent: Wednesday, October 24, 2012 10:19 AM
To: Stariha, Greg
Cc: Kyle Grinnell
Subject: Re: Kroneman/185-0027057
Greg,
You are going to do whatever you want to do. You've made that plain already. You
seem to think that the insured has been turning down houses that were
appropriate and are desiring to run up a huge hotel bill. To my knowledge they
have not been in one home yet that would accept their dogs and had a fenced yard
so that the dogs would be secure.

Capriciously cutting off ALE benefits is in fact bad faith.
Country owes them for their increase in living expenses. It isn't some gift or
favor that the policy provides. It is an obligation. Please stop with the
threat. It is inappropriate. Everyone wants them in a home that will work for
them. I don't believe that anyone is trying to prevent that. Just do your job,
which is to indemnify; not bully or threat.

I don't really care which service provider is involved in trying to find a house
for them. I think they all do pretty much the same level of service. Your
provider is most likely doing what they can do. I stay out of the equation
because it isn't what I do. Let the pros do their part. It will be handled.

You know the only other potential solution was shot down. Thanks for the policy
that I just took a quick look at with regards to ALE (page 14). It looks option
2 there would have applied if you were open minded about it. You may wish to
rethink that. Your reason for not doing fair rental value did not make a lot of
sense to me from a practical point of view. If you are open to it, I will
address it with your insureds to see if they will be accepting of it. That's
really about all I can think of to offer as a possible solution.

Kyle

On Oct 24, 2012, at 7:48 AM, "Stariha, Greg" <greg.stariha@countryfinancial.com>
wrote:

    Lauren,

    Please let me know if this goes through.

    Kyle,
    I would be willing to extend the hotel to Nov. 2 if this property is a go.
If not, we will have to stand by our decision to cut off the hotel on October 26
as previously noted.   Again, if you have any other housing possibilities or
options you would like for us to consider, please let me know.

    Greg Stariha, AIC, CPCU
    Seattle Claims Supervisor
    COUNTRY FINANCIAL
    ph:  253-661-9957   fax:  888-281-4512
    greg.stariha@countryfinancial.com

--------------------------------------------------------------------------------
    From: Lauren Morse [mailto:lmorse@dmahousing.com]
    Sent: Tuesday, October 23, 2012 2:55 PM
    To: Stariha, Greg
    Subject: RE: Kroneman/185-0027057

# Exhibit No. 6

 **Country Financial**

|  |  |
|---|---|
| Insured: | Kieth Kronanen |
| Property: | 9507 149th St. E. |
|  | Puyallup, WA 98374 |

| Claim Rep.: | Tim Foederer | Business: | (253) 661-9950 |
| Business: | 32001 32nd Ave S. Suite 300 | | |
|  | Federal Way, WA 98001 | | |

| Estimator: | Tim Foederer | Business: | (253) 661-9950 |
| Business: | 32001 32nd Ave S. Suite 300 | | |
|  | Federal Way, WA 98001 | | |

**Claim Number:** 185-0027057        **Policy Number:** AK4374742        **Type of Loss:** Fire

| Date of Loss: | | Date Received: | |
| Date Inspected: | 10/16/2012 | Date Entered: | 10/9/2012 8:38 AM |

| Price List: | WASE7X_OCT12 |
|  | Restoration/Service/Remodel |
| Estimate: | KRONANENCLEAN |

This estimate of repairs reflects the extent of known covered damage to your property. You may have the repairs made by a contractor of your choice. However, any repair charges that increase the repair cost above our estimate will be your responsibility unless agreed to in advance by us. COUNTRY Financial does not guarantee the workmanship of any contractor or vendor. Contractors and vendors are selected and hired by you.

Please note: If you have purchased replacement cost coverage (see your policy declarations page), you have one year from the date of loss to make repairs noted on this estimate and to request payment for the difference between the actual repair costs and the amount we have already paid. However, any replacement cost exceeding our estimate will be your responsibility unless otherwise agreed to by us.

CMIC_000110

 **Country Financial**

## KRONANENCLEAN

KRONANENCLEAN

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

This home is 10 years old. Depreciation is based on the age of the home.
Flooring 10 years.
Paint 3 years.

| | | | | | |
|---|---|---|---|---|---|
| **Total: KRONANENCLEAN** | | | **0.00** | **0.00** | **0.00** |

### General Conditions

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| permits & fees (Open item)* | 1.00 EA | 0.00 | 0.00 | (0.00) | 0.00 |
| **Will wait for permit invoice.** | | | | | |
| Engineering fees (Bid item) | 1.00 EA | 375.00 | 375.00 | (0.00) | 375.00 |

This line item covers the cost associated with the retention of a structural engineer for one site visit/inspection and the furnishing of a letter to meet pre-permitting requirements as defined by the city of Puyallup.
Any additional engineering, if required, is considered an open item in this estimate and it is agreed that any and all cost associated with required engineering, above and beyond that of the site visit and letter referenced above, will be paid as incurred.

| | | | | | |
|---|---|---|---|---|---|
| Temporary power usage (per month) | 0.00 MO | 93.48 | 0.00 | (0.00) | 0.00 |
| **This will be paid under ALE.** | | | | | |
| Temporary toilet (per month) | 2.00 MO | 161.50 | 323.00 | (0.00) | 323.00 |
| Dumpster load - Approx. 20 yards, 4 tons of debris | 2.00 EA | 659.66 | 1,319.32 | (0.00) | 1,319.32 |

These dumpsters will be used for the insulation removal from the attic as well as the carpet, siding and construction debris.

| | | | | | |
|---|---|---|---|---|---|
| Final cleaning - construction - Residential | 2,450.00 SF | 0.22 | 539.00 | (0.00) | 539.00 |
| **Totals: General Conditions** | | | **2,556.32** | **0.00** | **2,556.32** |

### Main Level

Main Level

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Two ladders with jacks and plank (per day) | 1.00 DA | 104.12 | 104.12 | (0.00) | 104.12 |

These items are for the painting of the cleaning and painting of the open soffit around the home.Includes: Equipment cost for two aluminum extension ladders with two jacks and one plank.
This is to side the gable end.

| | | | | | |
|---|---|---|---|---|---|
| R&R Siding - vinyl | 1,425.60 SF | 2.86 | 4,077.22 | (721.35) | 3,355.87 |

This is for the rear of the home and fire side of the home.

CMIC_000111

 **Country Financial**

CONTINUED - Main Level

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Includes: Vinyl siding, starter strip, under sill trim, j-trim, outside corner post, 16 gauge staples, and installation labor. Labor cost to remove siding and to discard in a job-site waste receptacle. Quality: Average grade, .042" to .044" thickness, standard colors and patterns. Note: Labor yield assumption addresses the average time necessary for normal one or two story applications where the ladder scaffold platform does not exceed 20'. | | | | | |
| R&R Attic vent - gable end - vinyl | 1.00 EA | 94.68 | 94.68 | (32.71) | 61.97 |
| R&R Light/outlet J-block - Vinyl | 3.00 EA | 18.52 | 55.56 | (9.68) | 45.88 |
| R&R House wrap (air/moisture barrier) | 1,425.60 SF | 0.37 | 527.47 | (0.00) | 527.47 |
| R&R Gutter / downspout - aluminum - up to 5" | 56.00 LF | 4.70 | 263.20 | (0.00) | 263.20 |
| This is for the rear of the home gutter and down spout. | | | | | |
| Light fixture - Detach & reset | 1.00 EA | 40.87 | 40.87 | (0.00) | 40.87 |
| R&R Sheathing - waferboard - 1/2" | 256.00 SF | 1.52 | 389.12 | (0.00) | 389.12 |
| This is the wall sheathing needing replaced at the fire damaged area. | | | | | |
| R&R Deck guard rail - treated lumber | 6.00 LF | 23.14 | 138.84 | (0.00) | 138.84 |
| R&R 4" x 4" square wood post (1.33 BF per LF) | 8.00 LF | 6.09 | 48.72 | (0.00) | 48.72 |
| These above two items are for the damaged wood post and hand rail. | | | | | |
| Pressure/chemical wash - Minimum charge | 1.00 EA | 160.00 | 160.00 | (0.00) | 160.00 |
| This is to pressure wash the deck. | | | | | |
| Paint deck - 2 coats paint | 488.00 SF | 0.75 | 366.00 | (0.00) | 366.00 |
| This is to paint the deck and handrail. | | | | | |
| 2" x 10" x 16' #2 & better Fir / Larch (material only) | 1.00 EA | 18.33 | 18.33 | (0.00) | 18.33 |
| Carpenter - General Framer - per hour | 6.00 HR | 51.85 | 311.10 | (0.00) | 311.10 |
| These above two items are to replaced the damaged rim joist. | | | | | |
| **Total: Main Level** | | | 6,595.23 | 763.74 | 5,831.49 |

CMIC_000112

 **Country Financial**

---

| | Garage | | | | | Height: 8' |
|---|---|---|---|---|---|---|
| | 506.22 SF Walls | | | | 372.13 SF Ceiling | |
| | 878.35 SF Walls & Ceiling | | | | 372.13 SF Floor | |
| | 41.35 SY Flooring | | | | 60.50 LF Floor Perimeter | |
| | 77.17 LF Ceil. Perimeter | | | | | |

| **Door** | 14' 2" X 6' 8" | **Opens into Exterior** |
|---|---|---|
| **Door** | 2' 6" X 6' 8" | **Opens into KITCH_ADD_ON** |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Furnace - check, clean, replace filters and service | 1.00 EA | 130.63 | 130.63 | (0.00) | 130.63 |
| **Includes: Labor and materials cost to check and clean a furnace and replace filters.** | | | | | |

| **Totals: Garage** | | | **130.63** | **0.00** | **130.63** |
|---|---|---|---|---|---|

---

| | Kitchen | | | | | Height: 8' |
|---|---|---|---|---|---|---|
| | 254.25 SF Walls | | | | 166.17 SF Ceiling | |
| | 420.42 SF Walls & Ceiling | | | | 124.74 SF Floor | |
| | 13.86 SY Flooring | | | | 13.12 LF Floor Perimeter | |
| | 57.90 LF Ceil. Perimeter | | | | | |

| **Window** | 2' 6" X 2' 6" | **Opens into Exterior** |
|---|---|---|
| **Door** | 2' 6" X 6' 8" | **Opens into KITCHEN** |
| **Door** | 2' 6" X 6' 8" | **Opens into BATHROOM** |
| **Door** | 2' 6" X 6' 8" | **Opens into GARAGE** |
| **Missing Wall - Goes to Floor** | 7' 5" X 6' 8" | **Opens into DINING_ROOM** |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Clean ductwork - Interior (PER REGISTER) | 2.00 EA | 28.86 | 57.72 | (0.00) | 57.72 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 13.40 | 26.80 | (0.00) | 26.80 |
| Paint the ceiling - two coats | 166.17 SF | 0.55 | 91.39 | (0.00) | 91.39 |

| **Totals: Kitchen** | | | **175.91** | **0.00** | **175.91** |
|---|---|---|---|---|---|

---

KRONANENCLEAN

10/17/2012          Page: 4

CMIC_000113

 **Country Financial**

| Stairs | | | | | Height: 17' |
|---|---|---|---|---|---|
| | 19.10 SF Walls | | | 3.17 SF Ceiling | |
| | 22.27 SF Walls & Ceiling | | | 7.25 SF Floor | |
| | 0.81 SY Flooring | | | 1.38 LF Floor Perimeter | |
| | 1.17 LF Ceil. Perimeter | | | | |

**Missing Wall**   3' 2" X 17'   Opens into ENTRY_HALLWA

**Missing Wall**   1' X 17'   Opens into ENTRY_HALLWA

| Subroom: Stairs2 (1) | | | | | Height: 17' |
|---|---|---|---|---|---|
| | 193.70 SF Walls | | | 25.00 SF Ceiling | |
| | 218.70 SF Walls & Ceiling | | | 48.18 SF Floor | |
| | 5.35 SY Flooring | | | 18.67 LF Floor Perimeter | |
| | 15.17 LF Ceil. Perimeter | | | | |

**Missing Wall**   3' 4" X 17'   Opens into STAIRS1

| Subroom: Stairs1 (2) | | | | | Height: 17' |
|---|---|---|---|---|---|
| | 105.00 SF Walls | | | 11.07 SF Ceiling | |
| | 116.07 SF Walls & Ceiling | | | 11.08 SF Floor | |
| | 1.23 SY Flooring | | | 6.67 LF Floor Perimeter | |
| | 6.67 LF Ceil. Perimeter | | | | |

**Missing Wall**   3' X 17'   Opens into STAIRS

**Missing Wall**   3' 4" X 17'   Opens into STAIRS2

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Paint the surface area - two coats | 334.77 SF | 0.55 | 184.12 | (0.00) | 184.12 |
| Step charge for "waterfall" carpet installation | 11.00 EA | 4.88 | 53.68 | (26.84) | 26.84 |
| R&R Carpet | 66.52 SF | 3.05 | 202.88 | (93.46) | 109.42 |
| R&R Carpet pad | 66.52 SF | 0.72 | 47.90 | (20.96) | 26.94 |
| **Totals: Stairs** | | | **488.58** | **141.26** | **347.32** |

CMIC_000114

 **Country Financial**

| Entry/Hallway | | | | | Height: 8' |
|---|---|---|---|---|---|

| | | |
|---|---|---|
| 55.33 SF Walls | | 29.42 SF Ceiling |
| 84.76 SF Walls & Ceiling | | 29.42 SF Floor |
| 3.27 SY Flooring | | 6.08 LF Floor Perimeter |
| 11.08 LF Ceil. Perimeter | | |

| | | |
|---|---|---|
| Missing Wall | 9' 7" X 8' | Opens into LIVING_ROOM |
| Door | 2' 6" X 6' 8" | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into ENTRY_CLST |
| Missing Wall | 1' X 8' | Opens into STAIRS |
| Missing Wall | 3' 2" X 8' | Opens into STAIRS |

| Subroom: Room2 (1) | | | | | Height: 8' |
|---|---|---|---|---|---|

| | | |
|---|---|---|
| 52.00 SF Walls | | 19.55 SF Ceiling |
| 71.55 SF Walls & Ceiling | | 19.55 SF Floor |
| 2.17 SY Flooring | | 6.50 LF Floor Perimeter |
| 6.50 LF Ceil. Perimeter | | |

| | | |
|---|---|---|
| Missing Wall | 3' 5 1/8" X 8' | Opens into DINING_ROOM |
| Missing Wall | 2' 1 7/16" X 8' | Opens into ENTERTAINMEN |
| Missing Wall | 5" X 8' | Opens into LIVING_ROOM |
| Missing Wall | 3' 9" X 8' | Opens into LIVING_ROOM |
| Missing Wall | 3' X 8' | Opens into ENTRY_HALLWA |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Paint the ceiling - two coats - 2 colors | 48.97 SF | 0.66 | 32.32 | (0.00) | 32.32 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 28.86 | 28.86 | (0.00) | 28.86 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 13.40 | 13.40 | (0.00) | 13.40 |
| R&R Carpet | 48.97 SF | 3.05 | 149.36 | (68.81) | 80.55 |
| R&R Carpet pad | 48.97 SF | 0.72 | 35.26 | (15.43) | 19.83 |
| **Totals: Entry/Hallway** | | | **259.20** | **84.24** | **174.96** |

CMIC_000115

 **Country Financial**

---

### Living Room
**Height: 8'**

| | |
|---|---|
| 266.13 SF Walls | 140.78 SF Ceiling |
| 406.91 SF Walls & Ceiling | 140.78 SF Floor |
| 15.64 SY Flooring | 33.27 LF Floor Perimeter |
| 33.27 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Window | 2' X 4' | Opens into Exterior |
| Window | 2' X 4' | Opens into Exterior |
| Missing Wall | 9' 7" X 8' | Opens into ENTRY_HALLWA |
| Missing Wall | 3' 9" X 8' | Opens into ROOM2 |
| Missing Wall | 5" X 8' | Opens into ROOM2 |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Paint the ceiling - two coats - 2 colors | 140.78 SF | 0.66 | 92.91 | (0.00) | 92.91 |
| Clean ductwork - Interior (PER REGISTER) | 2.00 EA | 28.86 | 57.72 | (0.00) | 57.72 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 13.40 | 26.80 | (0.00) | 26.80 |
| R&R Carpet | 140.78 SF | 3.05 | 429.38 | (197.80) | 231.58 |
| R&R Carpet pad | 140.78 SF | 0.72 | 101.36 | (44.35) | 57.01 |
| **Totals: Living Room** | | | **708.17** | **242.15** | **466.02** |

---

### Dining Room
**Height: 8'**

| | |
|---|---|
| 156.09 SF Walls | 136.11 SF Ceiling |
| 292.20 SF Walls & Ceiling | 136.11 SF Floor |
| 15.12 SY Flooring | 17.68 LF Floor Perimeter |
| 30.10 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Door | 5' X 6' 8" | Opens into Exterior |
| Missing Wall - Goes to Floor | 7' 5" X 6' 8" | Opens into KITCH_ADD_ON |
| Missing Wall | 3' 7 1/8" X 8' | Opens into ROOM2 |
| Missing Wall | 3' 3 7/8" X 8' | Opens into ENTERTAINMEN |
| Missing Wall | 12' 2" X 8' | Opens into ENTERTAINMEN |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Seal floor or ceiling joist system (shellac) | 136.11 SF | 0.84 | 114.33 | (0.00) | 114.33 |
| R&R 5/8" drywall - hung, taped, ready or texture | 136.11 SF | 1.90 | 258.61 | (0.00) | 258.61 |

KRONANENCLEAN

CMIC_000116

 **Country Financial**

FINANCIAL

CONTINUED - Dining Room

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Texture drywall - machine | 292.20 SF | 0.30 | 87.66 | (0.00) | 87.66 |
| Seal part of the walls and ceiling shellac - one coat | 142.20 SF | 0.39 | 55.46 | (0.00) | 55.46 |
| Seal the surface area w/latex based stain blocker - one coat | 150.00 SF | 0.33 | 49.50 | (0.00) | 49.50 |
| Mask and prep for paint - paper and tape (per LF) | 17.68 LF | 0.44 | 7.78 | (0.00) | 7.78 |
| Masking at wall to baseboard interface | | | | | |
| Paint baseboard - two coats | 17.68 LF | 0.83 | 14.67 | (0.00) | 14.67 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 28.86 | 28.86 | (0.00) | 28.86 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 13.40 | 13.40 | (0.00) | 13.40 |
| R&R Chandelier | 1.00 EA | 223.48 | 223.48 | (0.00) | 223.48 |
| R&R 1/2" drywall - hung, taped, loated, ready for paint | 80.00 SF | 1.94 | 155.20 | (0.00) | 155.20 |
| Removal of gypsum wallboard on the walls completed by the mitigation company. | | | | | |
| Paint the walls and ceiling - two coats | 292.20 SF | 0.55 | 160.71 | (0.00) | 160.71 |
| Mask and prep for paint - plastic, paper, tape (per LF) | 30.10 LF | 0.83 | 24.98 | (0.00) | 24.98 |
| Batt insulation - 6" - R21 | 120.00 SF | 0.89 | 106.80 | (0.00) | 106.80 |
| Clean ductwork - Interior (PER REGISTER) | 3.00 EA | 28.86 | 86.58 | (0.00) | 86.58 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 13.40 | 26.80 | (0.00) | 26.80 |
| Detach & Reset Cold air return cover - Large | 1.00 EA | 18.29 | 18.29 | (0.00) | 18.29 |
| R&R Carpet - metal transition strip | 3.00 LF | 3.49 | 10.47 | (4.37) | 6.10 |
| R&R Carpet pad | 136.11 SF | 0.72 | 98.00 | (42.88) | 55.12 |
| R&R Carpet | 136.11 SF | 3.05 | 415.14 | (191.24) | 223.90 |
| R&R Baseboard - 2 1/4" | 7.68 LF | 2.51 | 19.27 | (0.00) | 19.27 |
| **Totals: Dining Room** | | | **1,975.99** | **238.49** | **1,737.50** |

CMIC_000117

 **Country Financial**

| entertainment | | | | | Height: 8' |
|---|---|---|---|---|---|

310.67 SF Walls        188.92 SF Ceiling
499.58 SF Walls & Ceiling        188.92 SF Floor
20.99 SY Flooring        38.83 LF Floor Perimeter
38.83 LF Ceil. Perimeter

| | | |
|---|---|---|
| Missing Wall | 12' 2" X 8' | Opens into DINING_ROOM |
| Missing Wall | 3' 3 7/8" X 8' | Opens into DINING_ROOM |
| Missing Wall | 2' 1 7/16" X 8' | Opens into ROOM2 |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 5/8" drywall - hung, taped, ready for texture | 188.92 SF | 1.52 | 287.16 | (0.00) | 287.16 |
| Replacement of gypsum wallboard on the lid removed by the mitigation company. | | | | | |
| R&R 1/2" drywall - hung, taped, floated, ready for paint | 80.00 SF | 1.94 | 155.20 | (0.00) | 155.20 |
| Removal of gypsum wallboard on the walls completed by the mitigation company. | | | | | |
| Paint the walls and ceiling - two coats | 499.58 SF | 0.55 | 274.77 | (0.00) | 274.77 |
| Mask and prep for paint - plastic, paper, tape (per LF) | 38.83 LF | 0.83 | 32.23 | (0.00) | 32.23 |
| Batt insulation - 6" - R21 | 120.00 SF | 0.89 | 106.80 | (0.00) | 106.80 |
| Clean ductwork - Interior (PER REGISTER) | 3.00 EA | 28.86 | 86.58 | (0.00) | 86.58 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 13.40 | 26.80 | (0.00) | 26.80 |
| Detach & Reset Cold air return cover - Large | 1.00 EA | 18.29 | 18.29 | (0.00) | 18.29 |
| Paint baseboard - two coats | 38.83 LF | 0.83 | 32.23 | (0.00) | 32.23 |
| R&R Baseboard - 2 1/4" | 28.83 LF | 2.51 | 72.36 | (0.00) | 72.36 |
| R&R Carpet | 188.92 SF | 3.05 | 576.21 | (265.44) | 310.77 |
| R&R Carpet pad | 188.92 SF | 0.72 | 136.02 | (59.51) | 76.51 |
| R&R Stud wall - 2" x 6" x 8' - 16" oc | 14.00 LF | 21.56 | 301.84 | (0.00) | 301.84 |
| Temporary shoring post - Screw jack (per day) | 3.00 DA | 27.62 | 82.86 | (0.00) | 82.86 |
| 2" x 12" x 12' #2 treated pine (material only) | 2.00 EA | 28.96 | 57.92 | (0.00) | 57.92 |
| Carpenter - General Framer - per hour | 8.00 HR | 51.85 | 414.80 | (0.00) | 414.80 |
| These above 3 items are to shore up the floor system so the exterior wall damage can be repaired. | | | | | |
| Totals: entertainment | | | 2,662.07 | 324.95 | 2,337.12 |

| Total: Main Level | | | 12,995.78 | 1,794.83 | 11,200.95 |

CMIC_000118

 **Country Financial**

## Upper Level



| Bedroom 2 | | | | | Height: 8' |
|---|---|---|---|---|---|
| 388.98 SF Walls | | | 169.03 SF Ceiling | | |
| 558.01 SF Walls & Ceiling | | | 169.03 SF Floor | | |
| 18.78 SY Flooring | | | 47.21 LF Floor Perimeter | | |
| 55.71 LF Ceil. Perimeter | | | | | |

| Door | 6' X 6' 8" | Opens into CLOSET_BDRM_ |
|---|---|---|
| Door | 2' 6" X 6' 8" | Opens into RECREATION_R |
| Window | 2' X 4' | Opens into Exterior |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| R&R Carpet | 169.03 SF | 3.05 | 515.54 | (237.49) | 278.05 |
| R&R Carpet pad | 169.03 SF | 0.72 | 121.70 | (53.25) | 68.45 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 28.86 | 28.86 | (0.00) | 28.86 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 13.40 | 13.40 | (0.00) | 13.40 |
| **Totals: Bedroom 2** | | | **679.50** | **290.74** | **388.76** |

| Closet Bdrm 2 | | | | | Height: 8' |
|---|---|---|---|---|---|
| 157.33 SF Walls | | | 20.67 SF Ceiling | | |
| 178.00 SF Walls & Ceiling | | | 20.67 SF Floor | | |
| 2.30 SY Flooring | | | 18.67 LF Floor Perimeter | | |
| 24.67 LF Ceil. Perimeter | | | | | |

| Door | 6' X 6' 8" | Opens into BEDROOM_2 |
|---|---|---|

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| R&R Carpet | 20.67 SF | 3.05 | 63.04 | (29.04) | 34.00 |
| R&R Carpet pad | 20.67 SF | 0.72 | 14.88 | (6.51) | 8.37 |
| **Totals: Closet Bdrm 2** | | | **77.92** | **35.55** | **42.37** |

KRONANENCLEAN

10/17/2012          Page: 10

**CMIC_000119**

 **Country Financial**

---

**Bathroom** | | | | | **Height: 8'**

227.33 SF Walls            50.81 SF Ceiling
278.14 SF Walls & Ceiling      50.81 SF Floor
5.65 SY Flooring           28.00 LF Floor Perimeter
30.50 LF Ceil. Perimeter

**Door**          2' 6" X 6' 8"          Opens into RECREATION_R

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 28.86 | 28.86 | (0.00) | 28.86 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 13.40 | 13.40 | (0.00) | 13.40 |
| **Totals: Bathroom** | | | **42.26** | **0.00** | **42.26** |

---

**Recreation Room** | | | | | **Height: 8'**

526.87 SF Walls           218.82 SF Ceiling
745.69 SF Walls & Ceiling     218.82 SF Floor
24.31 SY Flooring         66.28 LF Floor Perimeter
74.78 LF Ceil. Perimeter

| | | |
|---|---|---|
| Window | 2' X 4' | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into LAUNDRY_ROOM |
| Door | 2' 6" X 6' 8" | Opens into BEDROOM_1 |
| Door | 2' 6" X 6' 8" | Opens into MASTER_BEDRO |
| Missing Wall - Goes to Ceiling | 2' X 5' | Opens into Exterior |
| Missing Wall | 3' X 8' | Opens into Exterior |
| Missing Wall - Goes to Ceiling | 2' X 5' | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into BEDROOM_2 |
| Door | 2' 6" X 6' 8" | Opens into BATHROOM |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Drywall Installer / Finisher - per hour | 4.00 HR | 65.21 | 260.84 | (0.00) | 260.84 |
| This is extra time for patching in the existing drywall. | | | | | |
| 5/8" drywall - hung, taped, ready for texture | 48.00 SF | 1.52 | 72.96 | (0.00) | 72.96 |
| Replacement of gypsum wallboard on the lid removed by the mitigation company. | | | | | |
| R&R 1/2" drywall - hung, taped, loated, ready for paint | 80.00 SF | 1.94 | 155.20 | (0.00) | 155.20 |

KRONANENCLEAN

CMIC_000120

 **Country Financial**

### CONTINUED - Recreation Room

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Removal of gypsum wallboard on the walls completed by the mitigation company. | | | | | |
| Paint the walls and ceiling - two coats | 745.69 SF | 0.55 | 410.13 | (0.00) | 410.13 |
| Mask and prep for paint - plastic, paper, tape (per LF) | 74.78 LF | 0.83 | 62.07 | (0.00) | 62.07 |
| Batt insulation - 6" - R21 | 120.00 SF | 0.89 | 106.80 | (0.00) | 106.80 |
| Clean ductwork - Interior (PER REGISTER) | 3.00 EA | 28.86 | 86.58 | (0.00) | 86.58 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 13.40 | 26.80 | (0.00) | 26.80 |
| Detach & Reset Cold air return cover - Large | 1.00 EA | 18.29 | 18.29 | (0.00) | 18.29 |
| Paint baseboard - two coats | 66.28 LF | 0.83 | 55.01 | (0.00) | 55.01 |
| R&R Baseboard - 2 1/4" | 56.28 LF | 2.51 | 141.26 | (0.00) | 141.26 |
| R&R Carpet pad | 218.82 SF | 0.72 | 157.55 | (68.93) | 88.62 |
| R&R Carpet | 218.82 SF | 3.05 | 667.40 | (307.44) | 359.96 |
| **Totals: Recreation Room** | | | **2,220.89** | **376.37** | **1,844.52** |



| Bedroom 1 | | | | | Height: 8' |
|---|---|---|---|---|---|
| | 316.67 SF Walls | | | 119.36 SF Ceiling | |
| | 436.02 SF Walls & Ceiling | | | 119.36 SF Floor | |
| | 13.26 SY Flooring | | | 38.75 LF Floor Perimeter | |
| | 43.75 LF Ceil. Perimeter | | | | |
| Door | 2' 6" X 6' 8" | | Opens into RECREATION_R | | |
| Door | 2' 6" X 6' 8" | | Opens into ROOM7 | | |
| Window | 2' X 4' | | Opens into Exterior | | |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 28.86 | 28.86 | (0.00) | 28.86 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 13.40 | 13.40 | (0.00) | 13.40 |
| R&R Carpet pad | 119.36 SF | 0.72 | 85.94 | (37.60) | 48.34 |
| R&R Carpet | 119.36 SF | 3.05 | 364.05 | (167.70) | 196.35 |

KRONANENCLEAN

10/17/2012        Page: 12

CMIC_000121


**Country Financial**

CONTINUED - Bedroom 1

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Totals: Bedroom 1 | | | 492.25 | 205.30 | 286.95 |



**Walk-in Closet Bdrm 1**                                                     Height: 8'

178.00 SF Walls                     35.83 SF Ceiling
213.83 SF Walls & Ceiling           35.83 SF Floor
3.98 SY Flooring                    21.83 LF Floor Perimeter
24.33 LF Ceil. Perimeter

| Door | 2' 6" X 6' 8" | | Opens into BEDROOM_1 | | |
|---|---|---|---|---|---|
| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
| R&R Carpet | 35.83 SF | 3.05 | 109.28 | (50.34) | 58.94 |
| R&R Carpet pad | 35.83 SF | 0.72 | 25.79 | (11.29) | 14.50 |
| Totals: Walk-in Closet Bdrm 1 | | | 135.07 | 61.63 | 73.44 |



**Walk-in Closet**                                                          Height: 8'

264.33 SF Walls                     77.09 SF Ceiling
341.41 SF Walls & Ceiling           77.09 SF Floor
8.57 SY Flooring                    32.62 LF Floor Perimeter
35.12 LF Ceil. Perimeter

| Door | 2' 6" X 6' 8" | | Opens into MASTER_BATH | | |
|---|---|---|---|---|---|
| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 28.86 | 28.86 | (0.00) | 28.86 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 13.40 | 13.40 | (0.00) | 13.40 |
| R&R Carpet | 77.09 SF | 3.05 | 235.12 | (108.31) | 126.81 |
| R&R Carpet pad | 77.09 SF | 0.72 | 55.51 | (24.29) | 31.22 |
| Totals: Walk-in Closet | | | 332.89 | 132.60 | 200.29 |

KRONANENCLEAN

10/17/2012                      Page: 13

 **Country Financial**



| Master Bedroom | | | | | Height: 8' |
|---|---|---|---|---|---|
| 598.67 SF Walls | | | 323.01 SF Ceiling | | |
| 921.68 SF Walls & Ceiling | | | 323.01 SF Floor | | |
| 35.89 SY Flooring | | | 76.50 LF Floor Perimeter | | |
| 81.50 LF Ceil. Perimeter | | | | | |

| Door | 2' 6" X 6' 8" | Opens into RECREATION_R |
|---|---|---|
| Door | 2' 6" X 6' 8" | Opens into MASTER_BATH |
| Window | 2' 6" X 4' | Opens into Exterior |
| Window | 2' 6" X 4' | Opens into Exterior |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Clean ductwork - Interior (PER REGISTER) | 2.00 EA | 28.86 | 57.72 | (0.00) | 57.72 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 13.40 | 26.80 | (0.00) | 26.80 |
| R&R Carpet pad | 323.01 SF | 0.72 | 232.57 | (101.75) | 130.82 |
| R&R Carpet | 323.01 SF | 3.05 | 985.18 | (453.83) | 531.35 |
| **Totals: Master Bedroom** | | | **1,302.27** | **555.58** | **746.69** |

| **Total: Upper Level** | | | **5,283.05** | **1,657.77** | **3,625.28** |

### Roof



| Roof | | | | |
|---|---|---|---|---|
| 1687.05 Surface Area | | | 16.87 Number of Squares | |
| 196.01 Total Perimeter Length | | | 61.00 Total Ridge Length | |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Clean soffit - wood | 196.00 SF | 0.26 | 50.96 | (0.00) | 50.96 |
| Prime & paint exterior soffit - wood | 196.00 SF | 1.31 | 256.76 | (0.00) | 256.76 |
| Painter - per hour | 16.00 HR | 45.68 | 730.88 | (0.00) | 730.88 |
| This is labor for the soffit sealing and paint for the 2 story high work and moving of equipment. | | | | | |
| Two ladders with jacks and plank (per day) | 4.00 DA | 104.12 | 416.48 | (0.00) | 416.48 |
| These items are for the painting of the cleaning and painting of the open soffit around the home. Includes: Equipment cost for two aluminum extension ladders with two jacks and one plank. | | | | | |

KRONANENCLEAN                                                          10/17/2012          Page: 14

CMIC_000123

 COUNTRY FINANCIAL Country Financial

CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| **Totals: Roof** | | | **1,455.08** | **0.00** | **1,455.08** |
| **Total: Roof** | | | **1,455.08** | **0.00** | **1,455.08** |

Attic

**Attic** **Height: 8'**

| | | | |
|---|---|---|---|
| 1146.67 | SF Walls | 1225.15 | SF Ceiling |
| 2371.81 | SF Walls & Ceiling | 1225.15 | SF Floor |
| 136.13 | SY Flooring | 143.33 | LF Floor Perimeter |
| 143.33 | LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Remove Blown-in insulation - Machine removal | 1,225.15 SF | 1.48 | 1,813.22 | (0.00) | 1,813.22 |
| Blown-in insulation - 16" depth - R44 | 1,225.15 SF | 1.05 | 1,286.41 | (0.00) | 1,286.41 |
| Seal truss system - up to 5/12 | 1,225.15 SF | 1.02 | 1,249.65 | (0.00) | 1,249.65 |
| Seal floor or ceiling joist system (shellac) | 1,213.15 SF | 0.84 | 1,019.05 | (0.00) | 1,019.05 |
| R&R Baffle vent - cardboard | 62.00 LF | 0.84 | 52.08 | (0.00) | 52.08 |
| **Totals: Attic** | | | **5,420.41** | **0.00** | **5,420.41** |
| **Total: Attic** | | | **5,420.41** | **0.00** | **5,420.41** |

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Batt insulation - 4" - R15 | 150.00 SF | 0.82 | 123.00 | (0.00) | 123.00 |
| **This is for the rim joist.** | | | | | |
| Seal floor or ceiling joist system (shellac) | 150.00 SF | 0.84 | 126.00 | (0.00) | 126.00 |
| R&R Vapor barrier - visqueen - 6mil | 200.00 SF | 0.32 | 64.00 | (0.00) | 64.00 |

CMIC_000124

**Country Financial**

CONTINUED - Crawl

| DESCRIPTION | QUANTITY | UNIT COST | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| Totals: Crawl | | | 313.00 | 0.00 | 313.00 |
| Line Item Totals: KRONANENCLEAN | | | 28,023.64 | 3,452.60 | 24,571.04 |

## Grand Total Areas:

| | | | | | | |
|---|---|---|---|---|---|---|
| 6,807.67 | SF Walls | 3,547.82 | SF Ceiling | 10,355.49 | SF Walls and Ceiling |
| 3,529.09 | SF Floor | 392.12 | SY Flooring | 804.56 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 941.38 | LF Ceil. Perimeter |
| | | | | | |
| 3,529.09 | Floor Area | 3,784.26 | Total Area | 6,281.13 | Interior Wall Area |
| 4,765.08 | Exterior Wall Area | 460.65 | Exterior Perimeter of Walls | | |
| | | | | | |
| 1,687.05 | Surface Area | 16.87 | Number of Squares | 196.01 | Total Perimeter Length |
| 61.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

CMIC_000125

 **Country Financial**

## Summary for Dwelling

| | | | |
|---|---|---|---:|
| Line Item Total | | | 28,023.64 |
| Overhead | @ | 10.0% | 2,802.49 |
| Profit | @ | 10.0% | 2,802.49 |
| Sales Tax | @ | 8.400% | 2,824.74 |
| **Replacement Cost Value** | | | **$36,453.36** |
| Less Depreciation | | | (3,742.62) |
| **Actual Cash Value** | | | **$32,710.74** |
| Less Deductible | | | (1,000.00) |
| **Net Claim** | | | **$31,710.74** |
| Total Recoverable Depreciation | | | 3,742.62 |
| **Net Claim if Depreciation is Recovered** | | | **$35,453.36** |

Tim  Foederer

CMIC_000126

 **Country Financial**

## Recap by Room

| | | |
|---|---:|---:|
| **Estimate: KRONANENCLEAN** | | |
| General Conditions | 2,556.32 | 9.12% |
| | | |
| **Area: Main Level** | 6,595.23 | 23.53% |
| Garage | 130.63 | 0.47% |
| Kitchen | 175.91 | 0.63% |
| Stairs | 488.58 | 1.74% |
| Entry/Hallway | 259.20 | 0.92% |
| Living Room | 708.17 | 2.53% |
| Dining Room | 1,975.99 | 7.05% |
| entertainment | 2,662.07 | 9.50% |
| | | |
| Area Subtotal: Main Level | 12,995.78 | 46.37% |
| | | |
| **Area: Upper Level** | | |
| Bedroom 2 | 679.50 | 2.42% |
| Closet Bdrm 2 | 77.92 | 0.28% |
| Bathroom | 42.26 | 0.15% |
| Recreation Room | 2,220.89 | 7.93% |
| Bedroom 1 | 492.25 | 1.76% |
| Walk-in Closet Bdrm 1 | 135.07 | 0.48% |
| Walk-in Closet | 332.89 | 1.19% |
| Master Bedroom | 1,302.27 | 4.65% |
| | | |
| Area Subtotal: Upper Level | 5,283.05 | 18.85% |
| | | |
| **Area: Roof** | | |
| Roof | 1,455.08 | 5.19% |
| | | |
| Area Subtotal: Roof | 1,455.08 | 5.19% |
| | | |
| **Area: Attic** | | |
| Attic | 5,420.41 | 19.34% |
| | | |
| Area Subtotal: Attic | 5,420.41 | 19.34% |
| Crawl | 313.00 | 1.12% |
| | | |
| **Subtotal of Areas** | 28,023.64 | 100.00% |
| | | |
| **Total** | 28,023.64 | 100.00% |

CMIC_000127

 **Country Financial**

## Recap by Category with Depreciation

| O&P Items | | | RCV | Deprec. | ACV |
|---|---|---|---:|---:|---:|
| CLEANING | | | 1,356.02 | | 1,356.02 |
| GENERAL DEMOLITION | | | 4,575.43 | | 4,575.43 |
| DRYWALL | | | 1,292.31 | | 1,292.31 |
| FLOOR COVERING - CARPET | | | 5,377.59 | 2,688.86 | 2,688.73 |
| FLOOR COVERING - WOOD | | | 50.00 | | 50.00 |
| PERMITS AND FEES | | | 375.00 | | 375.00 |
| FINISH CARPENTRY / TRIMWORK | | | 202.28 | | 202.28 |
| FRAMING & ROUGH CARPENTRY | | | 1,605.75 | | 1,605.75 |
| HEAT, VENT & AIR CONDITIONING | | | 426.70 | | 426.70 |
| INSULATION | | | 2,240.56 | | 2,240.56 |
| LIGHT FIXTURES | | | 250.05 | | 250.05 |
| PAINTING | | | 5,442.95 | | 5,442.95 |
| SCAFFOLDING | | | 520.60 | | 520.60 |
| SIDING | | | 3,743.48 | 763.74 | 2,979.74 |
| SOFFIT, FASCIA, & GUTTER | | | 241.92 | | 241.92 |
| TEMPORARY REPAIRS | | | 323.00 | | 323.00 |
| )&P Items Subtotal | | | 28,023.64 | 3,452.60 | 24,571.04 |
| Overhead | @ | 10.0% | 2,802.49 | | 2,802.49 |
| Profit | @ | 10.0% | 2,802.49 | | 2,802.49 |
| Sales Tax | @ | 8.400% | 2,824.74 | 290.02 | 2,534.72 |
| Total | | | 36,453.36 | 3,742.62 | 32,710.74 |

CMIC_000128

# Exhibit No. 7

# Step-Up
## CONSTRUCTION

Client: Kieth Kronanen
Property: 9507 149th St. E.
Puyallup, WA 98374

Operator Info:
Operator: BERNIE

Estimator: Bernie Williams                                    Business:    (206) 422-7821
Position: Estimator
Company: Step Up Construction

Type of Estimate:
Date Entered: 10/9/2012                    Date Assigned:

Price List: WATA7X_OCT12
Labor Efficiency: Restoration/Service/Remodel
Estimate: 2012-10-09-0836REV



Step-Up
CONSTRUCTION

**2012-10-09-0836REV**

### General Conditions

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Taxes, insurance, permits & fees (Bid item) | 1.00 EA | 0.00 | 0.00 | 0.00 |
| Will be submitted outside of this scope of repairs as a supplemental estimate | | | | |
| Engineering fees (Bid item) | 1.00 EA | 0.00 | 375.00 | 375.00 |
| This line item covers the cost associated with the retention of a structural engineer for one site visit/inspection and the furnishing of a letter to meet pre-permitting requirements as defined by the city of Puyallup. | | | | |
| Any additional engineering, if required, is considered an open item in this estimate and it is agreed that any and all cost associated with required engineering, above and beyond that of the site visit and letter referenced above, will be paid as incurred. | | | | |
| Architectural/Drafting fees (Bid item) | 1.00 EA | 0.00 | 0.00 | 0.00 |
| Temporary toilet (per month) | 2.00 MO | 0.00 | 126.23 | 252.46 |
| Lock Box | 1.00 EA | 0.00 | 37.67 | 37.67 |
| Dumpster load - Approx. 20 yards, 4 tons of debris | 2.00 EA | 701.66 | 0.00 | 1,403.32 |
| Demolition debris | | | | |
| Single axle dump truck - per load - including dump fees | EA | 262.68 | 0.00 | 0.00 |
| **Remopved per email received on 12/3/12 at 4:10pm.  If additional dumsters or dump trucks are needed, Country Financial has agreed to pay for them based furnished receipts + 10% overhead and 10% profit.** | | | | |
| Totals:  General Conditions | | | | 2,068.45 |

### Main Level

| | Bathroom | | Height: 8' |
|---|---|---|---|
| | 128.94 SF Walls | 18.75 SF Ceiling | |
| | 147.69 SF Walls & Ceiling | 14.17 SF Floor | |
| | 1.57 SY Flooring | 11.33 LF Floor Perimeter | |
| | 20.00 LF Ceil. Perimeter | | |

| Door | 2' 6" X 6' 8" | Opens into KITCH_ADD_ON |
|---|---|---|

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Vanity | LF | 5.80 | 122.81 | 0.00 |
| Cabinets inserted in sketch for subtraction of floor and wall surfaces only | | | | |
| Seal the walls and ceiling shellac - one coat | 147.69 SF | 0.00 | 0.39 | 57.60 |

CMIC_000301



Step-Up
CONSTRUCTION

## CONTINUED - Bathroom

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Paint the walls and ceiling - two coats - 2 colors | 147.69 SF | 0.00 | 0.69 | 101.91 |
| Mask and prep for paint - paper and tape (per LF) | 11.33 LF | 0.00 | 0.46 | 5.21 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 20.00 LF | 0.00 | 0.83 | 16.60 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | 0.00 | 22.49 | 44.98 |
| Paint single bifold door - slab only - 2 coats (per side) | 4.00 EA | 0.00 | 19.03 | 76.12 |
| Bifold door set - (4 slabs only) - Double Detach & reset | 1.00 EA | 0.00 | 35.09 | 35.09 |
| Toilet - Detach & reset | 1.00 EA | 0.00 | 187.53 | 187.53 |
| Needs to be detached and reset to seal and paint behind it. | | | | |
| (Material Only) Plumbing fixture supply line | 1.00 EA | 0.00 | 4.93 | 4.93 |
| Plumber - per hour | 1.50 HR | 0.00 | 102.53 | 153.80 |
| Additional labor needed to complete detach and re-installation of this toilet.  PLM TLTRS line items will require two trips to complete. | | | | |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |

Totals:  Bathroom                                                                713.30

---

**Stairs**                                                           Height: 17'

|  |  |
|---|---|
| 19.10 SF Walls | 3.17 SF Ceiling |
| 22.27 SF Walls & Ceiling | 7.25 SF Floor |
| 0.81 SY Flooring | 1.38 LF Floor Perimeter |
| 1.17 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| **Missing Wall** | **3' 2" X 17'** | **Opens into ENTRY_HALLWA** |
| **Missing Wall** | **1' X 17'** | **Opens into ENTRY_HALLWA** |

Living Room

CMIC_000302



**Step-Up**
CONSTRUCTION

**CONTINUED - Stairs**



**Subroom: Stairs2 (1)**                                                          Height: 17'

| | |
|---|---|
| 193.70 SF Walls | 25.00 SF Ceiling |
| 218.70 SF Walls & Ceiling | 48.18 SF Floor |
| 5.35 SY Flooring | 18.67 LF Floor Perimeter |
| 15.17 LF Ceil. Perimeter | |

Missing Wall                          3' 4" X 17'                          Opens into STAIRS1

**Subroom: Stairs1 (2)**                                                          Height: 17'

| | |
|---|---|
| 105.00 SF Walls | 11.07 SF Ceiling |
| 116.07 SF Walls & Ceiling | 11.08 SF Floor |
| 1.23 SY Flooring | 6.67 LF Floor Perimeter |
| 6.67 LF Ceil. Perimeter | |

Missing Wall                          3' X 17'                          Opens into STAIRS
Missing Wall                          3' 4" X 17'                          Opens into STAIRS2

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 66.52 SF | 0.24 | 0.00 | 15.96 |
| Carpet | 173.25 SF | 0.00 | 2.77 | 479.90 |
| R&R Carpet pad | 66.52 SF | 0.09 | 0.67 | 50.56 |
| Step charge for "waterfall" carpet installation | 11.00 EA | 0.00 | 4.82 | 53.02 |
| Seal the surface area shellac - one coat | 334.77 SF | 0.00 | 0.39 | 130.56 |
| Paint the surface area - two coats - 2 colors | 334.77 SF | 0.00 | 0.69 | 230.99 |
| Mask and prep for paint - paper and tape (per LF) | 6.00 LF | 0.00 | 0.46 | 2.76 |
| Masking at wall to baseboard interface ( landing only ) | | | | |

Totals: Stairs                                                                          963.75

CMIC_000303

**Step-Up**
CONSTRUCTION

**Entry Clst**                                                    Height: 8'

| 100.67 SF Walls | 12.27 SF Ceiling |
| 112.94 SF Walls & Ceiling | 12.27 SF Floor |
| 1.36 SY Flooring | 12.17 LF Floor Perimeter |
| 14.67 LF Ceil. Perimeter | |

**Door**                        2' 6" X 6' 8"              Opens into ENTRY_HALLWA

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal the walls and ceiling shellac - one coat | 112.94 SF | 0.00 | 0.39 | 44.05 |
| Paint the walls and ceiling - two coats - 2 colors | 112.94 SF | 0.00 | 0.69 | 77.93 |
| Mask and prep for paint - paper and tape (per LF) | 12.17 LF | 0.00 | 0.46 | 5.60 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 14.67 LF | 0.00 | 0.83 | 12.18 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| nterior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |

Totals:  Entry Clst                                                          153.35

**Garage**                                                        Height: 8'

| 506.22 SF Walls | 372.13 SF Ceiling |
| 878.35 SF Walls & Ceiling | 372.13 SF Floor |
| 41.35 SY Flooring | 60.50 LF Floor Perimeter |
| 77.17 LF Ceil. Perimeter | |

**Door**                        14' 2" X 6' 8"            Opens into Exterior
**Door**                        2' 6" X 6' 8"             Opens into KITCH_ADD_ON

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Heat, Vent, & Air Conditioning - Labor Minimum | 1.00 EA | 0.00 | 251.53 | 251.53 |
| Furnace - check, clean, replace filters and service | EA | 0.00 | 123.65 | 0.00 |
| Minimum above covers cost of this line item | | | | |
| (Material Only) Furnace filter - (material only) | 1.00 EA | 0.00 | 29.97 | 29.97 |

2012-10-09-0836REV                                    12/3/2012                Page: 5

CMIC_000304

**Step-Up**
CONSTRUCTION

CONTINUED - Garage

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Totals: Garage | | | | 281.50 |

Pantry                                                                  Height: 8'

244.70 SF Walls                          58.78 SF Ceiling
303.48 SF Walls & Ceiling                58.78 SF Floor
6.53 SY Flooring                         30.17 LF Floor Perimeter
32.67 LF Ceil. Perimeter

| Door | 2' 6" X 6' 8" | | Opens into KITCH_ADD_ON | |
|---|---|---|---|---|
| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
| Seal the walls and ceiling shellac - one coat | 303.48 SF | 0.00 | 0.39 | 118.36 |
| Paint the walls and ceiling - two coats - 2 colors | 303.48 SF | 0.00 | 0.69 | 209.40 |
| Mask and prep for paint - paper and tape (per LF) | 30.17 LF | 0.00 | 0.46 | 13.88 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 32.67 LF | 0.00 | 0.83 | 27.12 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| Floor protection - cloth - skid resistant, leak proof | 58.78 SF | 0.71 | 0.00 | 41.73 |
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |

| Totals: Pantry | | | | 466.29 |
|---|---|---|---|---|

CMIC_000305

Step-Up
CONSTRUCTION

| | **Entertainment Room** | | | | **Height: 8'** |
|---|---|---|---|---|---|

| | |
|---|---|
| 310.67 SF Walls | 188.92 SF Ceiling |
| 499.58 SF Walls & Ceiling | 188.92 SF Floor |
| 20.99 SY Flooring | 38.83 LF Floor Perimeter |
| 38.83 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Window | 2' X 4' | Opens into Exterior |
| Missing Wall | 12' 2" X 8' | Opens into DINING_ROOM |
| Missing Wall | 3' 3 7/8" X 8' | Opens into DINING_ROOM |
| Missing Wall | 2' 1 7/16" X 8' | Opens into ROOM2 |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 188.92 SF | 0.24 | 0.00 | 45.34 |
| Carpet | 230.92 SF | 0.00 | 2.77 | 639.65 |
| R&R Carpet pad | 188.92 SF | 0.09 | 0.67 | 143.58 |
| Seal floor or ceiling joist system (shellac) | 338.92 SF | 0.00 | 0.84 | 284.69 |
| Includes sealing floor joist from crawl in area designated for insulation replacement | | | | |
| R&R 5/8" drywall - hung, taped, ready for texture | 150.92 SF | 0.37 | 1.49 | 280.71 |
| Removal of gyspum wallboard on the lid completed by the mitigation company for the purpose of drying out the structure has been removed from the calculation. | | | | |
| 5/8" drywall - hung, taped, ready for texture | 38.00 SF | 0.00 | 1.49 | 56.62 |
| This line item covers replacement of the gypsum wall board that was removed by the mitigation company for the purpose of drying the structure. | | | | |
| R&R 1/2" drywall - hung, taped, ready for texture | 120.00 SF | 0.37 | 1.32 | 202.80 |
| Removal of gyspum wallboard on the walls completed by the mitigation company, for the purpose of drying out the structure, is not included in this line item calculation | | | | |
| 1/2" drywall - hung, taped, ready for texture | 40.00 SF | 0.00 | 1.32 | 52.80 |
| This line item covers replacement of the gypsum wall board on the walls that was removed by the mitigation company for the purpose of drying the structure. | | | | |
| Texture drywall - machine | 499.58 SF | 0.00 | 0.29 | 144.88 |
| Mask per square foot for drywall or plaster work | 188.92 SF | 0.00 | 0.15 | 28.34 |
| Seal the surface area w/PVA primer - one coat | 380.00 SF | 0.00 | 0.31 | 117.80 |
| This is a base primer coat (PVA-Polyvinyl Acetate) required on all new drywall surfaces before application of texture | | | | |
| Seal part of the walls and ceiling shellac - one coat | 119.58 SF | 0.00 | 0.39 | 46.64 |
| Paint the walls and ceiling - two coats - 2 colors | 499.58 SF | 0.00 | 0.69 | 344.71 |

2012-10-09-0836REV

CMIC_000306

**Step-Up**
CONSTRUCTION

## CONTINUED - Entertainment Room

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Batt insulation - 6" - R21 | 189.33 SF | 0.23 | 0.00 | 43.55 |
| Batt insulation - 6" - R21 | 229.33 SF | 0.00 | 0.87 | 199.52 |
| Mask and prep for paint - paper and tape (per LF) | 38.83 LF | 0.00 | 0.46 | 17.86 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 38.83 LF | 0.00 | 0.83 | 32.23 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| **Baseboard - 3 1/4"** | **38.58 LF** | **0.00** | **2.52** | **97.22** |
| **Paint baseboard - two coats** | **38.58 LF** | **0.00** | **0.87** | **33.56** |
| Clean ductwork - Interior (PER REGISTER) | 2.00 EA | 0.00 | 29.53 | 59.06 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |
| R&R Junction box | 1.00 EA | 12.00 | 102.47 | 114.47 |
| R&R Outlet | 1.00 EA | 3.88 | 11.57 | 15.45 |
| R&R Outlet or switch cover | 1.00 EA | 0.49 | 2.26 | 2.75 |

Totals:  Entertainment Room                                                                                3,016.91

| Entry/Hallway | | Height: 8' |
|---|---|---|
| | 55.33 SF Walls | 29.42 SF Ceiling |
| | 84.76 SF Walls & Ceiling | 29.42 SF Floor |
| | 3.27 SY Flooring | 6.08 LF Floor Perimeter |
| | 11.08 LF Ceil. Perimeter | |

| Missing Wall | 9' 7" X 8' | Opens into LIVING_ROOM |
| Door | 2' 6" X 6' 8" | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into ENTRY_CLST |
| Missing Wall | 1' X 8' | Opens into STAIRS |
| Missing Wall | 3' 2" X 8' | Opens into STAIRS |

CMIC_000307



**Step-Up**
CONSTRUCTION

**CONTINUED - Entry/Hallway**

**Subroom: Room2 (1)**                                                 **Height: 8'**

|  |  |
|---|---|
| 52.00 SF Walls | 19.55 SF Ceiling |
| 71.55 SF Walls & Ceiling | 19.55 SF Floor |
| 2.17 SY Flooring | 6.50 LF Floor Perimeter |
| 6.50 LF Ceil. Perimeter |  |

| Missing Wall | 3' 5 1/8" X 8' | Opens into DINING_ROOM |
|---|---|---|
| Missing Wall | 2' 1 7/16" X 8' | Opens into ENTERTAINMEN |
| Missing Wall | 5" X 8' | Opens into LIVING_ROOM |
| Missing Wall | 3' 9" X 8' | Opens into LIVING_ROOM |
| Missing Wall | 3' X 8' | Opens into ENTRY_HALLWA |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal the walls and ceiling shellac - one coat | 156.30 SF | 0.00 | 0.39 | 60.96 |
| Paint the walls and ceiling - two coats - 2 colors | 156.30 SF | 0.00 | 0.69 | 107.85 |
| Mask and prep for paint - paper and tape (per LF) | 12.58 LF | 0.00 | 0.46 | 5.79 |
| Masking at wall to baseboard interface |  |  |  |  |
| Mask and prep for paint - plastic, paper, tape (per LF) | 17.58 LF | 0.00 | 0.83 | 14.59 |
| Masking at wall to ceiling interface for 2nd color painting |  |  |  |  |
| Floor protection - cloth - skid resistant, leak proof | 48.97 SF | 0.71 | 0.00 | 34.77 |
| R&R Baseboard - 3 1/4" | 6.50 LF | 0.35 | 2.52 | 18.66 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | 0.00 | 22.49 | 44.98 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |

| Totals: Entry/Hallway |  |  |  | 329.81 |
|---|---|---|---|---|

CMIC_000308

**Step-Up**
CONSTRUCTION

| Living Room | | | | Height: 8' |
|---|---|---|---|---|
| | 266.13 SF Walls | | 140.78 SF Ceiling | |
| | 406.91 SF Walls & Ceiling | | 140.78 SF Floor | |
| | 15.64 SY Flooring | | 33.27 LF Floor Perimeter | |
| | 33.27 LF Ceil. Perimeter | | | |

| | | | |
|---|---|---|---|
| Window | 2' X 4' | Opens into Exterior | |
| Window | 2' X 4' | Opens into Exterior | |
| Missing Wall | 9' 7" X 8' | Opens into ENTRY_HALLWA | |
| Missing Wall | 3' 9" X 8' | Opens into ROOM2 | |
| Missing Wall | 5" X 8' | Opens into ROOM2 | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal the walls and ceiling shellac - one coat | 406.91 SF | 0.00 | 0.39 | 158.69 |
| Painting - Faux (special effects) - 3 part | 266.13 SF | 0.00 | 1.96 | 521.61 |
| Paint the ceiling - two coats | 140.78 SF | 0.00 | 0.58 | 81.65 |
| Mask and prep for paint - paper and tape (per LF) | 33.27 LF | 0.00 | 0.46 | 15.30 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 33.27 LF | 0.00 | 0.83 | 27.61 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| Floor protection - cloth - skid resistant, leak proof | 140.78 SF | 0.71 | 0.00 | 99.95 |
| Clean ductwork - Interior (PER REGISTER) | 2.00 EA | 0.00 | 29.53 | 59.06 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 0.00 | 12.68 | 25.36 |

| | |
|---|---|
| Totals:  Living Room | 989.23 |

CMIC_000309

**Step-Up**
CONSTRUCTION

**Dining Room**                                                                 Height: 8'

| | |
|---|---|
| 156.09 SF Walls | 136.11 SF Ceiling |
| 292.20 SF Walls & Ceiling | 136.11 SF Floor |
| 15.12 SY Flooring | 17.68 LF Floor Perimeter |
| 30.10 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| **Door** | 5' X 6' 8" | **Opens into Exterior** |
| **Missing Wall - Goes to Floor** | 7' 5" X 6' 8" | **Opens into KITCH_ADD_ON** |
| **Missing Wall** | 3' 7 1/8" X 8' | **Opens into ROOM2** |
| **Missing Wall** | 3' 3 7/8" X 8' | **Opens into ENTERTAINMEN** |
| **Missing Wall** | 12' 2" X 8' | **Opens into ENTERTAINMEN** |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal floor or ceiling joist system (shellac) | 136.11 SF | 0.00 | 0.84 | 114.33 |
| R&R 5/8" drywall - hung, taped, ready for texture | 136.11 SF | 0.37 | 1.49 | 253.16 |
| Texture drywall - machine | 292.20 SF | 0.00 | 0.29 | 84.74 |
| Mask per square foot for drywall or plaster work | 156.09 SF | 0.00 | 0.15 | 23.41 |
| Seal part of the walls and ceiling shellac - one coat | 142.20 SF | 0.00 | 0.39 | 55.46 |
| Seal the surface area w/PVA primer - one coat | 150.00 SF | 0.00 | 0.31 | 46.50 |
| This is a base primer coat (PVA-Polyvinyl Acetate) required on all new drywall surfaces before application of texture | | | | |
| Paint the walls and ceiling - two coats - 2 colors | 292.20 SF | 0.00 | 0.69 | 201.62 |
| Mask and prep for paint - paper and tape (per LF) | 17.68 LF | 0.00 | 0.46 | 8.13 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 30.10 LF | 0.00 | 0.83 | 24.98 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| Floor protection - cloth - skid resistant, leak proof | 136.11 SF | 0.71 | 0.00 | 96.64 |
| Cabinets inserted in sketch for subtraction of floor and wall surfaces only | | | | |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |
| Paint baseboard - two coats | 17.68 LF | 0.00 | 0.87 | 15.38 |

Totals:  Dining Room                                                                        966.56

2012-10-09-0836REV

CMIC_000310

**Step-Up**
CONSTRUCTION

| Kitchen | | | | Height: 8' |
|---|---|---|---|---|

| | | |
|---|---|
| 254.25 SF Walls | 166.17 SF Ceiling |
| 420.42 SF Walls & Ceiling | 124.74 SF Floor |
| 13.86 SY Flooring | 13.12 LF Floor Perimeter |
| 57.90 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| **Window** | 2' 6" X 2' 6" | **Opens into Exterior** |
| **Door** | 2' 6" X 6' 8" | **Opens into KITCHEN** |
| **Door** | 2' 6" X 6' 8" | **Opens into BATHROOM** |
| **Door** | 2' 6" X 6' 8" | **Opens into GARAGE** |
| **Missing Wall - Goes to Floor** | 7' 5" X 6' 8" | **Opens into DINING_ROOM** |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Cabinetry - lower (base) units | LF | 5.80 | 151.81 | 0.00 |
| Cabinets inserted in sketch for subtraction of floor and wall surfaces only | | | | |
| R&R Cabinetry - upper (wall) units | LF | 5.80 | 112.51 | 0.00 |
| Cabinets inserted in sketch for subtraction of floor and wall surfaces only | | | | |
| Seal the walls and ceiling shellac - one coat | 420.42 SF | 0.00 | 0.39 | 163.96 |
| Paint the walls and ceiling - two coats - 2 colors | 420.42 SF | 0.00 | 0.69 | 290.09 |
| Mask and prep for paint - paper and tape (per LF) | 13.12 LF | 0.00 | 0.46 | 6.04 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 57.90 LF | 0.00 | 0.83 | 48.06 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| Painter - per hour | 2.00 HR | 0.00 | 48.00 | 96.00 |
| Additional labor hours needed to complete cut in work around kitchen cabinets | | | | |
| Floor protection - cloth - skid resistant, leak proof | 124.74 SF | 0.71 | 0.00 | 88.57 |
| Paint door/window trim & jamb - Large - 2 coats (per side) | 2.00 EA | 0.00 | 22.49 | 44.98 |
| Clean ductwork - Interior (PER REGISTER) | 2.00 EA | 0.00 | 29.53 | 59.06 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 0.00 | 12.68 | 25.36 |

| | |
|---|---|
| Totals: Kitchen | 822.12 |

| | |
|---|---|
| Total: Main Level | 8,702.82 |

2012-10-09-0836REV

12/3/2012          Page: 12

CMIC_000311



**Upper Level**



| Bedroom 2 | | | | Height: 8' |
|---|---|---|---|---|

388.98 SF Walls
558.01 SF Walls & Ceiling
18.78 SY Flooring
55.71 LF Ceil. Perimeter

169.03 SF Ceiling
169.03 SF Floor
47.21 LF Floor Perimeter

| | | | |
|---|---|---|---|
| Door | 6' X 6' 8" | | Opens into CLOSET_BDRM_ |
| Door | 2' 6" X 6' 8" | | Opens into RECREATION_R |
| Window | 2' X 4' | | Opens into Exterior |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 169.03 SF | 0.24 | 0.00 | 40.57 |
| Carpet | 214.75 SF | 0.00 | 2.77 | 594.86 |
| R&R Carpet pad | 169.03 SF | 0.09 | 0.67 | 128.46 |
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |

Totals: Bedroom 2                819.69



| Closet Bdrm 2 | | | | Height: 8' |
|---|---|---|---|---|

157.33 SF Walls
178.00 SF Walls & Ceiling
2.30 SY Flooring
24.67 LF Ceil. Perimeter

20.67 SF Ceiling
20.67 SF Floor
18.67 LF Floor Perimeter

| | | | |
|---|---|---|---|
| Door | 6' X 6' 8" | | Opens into BEDROOM_2 |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 20.67 SF | 0.24 | 0.00 | 4.96 |
| Carpet | 59.75 SF | 0.00 | 2.77 | 165.51 |
| R&R Carpet pad | 20.67 SF | 0.09 | 0.67 | 15.71 |

Totals: Closet Bdrm 2                186.18

CMIC_000312

**Step-Up**
CONSTRUCTION



**Bathroom**                                                                              Height: 8'

227.33 SF Walls                                    50.81 SF Ceiling
278.14 SF Walls & Ceiling                          50.81 SF Floor
5.65 SY Flooring                                   28.00 LF Floor Perimeter
30.50 LF Ceil. Perimeter

**Door**                          2' 6" X 6' 8"            Opens into RECREATION_R

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |
| Totals: Bathroom | | | | 42.21 |

**Recreation Room**                                                                       Height: 8'

526.87 SF Walls                                    218.82 SF Ceiling
745.69 SF Walls & Ceiling                          218.82 SF Floor
24.31 SY Flooring                                  66.28 LF Floor Perimeter
74.78 LF Ceil. Perimeter

| | | |
|---|---|---|
| Window | 2' X 4' | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into LAUNDRY_ROOM |
| Door | 2' 6" X 6' 8" | Opens into BEDROOM_1 |
| Door | 2' 6" X 6' 8" | Opens into MASTER_BEDRO |
| Missing Wall - Goes to Ceiling | 2' X 5' | Opens into Exterior |
| Missing Wall | 3' X 8' | Opens into Exterior |
| Missing Wall - Goes to Ceiling | 2' X 5' | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into BEDROOM_2 |
| Door | 2' 6" X 6' 8" | Opens into BATHROOM |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 218.82 SF | 0.24 | 0.00 | 52.52 |
| Carpet | 273.83 SF | 0.00 | 2.77 | 758.51 |
| R&R Carpet - metal transition strip At Laundry Room Doorway | 3.00 LF | 0.59 | 2.85 | 10.32 |
| R&R Carpet pad | 218.82 SF | 0.09 | 0.67 | 166.30 |

CMIC_000313



Step-Up
CONSTRUCTION

**CONTINUED - Recreation Room**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| 5/8" drywall - hung, taped, ready for texture | 12.00 SF | 0.00 | 1.49 | 17.88 |

Replacement of gyspum wallboard on the lid removed by the mitigation company for the purpose of drying out the structure.

| R&R 1/2" drywall - hung, taped, ready for texture | 80.00 SF | 0.37 | 1.32 | 135.20 |

Removal of gyspum wallboard on the walls completed by the mitigation company, for the purpose of drying out the structure, is not included in this line item calculation

| 1/2" drywall - hung, taped, ready for texture | 32.00 SF | 0.00 | 1.32 | 42.24 |

This line item covers replacement of the gypsum wall board on the walls that was removed by the mitigation company for the purpose of drying the structure.

| Texture drywall - machine | 745.69 SF | 0.00 | 0.29 | 216.25 |
| Mask per square foot for drywall or plaster work | 218.82 SF | 0.00 | 0.15 | 32.82 |
| Seal part of the walls and ceiling shellac - one coat | 613.69 SF | 0.00 | 0.39 | 239.34 |
| Seal the surface area w/PVA primer - one coat | 132.00 SF | 0.00 | 0.31 | 40.92 |

This is a base primer coat (PVA-Polyvinyl Acetate) required on all new drywall surfaces before application of texture

| Mask and prep for paint - plastic, paper, tape (per LF) | 74.78 LF | 0.00 | 0.83 | 62.07 |

Masking at wall to ceiling interface for 2nd color painting

| Remove Batt insulation - 6" - R21 | 88.00 SF | 0.23 | 0.00 | 20.24 |
| Batt insulation - 6" - R21 | 120.00 SF | 0.00 | 0.87 | 104.40 |
| Mask and prep for paint - paper and tape (per LF) | 66.28 LF | 0.00 | 0.46 | 30.49 |

Masking at wall to baseboard interface

| R&R Baseboard - 2 1/4" | 56.28 LF | 0.33 | 2.22 | 143.51 |
| Baseboard - 2 1/4" | 10.00 LF | 0.00 | 2.22 | 22.20 |
| Paint baseboard - two coats | 66.28 LF | 0.00 | 0.87 | 57.66 |
| Clean ductwork - Interior (PER REGISTER) | 3.00 EA | 0.00 | 29.53 | 88.59 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 0.00 | 12.68 | 25.36 |
| Detach & Reset Cold air return cover - Large | 1.00 EA | 0.00 | 0.00 | 17.29 |
| Paint the walls and ceiling - two coats - 2 colors | 745.69 SF | 0.00 | 0.69 | 514.53 |
| Detach & Reset Smoke detector | 1.00 EA | 0.00 | 0.00 | 37.50 |
| R&R 110 volt copper wiring run, box and outlet | 1.00 EA | 4.14 | 52.80 | 56.94 |
| Outlet or switch cover | 1.00 EA | 0.00 | 2.26 | 2.26 |

CMIC_000314

**Step-Up**
CONSTRUCTION

### CONTINUED - Recreation Room

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal stud wall for odor control | 132.00 SF | 0.00 | 0.56 | 73.92 |

| | | | | |
|---|---|---|---|---|
| Totals: Recreation Room | | | | 2,969.26 |

---

├─ 6' 4" ─┤

**Laundry Room**                                                                  **Height: 8'**

| | |
|---|---|
| 188.99 SF Walls | 41.12 SF Ceiling |
| 230.11 SF Walls & Ceiling | 41.12 SF Floor |
| 4.57 SY Flooring | 23.21 LF Floor Perimeter |
| 25.71 LF Ceil. Perimeter | |

**Door**                                     2' 6" X 6' 8"                     **Opens into RECREATION_R**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Seal the walls and ceiling shellac - one coat | 230.11 SF | 0.00 | 0.39 | 89.74 |
| Paint the walls and ceiling - two coats - 2 colors | 230.11 SF | 0.00 | 0.69 | 158.78 |
| Mask and prep for paint - paper and tape (per LF) | 23.21 LF | 0.00 | 0.46 | 10.68 |
| Masking at wall to baseboard interface | | | | |
| Mask and prep for paint - plastic, paper, tape (per LF) | 25.71 LF | 0.00 | 0.83 | 21.34 |
| Masking at wall to ceiling interface for 2nd color painting | | | | |
| Floor protection - cloth - skid resistant, leak proof | 41.12 SF | 0.71 | 0.00 | 29.20 |
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |

| | | | | |
|---|---|---|---|---|
| Totals: Laundry Room | | | | 365.54 |

---

CMIC_000315

**Step-Up**
CONSTRUCTION

**Bedroom 1**                                                                                      Height: 8'

| | | |
|---|---|---|
| 316.67 SF Walls | | 119.36 SF Ceiling |
| 436.02 SF Walls & Ceiling | | 119.36 SF Floor |
| 13.26 SY Flooring | | 38.75 LF Floor Perimeter |
| 43.75 LF Ceil. Perimeter | | |

| | | |
|---|---|---|
| **Door** | 2' 6" X 6' 8" | **Opens into RECREATION_R** |
| **Door** | 2' 6" X 6' 8" | **Opens into ROOM7** |
| **Window** | 2' X 4' | **Opens into Exterior** |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 119.36 SF | 0.24 | 0.00 | 28.65 |
| Carpet | 161.83 SF | 0.00 | 2.77 | 448.27 |
| R&R Carpet pad | 119.36 SF | 0.09 | 0.67 | 90.71 |
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |

Totals: Bedroom 1                                                                                      623.43

**Walk-in Closet Bdrm 1**                                                                          Height: 8'

| | | |
|---|---|---|
| 178.00 SF Walls | | 35.83 SF Ceiling |
| 213.83 SF Walls & Ceiling | | 35.83 SF Floor |
| 3.98 SY Flooring | | 21.83 LF Floor Perimeter |
| 24.33 LF Ceil. Perimeter | | |

| | | |
|---|---|---|
| **Door** | 2' 6" X 6' 8" | **Opens into BEDROOM_1** |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 35.83 SF | 0.24 | 0.00 | 8.60 |
| Carpet | 72.92 SF | 0.00 | 2.77 | 201.99 |
| R&R Carpet pad | 35.83 SF | 0.09 | 0.67 | 27.23 |
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |

Totals: Walk-in Closet Bdrm 1                                                                      251.41

CMIC_000316

**Step-Up**
CONSTRUCTION

**Master Bath**                                                      **Height: 8'**

| | |
|---|---|
| 237.39 SF Walls | 77.65 SF Ceiling |
| 315.04 SF Walls & Ceiling | 51.16 SF Floor |
| 5.68 SY Flooring | 15.14 LF Floor Perimeter |
| 38.87 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Door | 2' 6" X 6' 8" | Opens into MASTER_BEDRO |
| Door | 2' 6" X 6' 8" | Opens into WALKIN_CLOS |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Clean ductwork - Interior (PER REGISTER) | 1.00 EA | 0.00 | 29.53 | 29.53 |
| Heat/AC register - Mechanically attached - Detach & reset | 1.00 EA | 0.00 | 12.68 | 12.68 |
| Remove Vinyl floor covering (sheet goods) | 51.16 SF | 0.72 | 0.00 | 36.84 |
| Vinyl floor covering (sheet goods) | 159.25 SF | 0.00 | 3.07 | 488.90 |
| R&R Vinyl - metal transition strip | 6.00 LF | 0.59 | 2.85 | 20.64 |
| Floor preparation for sheet goods - Heavy | 51.16 SF | 0.00 | 0.86 | 44.00 |
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |
| R&R Bathtub | EA | 57.97 | 667.06 | 0.00 |
| Bathtub inserted in sketch only for subtraction of square footage | | | | |
| Detach & Reset Toilet | 1.00 EA | 0.00 | 0.00 | 187.53 |
| Plumbing fixture supply line | 1.00 EA | 0.00 | 15.31 | 15.31 |
| R&R Baseboard - 2 1/4" | 15.14 LF | 0.33 | 2.22 | 38.61 |
| Paint baseboard - two coats | 15.14 LF | 0.00 | 0.87 | 13.17 |
| R&R Casing - 2 1/4" | 34.00 LF | 0.39 | 1.50 | 64.26 |
| Paint casing - two coats | 34.00 LF | 0.00 | 0.87 | 29.58 |
| Stain & finish door/window trim & jamb (per side) | 2.00 EA | 0.00 | 25.08 | 50.16 |
| Bathroom side of bathroom door and walk in closet door. | | | | |
| Caulking - silicone | 5.00 LF | 0.00 | 1.86 | 9.30 |
| caulking at tub to floor transition | | | | |

Totals:  Master Bath                                                      1,054.10

CMIC_000317

**Step-Up**
CONSTRUCTION

**Walk-in Closet**                                                                 Height: 8'

| | |
|---|---|
| 264.33 SF Walls | 77.09 SF Ceiling |
| 341.41 SF Walls & Ceiling | 77.09 SF Floor |
| 8.57 SY Flooring | 32.62 LF Floor Perimeter |
| 35.12 LF Ceil. Perimeter | |

Door                             2' 6" X 6' 8"                    Opens into MASTER_BATH

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |

Totals: Walk-in Closet                                                                           13.59

**Master Bedroom**                                                                 Height: 8'

| | |
|---|---|
| 598.67 SF Walls | 323.01 SF Ceiling |
| 921.68 SF Walls & Ceiling | 323.01 SF Floor |
| 35.89 SY Flooring | 76.50 LF Floor Perimeter |
| 81.50 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Door | 2' 6" X 6' 8" | Opens into RECREATION_R |
| Door | 2' 6" X 6' 8" | Opens into MASTER_BATH |
| Window | 2' 6" X 4' | Opens into Exterior |
| Window | 2' 6" X 4' | Opens into Exterior |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Carpet | 323.01 SF | 0.24 | 0.00 | 77.52 |
| Carpet | 378.67 SF | 0.00 | 2.77 | 1,048.92 |
| R&R Carpet pad | 323.01 SF | 0.09 | 0.67 | 245.49 |
| Interior door - Detach & reset - slab only | 1.00 EA | 0.00 | 13.59 | 13.59 |
| Clean ductwork - Interior (PER REGISTER) | 2.00 EA | 0.00 | 29.53 | 59.06 |
| Heat/AC register - Mechanically attached - Detach & reset | 2.00 EA | 0.00 | 12.68 | 25.36 |

Totals: Master Bedroom                                                                       1,469.94

Total: Upper Level                                                                             7,795.35

**Roof**

2012-10-09-0836REV                                                12/3/2012          Page: 19

**Step-Up**
CONSTRUCTION



**Roof**

| | |
|---|---|
| 1,687.05 Surface Area | 16.87 Number of Squares |
| 196.01 Total Perimeter Length | 61.00 Total Ridge Length |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Clean stud wall - Heavy | 2,969.70 SF | 0.00 | 0.71 | 2,108.49 |

Clean top chords and roof decking, truss webbing, bottom chords and back of drywall, open stud bays first and second floor.

**KILZ® Original Primer**

**Surface Preparation†**
Wash off any dirt, grease or smoke damage with a non-soapy detergent or a TSP substitute, rinse well and then allow to dry.
Remove all mildew with a commercially available mildew remover, rinse well and then allow to dry. Note: KILZ PREMIUM and KILZ 2 are recommended for mildew-prone surfaces.
Unpainted, exterior wood exposed to sun and/or moisture longer than 2-4 weeks must be cleaned and sanded before priming.
For maximum adhesion, scrape off loose paint and scuff sand the surface thoroughly before priming. On glossy surfaces: scuff sand the surface thoroughly before priming.

WARNING!
This product contains chemicals known to the state of California to cause cancer, birth defects, or other reproductive harm.

| | | | | |
|---|---|---|---|---|
| Cleaning Technician - per hour | 16.00 HR | 0.00 | 31.64 | 506.24 |

Additional labor hours needed to clean in the confined space of the attic. Crew will be working on their knees on pieces of 2x6 so they dont fall through the drywall.

| | | | | |
|---|---|---|---|---|
| Add for HEPA filter (for neg. air machine/vacuum - Large) | 2.00 EA | 0.00 | 239.62 | 479.24 |
| Neg. air fan/Air scrub.-Large (per 24 hr period)-No monit. | 2.00 DA | 0.00 | 109.88 | 219.76 |
| Containment Barrier/Airlock/Decon. Chamber | 230.00 SF | 0.00 | 0.65 | 149.50 |
| Dust control barrier - tension post - per day | 14.00 DA | 3.30 | 0.00 | 46.20 |
| Peel & seal zipper | 3.00 EA | 0.00 | 9.36 | 28.08 |
| Painter - per hour | 1.50 HR | 0.00 | 48.00 | 72.00 |

Labor to mask windows inside containment area and to mask all heat registers openings in the ceiling. and in mask when smoke seal has been completed.

| | | | | |
|---|---|---|---|---|
| Painter - per hour | 3.50 HR | 0.00 | 48.00 | 168.00 |

Additional labor to customize decon chamber to keep equipment outside of it

CMIC_000319

**Step-Up**
CONSTRUCTION

---

<div align="center">CONTINUED - Roof</div>

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|

**Occupational Safety & Health Administration Report**

Accident: 202541322 -- Report ID: 0950641 -- Event Date: 09/29/2009

Inspection   Open Date   SIC   Establishment Name
300870755   10/06/2009   1799   911 Restoration Enterprises Inc

On September 29, 2009, Employees #1 and #2, who were employed by a restoration services company, were working in an apartment unit, on the second floor of an inhabited, four-story multi-unit residential building. The workers had been at the site on two previous occasions to expose framing members by removing drywall and then to enclosed the subject area with plastic sheeting. Because test results from an independent testing lab showed that mold was still present, Employees #1 and #2 returned to the apartment unit a third time to encapsulate the mold. Employees #1 and #2 were spraying Kilz(R) Original Aerosol to encapsulate visible mold that was on the framing members of an interior partition wall of the apartment unit, while inside the plastic-enclosed containment area. The homeowner was in the kitchen area of the apartment. Employees #1 and #2 exhausted four and one-half, 13-ounce-sized cans of the flammable aerosol within the containment area, which measured 41 inches deep by 8 feet long by 8 feet, 10 inches high. They then plugged into an electrical outlet an OmniAire 1000V HEPA air filtration machine, which was also inside the containment area. An explosion and fire occurred, when an ignition source was introduced inside the containment area where flammable vapors were concentrated. Employees #1 and #2 sustained serious burns (second and third degree) to their upper bodies and faces. They required inpatient hospitalization for more than 24 hours. According to the manufacturer, OmniAire 1000V was an air filtering machine designed for filtering particulates and providing negative air pressure for asbestos abatement. The machine was listed as meeting requirements for UL (Underwriters Laboratories) Standard UL507 for Safety for Electric Fans. The listing did not include use in hazardous atmospheres, where flammable vapors were present. The machine had a variable speed controller and Emerson, open-frame type fan motor. The investigation found that the employer's IIPP (Injury and Illness Prevention Program) lacked several required elements and that the workers were not trained on the physical or health hazards of the Kilz(R) Original Aerosol. Further, the improper use of listed equipment in a hazardous atmosphere caused the explosion and fire. The employer was issued citations accordingly.

**OSHA ENFORCEMENT**

Under the OSH Act, employers are responsible for providing a safe and healthful workplace. OSHA's mission is to assure safe and healthful workplaces by setting and enforcing standards and by providing training, outreach, education and assistance. This page contains information about OSHA's enforcement activities. If you have questions, need additional information, want to file a complaint, or would like to contact OSHA, please call 1-800-321-OSHA (6742). You can also e-mail us your questions (e-mail OSHA). It's confidential. We are here to help.

**Fine vor this type and level of violation $7,000.00**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Respirator cartridge - HEPA only (per pair) | 4.00 EA | 0.00 | 8.56 | 34.24 |
| Add for personal protective equipment - Heavy duty | 2.00 EA | 0.00 | 17.69 | 35.38 |
| Eye protection - plastic goggles - Disposable | 10.00 EA | 0.00 | 6.48 | 64.80 |
| Equipment decontamination charge - HVY, per piece of equip | 1.00 EA | 0.00 | 48.81 | 48.81 |
| Explosion proof lighting rental charge | 1.00 EA | 0.00 | 672.00 | 672.00 |

2012-10-09-0836REV

12/3/2012                Page: 21

CMIC_000320

**Step-Up**
CONSTRUCTION

<div align="center">

**CONTINUED - Roof**

</div>

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| General Laborer - per hour | 4.00 HR | 0.00 | 40.88 | 163.52 |
| Labor to clean Primer from the lights post use | | | | |

| | |
|---|---|
| Totals: Roof | 4,796.26 |

| | |
|---|---|
| Total: Roof | 4,796.26 |

<div align="center">

**Attic**

</div>



**Attic**                                                                 Height: 8'

1,146.67 SF Walls                      1,225.15 SF Ceiling
2,371.81 SF Walls & Ceiling            1,225.15 SF Floor
136.13 SY Flooring                     143.33 LF Floor Perimeter
143.33 LF Ceil. Perimeter

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Remove Blown-in insulation - Machine removal | 1,225.15 SF | 1.01 | 0.00 | 1,237.40 |
| Blown-in insulation - 16" depth - R44 | 1,225.15 SF | 0.00 | 1.03 | 1,261.90 |
| Baffle vent - cardboard | 62.00 LF | 0.00 | 0.64 | 39.68 |
| Seal truss system - up to 5/12 | 1,225.15 SF | 0.00 | 1.06 | 1,298.66 |
| Seal floor or ceiling joist system (shellac) | 1,213.15 SF | 0.00 | 0.84 | 1,019.05 |

This line item is meant to cover material and labor cost associated with sealing of the drywall lid from the attic space. Use of special tips and extensions will be used to seal tight (restrictive) spaces such as the areas by the vent blocks. This work should be completed before the siding is replaced to prevent sealer from traveling through the vent block openings and getting on the siding. If siding is not replaced (Whole House) then Country Financial should consider paying additional monies to prevent overspray, originating from smoke sealing the attic, from coming out of the vent blocks and damaging the siding. The vent screens should be cleaned by the mitigation company and masked off prior to smoke seal since the vent screens are visible from the street and driveway.

| Painter - per hour | 1.20 HR | 0.00 | 48.00 | 57.60 |
|---|---|---|---|---|

These additional hours will be needed to copiously seal all surfaces in the attic space. This is due to its (the attic space) restrictive area, lack of walking surface and need for use of specialized equipment. One additional worker will be required at the attic access point to manage the sprayer line and communicate with the worker manning the nozzle.

| | |
|---|---|
| Totals: Attic | 4,914.29 |

| | |
|---|---|
| Total: Attic | 4,914.29 |

<div align="center">

**Crawl**

</div>

CMIC_000321

**Step-Up**
CONSTRUCTION



**Crawlspace**                                                    **Height: 8'**

| | |
|---|---|
| 1,081.33 SF Walls | 820.75 SF Ceiling |
| 1,902.09 SF Walls & Ceiling | 820.75 SF Floor |
| 91.19 SY Flooring | 135.17 LF Floor Perimeter |
| 135.17 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Batt insulation - 10" - R30 | 150.00 SF | 0.00 | 0.91 | 136.50 |
| Seal floor or ceiling joist system (shellac) | 150.00 SF | 0.00 | 0.84 | 126.00 |
| Painter - per hour | 1.00 HR | 0.00 | 48.00 | 48.00 |

These additional hours will be needed to effectively seal affected floor joist in the crawl. Do to the constructive nature of the crawl space and only one egress/ingress, an additional worker will be required at the crawl opening to manage the sprayer line and communicate with the worker manning the nozzle. This crawl meets the definition of Permittable space (confined space) as defined by OSHA and WISHA.

| | | | | |
|---|---|---|---|---|
| R&R Vapor barrier - visqueen - 6mil | 200.00 SF | 0.07 | 0.25 | 64.00 |

| | |
|---|---|
| Totals: Crawlspace | 374.50 |

| | |
|---|---|
| Total: Crawl | 374.50 |

**Gutters**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Gutter / downspout - aluminum - up to 5" | 147.58 LF | 0.42 | 4.12 | 670.01 |
| R&R Gutter / downspout - aluminum - up to 5" | 91.58 LF | -0.42 | -4.12 | -415.77 |

This credit is to bring our scope in line with what Greg Stariha of Country Financial has agreed to pay for. Step Up Construction, Inc. cannot be responsible for deminished value of the home resulting from gutters and downspouts that don't match.

| | |
|---|---|
| Totals: Gutters | 254.24 |

**SW Elevation (Front)**

CMIC_000322

**Step-Up**
CONSTRUCTION

**SW Elevation(s) Front**                                           Height: 4"

26.24 SF Walls                          411.67 SF Ceiling
437.91 SF Walls & Ceiling               294.89 SF Floor
32.77 SY Flooring                        78.73 LF Floor Perimeter
78.73 LF Ceil. Perimeter

**Subroom:  SW Elevatio2 (2)**                                     Height: 4"

17.39 SF Walls                          146.28 SF Ceiling
163.67 SF Walls & Ceiling               135.69 SF Floor
15.08 SY Flooring                        52.18 LF Floor Perimeter
52.18 LF Ceil. Perimeter

**Subroom:  SW Elevatio1 (1)**                                     Height: 4"

17.89 SF Walls                          160.55 SF Ceiling
178.44 SF Walls & Ceiling               124.77 SF Floor
13.86 SY Flooring                        53.68 LF Floor Perimeter
53.68 LF Ceil. Perimeter

**Subroom:  Porch Soffit (3)**                                     Height: 4"

15.85 SF Walls                          105.82 SF Ceiling
121.67 SF Walls & Ceiling               105.82 SF Floor
11.76 SY Flooring                        47.54 LF Floor Perimeter
47.54 LF Ceil. Perimeter

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Siding - vinyl | 694.23 SF | 0.34 | 2.69 | 2,103.52 |
| R&R House wrap (air/moisture barrier) | 661.17 SF | 0.04 | 0.27 | 204.97 |
| R&R Fanfold foam insulation board - 1/4" | 661.17 SF | 0.24 | 0.43 | 442.98 |
| R&R Light/outlet J-block - Vinyl | 1.00 EA | 2.41 | 15.88 | 18.29 |
| Shutters - Detach & reset | 8.00 EA | 0.00 | 18.48 | 147.84 |
| R&R Vinyl inside corner post | 20.00 LF | 0.96 | 2.88 | 76.80 |
| R&R Window/door trim | 102.00 LF | 0.80 | 1.94 | 279.48 |
| Door numbers/letters - Detach & reset | 1.00 EA | 0.00 | 9.15 | 9.15 |

CMIC_000323



**Step-Up**
CONSTRUCTION

### CONTINUED - SW Elevation(s) Front

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Exterior light fixture - Detach & reset | 1.00 EA | 0.00 | 57.50 | 57.50 |
| Prime & paint exterior fascia - wood, 4"- 6" wide | 59.83 LF | 0.00 | 1.04 | 62.22 |
| Prime and paint Shadow board | 59.83 LF | 0.00 | 0.61 | 36.50 |
| Shadow board | | | | |
| Prime & paint exterior soffit - exposed rafters | 59.83 SF | 0.00 | 1.96 | 117.27 |
| Mask and prep for paint - paper and tape (per LF) | 59.83 LF | 0.00 | 0.46 | 27.52 |
| Masking between shadow board and roofing material | | | | |
| SIDING | 1.00 EA | 0.00 | -3,584.04 | -3,584.04 |

This credit is inclusive of overhead, profit and WSST.   Its purpose is to bring our scope in line with the scope authorized by Greg Stariha at Country Financial. Step Up Construction, Inc. cannot accept responsibility for diminished home value resulting from siding only two of the four elevations. Step Up Construction and Greg Stariha are in agreement that the siding will not match, however, it appears to be a coverage issue that has influenced Greg Stariha's decision not to cover the cost of re-siding the entire structure. As we are contractors and not adjusters, we defer to Greg Stariha's decision.

Totals:  SW Elevation(s) Front                                                                              0.00

### NE Elevation (Rear)



**NE Elevation(s) Rear**                                                              **Height: 4"**

| 37.37 SF Walls | 700.26 SF Ceiling |
| 737.63 SF Walls & Ceiling | 700.26 SF Floor |
| 77.81 SY Flooring | 112.10 LF Floor Perimeter |
| 112.10 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Siding - vinyl | 735.27 SF | 0.34 | 2.69 | 2,227.87 |
| R&R House wrap (air/moisture barrier) | 700.26 SF | 0.04 | 0.27 | 217.08 |
| R&R Light/outlet J-block - Vinyl | 2.00 EA | 2.41 | 15.88 | 36.58 |
| R&R Window/door trim | 78.00 LF | 0.80 | 1.94 | 213.72 |
| Exterior light fixture - Detach & reset | 1.00 EA | 0.00 | 57.50 | 57.50 |
| Prime & paint exterior fascia - wood, 4"- 6" wide | 41.00 LF | 0.00 | 1.04 | 42.64 |
| Prime and paint Shadow board | 41.00 LF | 0.00 | 0.61 | 25.01 |
| Shadow board | | | | |

2012-10-09-0836REV

CMIC_000324

**Step-Up**
CONSTRUCTION

### CONTINUED - NE Elevation(s) Rear

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Prime & paint exterior soffit - exposed rafters | 41.00 SF | 0.00 | 1.96 | 80.36 |
| Mask and prep for paint - paper and tape (per LF) | 41.00 LF | 0.00 | 0.46 | 18.86 |
| Masking between shadow board and roofing material | | | | |
| Siding Installer - per hour | 1.00 HR | 0.00 | 57.02 | 57.02 |
| Detach and reset the window A/C brackets | | | | |

| Totals: NE Elevation(s) Rear | | | | 2,976.64 |
|---|---|---|---|---|

| Total: NE Elevation (Rear) | | | | 2,976.64 |
|---|---|---|---|---|

### NW Elevation (Side)



**NW Elevation(s)**                **Height: 4"**

37.36 SF Walls               781.53 SF Ceiling
818.88 SF Walls & Ceiling        781.53 SF Floor
86.84 SY Flooring            112.07 LF Floor Perimeter
112.07 LF Ceil. Perimeter

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Siding - vinyl | 820.60 SF | 0.34 | 2.69 | 2,486.41 |
| R&R House wrap (air/moisture barrier) | 781.53 SF | 0.04 | 0.27 | 242.27 |
| R&R Fanfold foam insulation board - 1/4" | 781.53 SF | 0.24 | 0.43 | 523.63 |
| R&R Attic vent - gable end - vinyl | 1.00 EA | 6.44 | 87.19 | 93.63 |
| Fencing Installer - per hour | 4.00 HR | 0.00 | 51.79 | 207.16 |
| Fence manipulation and required to complete siding | | | | |
| Prime & paint exterior fascia - wood, 4"- 6" wide | 42.17 LF | 0.00 | 1.04 | 43.86 |
| Prime and paint Shadow board | 42.17 LF | 0.00 | 0.61 | 25.72 |
| Shadow board | | | | |
| Prime & paint exterior soffit - exposed rafters | 42.17 SF | 0.00 | 1.96 | 82.65 |
| Mask and prep for paint - paper and tape (per LF) | 42.17 LF | 0.00 | 0.46 | 19.40 |
| Masking between shadow board and roofing material | | | | |

CMIC_000325



**Step-Up**
CONSTRUCTION

### CONTINUED - NW Elevation(s)

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| SIDING | 1.00 EA | 0.00 | -3,724.73 | -3,724.73 |

This credit is inclusive of overhead, profit and WSST.   Its purpose is to bring our scope in line with the scope authorized by Greg Stariha at Country Financial. Step Up Construction, Inc. cannot accept responsibility for diminished home value resulting from siding only two of the four elevations.  Step Up Construction and Greg Stariha are in agreement that the siding will not match, however, it appears to be a coverage issue that has influenced Greg Stariha's decision not to cover the cost of re-siding the entire structure.  As we are contractors and not adjusters, we defer to Greg Stariha's decision.

Totals:  NW Elevation(s)                                                                                                   0.00

### SE Elevation (Side)



**SE Elevation(s)**                                                                    Height: 4"

| | |
|---|---|
| 36.34  SF Walls | 700.00  SF Ceiling |
| 736.34  SF Walls & Ceiling | 700.00  SF Floor |
| 77.78  SY Flooring | 109.02  LF Floor Perimeter |
| 109.02  LF Ceil. Perimeter | |



**Subroom:  SE Elevatio1 (1)**                                                         Height: 4"

| | |
|---|---|
| 17.54  SF Walls | 75.03  SF Ceiling |
| 92.57  SF Walls & Ceiling | 75.03  SF Floor |
| 8.34  SY Flooring | 52.63  LF Floor Perimeter |
| 52.63  LF Ceil. Perimeter | |

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Siding - vinyl | 813.78 SF | 0.34 | 2.69 | 2,465.76 |
| R&R House wrap (air/moisture barrier) | 775.03 SF | 0.04 | 0.27 | 240.26 |
| R&R Attic vent - gable end - vinyl | 1.00 EA | 6.44 | 87.19 | 93.63 |
| R&R Light/outlet J-block - Vinyl | 1.00 EA | 2.41 | 15.88 | 18.29 |
| R&R Window/door trim | 13.00 LF | 0.80 | 1.94 | 35.62 |
| Fencing Installer - per hour | 4.00 HR | 0.00 | 51.79 | 207.16 |
| Fence manipulation required to complete siding | | | | |
| Detach & Reset Storage shed - Vinyl - Gable type - 8' x 6' | 1.00 EA | 0.00 | 0.00 | 315.68 |
| This shed will have to be removed from its current location to facilitate siding repairs and reset post repairs | | | | |
| R&R Fascia - 2" x 6" - softwood - re-sawn | 36.17 LF | 0.26 | 6.73 | 252.82 |

2012-10-09-0836REV                                                12/3/2012                        Page: 27

CMIC_000326



**Step-Up**
CONSTRUCTION

**CONTINUED - SE Elevation(s)**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Rake board | | | | |
| R&R Trim board - 1" x 2" - installed (cedar) | 36.17 LF | 0.27 | 2.22 | 90.07 |
| Shadow Board | | | | |
| Soffit & Fascia Installer - per hour | 0.40 HR | 0.00 | 57.02 | 22.81 |
| Labor to remove existing cornice and replace with a new one that is field cut. There is no material charge because it will be cut out of rake board scrap | | | | |
| Prime & paint exterior fascia - wood, 4"- 6" wide | 45.17 LF | 0.00 | 1.04 | 46.98 |
| Prime and paint Shadow board | 45.17 LF | 0.00 | 0.61 | 27.55 |
| Shadow board | | | | |
| Prime & paint exterior soffit - exposed rafters | 45.17 SF | 0.00 | 1.96 | 88.53 |
| Mask and prep for paint - paper and tape (per LF) | 45.17 LF | 0.00 | 0.46 | 20.78 |
| Masking between shadow board and roofing material | | | | |
| (Material Only) Sheathing - waferboard - 1/2" | 256.00 SF | 0.00 | 0.45 | 115.20 |
| (Material Only) 2" x 6" lumber (1 BF per LF) | 30.00 LF | 0.00 | 0.64 | 19.20 |
| (Material Only) Nails - 10d to 16d - per pound | 5.00 LB | 0.00 | 5.55 | 27.75 |
| Framing - Labor Minimum | 1.00 EA | 0.00 | 131.33 | 131.33 |
| Per Xactimate: "Minimum charge for framing repair. Minimum items are not meant to be used in conjunction with applied Base Service Charges. If additional time is needed to match or purchase materials, **it may be necessary to add supplemental labor hours; see item FRM LAB".** | | | | |
| Carpenter - General Framer - per hour | 5.50 HR | 0.00 | 52.53 | 288.92 |
| Needed to purchase materials and complete repairs. This repair will consume 1 full day of labor. | | | | |

| | | | | |
|---|---|---|---|---|
| Totals: SE Elevation(s) | | | | 4,508.34 |

| | | | | |
|---|---|---|---|---|
| Total: SE Elevation (Side) | | | | 4,508.34 |

**Shed**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Storage shed - Vinyl - Gable type - 8' x 6' | 1.00 EA | 115.92 | 919.89 | 1,035.81 |

| | | | | |
|---|---|---|---|---|
| Totals: Shed | | | | 1,035.81 |

CMIC_000327


**Step-Up**
CONSTRUCTION

### Scaffolding

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Two ladders with jacks and plank (per week) | 14.00 WK | 0.00 | 311.12 | 4,355.68 |
| Seven sections for 2 weeks. These will be used for for all applicable trades - dmo, siding | | | | |
| Two ladders with jacks and plank (per week) | 9.00 WK | 0.00 | -311.12 | -2,800.08 |
| Less siding approved by Greg Stariha will mean less scaffolding is needed | | | | |

Totals:  Scaffolding                                                                                          1,555.60

### GC-Site Protection

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| **The following line items represent material and labor cost associated with protecting the following exterior surfaces: Driveway - Sidewalk - Front Porch and Deck.** | | | | |
| **(Material Only) Sheathing - plywood - 1/2" CDX** | **160.00 SF** | **0.00** | **0.72** | **115.20** |
| *5 sheets of plywood for site protection.  0 sheets for the deck, 1 sheets for the front porch, 4 for the driveway under dumpster legs and the same 4 used on the driveway under debris pile once the dumpster has been removed* | | | | |
| **4 sheet designated to protect the deck from damage as a result of falling tools, material and/or debris and also from the scaffolding legs, has been removed.** | | | | |
| WR hardboard - per roll | 1.00 RL | 59.00 | 0.00 | 59.00 |
| WR Hardboard (material only).  Used for protection of exterior walking surfaces - used in conjuction with 1/2" ply | | | | |
| Sticky mat - dust and debris collection system | 1.00 BX | 58.00 | 0.00 | 58.00 |
| Sticky Mat (material only).  This product will be placed at front, rear and garage man doors and used as part of our site protection system | | | | |
| Polycraft - (material only) | 1.00 RL | 49.65 | 0.00 | 49.65 |
| Poly Craft  (material only).  Used for protection of exterior concrete surfaces - used in conjuction with 1/2" ply | | | | |
| **General Laborer - per hour** | **2.50 HR** | **0.00** | **40.88** | **102.20** |
| **Labor to manipulate, set in place and remove FRM SH1/2, DMO WHRB, DMO SMAT, and DMO PLOYC  designated for exterior site protection.  1.5 hrs removed to jive with deck protection being removed.** | | | | |

Totals:  GC-Site Protection                                                                                   384.05

### Life Safety

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|

CMIC_000328



**Step-Up**
CONSTRUCTION

**CONTINUED - Life Safety**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Air clearance testing - VOC | 1.00 EA | 0.00 | 2,800.00 | 2,800.00 |

Air clearance test including VOC reporting.  Homeowner is asthmatic and home will have to be cleared before the structure is safe to occupy.

| Air clearance testing - VOC | 1.00 EA | 0.00 | -2,800.00 | -2,800.00 |

Greg Stariha with Country Financial stated that he would not pay for VOC testing but would pay for an extension of ALE.  Given that the homeowner and her son both suffer from Asthma,  this does not seem to be the best approach.  The manufacturers that I have spoken to about this state that dissipation of VOC's is contingent on many factors such as humidity, temperature and air flow.  They have also stated  that it could take several weeks before the homeowner could safely move back in.  There is also the chance that she could move in and then have to move back out for medical reasons related to VOC exposure resulting from the refusal of Greg Stariha of Country financial to pay for VOC testing.  A VOC clearance test would clear the structure and remove any liability.  Step Up Construction urges Greg Stariha and Country Financial to research the negative effects of VOC's on the general population and specifically on those suffering from a respiratory desease or illness like asthma.  MSDS sheets of products we are using to complete the repairs will me given to the homeowner prior to them moving back in so that they are aware of the possible health risk and danger to life.

.

.

.

**THORAX**
**INTERNATIONAL JOURNAL OF RESPIRATORY MEDICINE**

.



**Step-Up**
CONSTRUCTION

CONTINUED - Life Safety

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| . | | | | |

**Domestic exposure to volatile organic compounds with asthma**

**Results:**
Cases were exposed to significantly higher VOC levels (μg/m3) than controls (p<0.01). Most of the individual VOCs appeared to be significant risk factors for asthma with the highest odds ratios for benzene followed by ethylbenzene and toluene. For every 10 unit increase in the concentration of toluene and benzene (μg/m3) the risk of having asthma increased by almost two and three times, respectively.

**Conclusions:**
Domestic exposure to VOCs at levels below currently accepted recommendations may increase the risk of childhood asthma. Measurement of total VOCs may underestimate the risks associated with individual compounds.

**References from this article.**

Anderson HR, Butland BK, Strachan DP. Trends in prevalence and severity of childhood asthma. BMJ. 1994 Jun 18;308(6944):1600-1604. [PMC free article]
Burney PG, Chinn S, Rona RJ. Has the prevalence of asthma increased in children? Evidence from the national study of health and growth 1973-86. BMJ. 1990 May 19;300(6735):1306-1310. [PMC free article]
Peat JK, van den Berg RH, Green WF, Mellis CM, Leeder SR, Woolcock AJ. Changing prevalence of asthma in Australian children. BMJ. 1994 Jun 18;308(6944):1591-1596. [PMC free article]
Hyndman SJ, Brown DL, Ewan PW, Higenbottam TW, Maunder JW, Williams DR. Humidity regulation in the management of asthma patients sensitized to house dust mites. Q J Med. 1994 Jun;87(6):367-372.
Environmental Controls and Lung Disease. Am Rev Respir Dis. 1990 Oct;142(4):915-939.
Norbäck D, Björnsson E, Janson C, Widström J, Boman G. Asthmatic symptoms and volatile organic compounds, formaldehyde, and carbon dioxide in dwellings. Occup Environ Med. 1995 Jun;52(6):388-395. [PMC free article]
Wieslander G, Norbäck D, Björnsson E, Janson C, Boman G. Asthma and the indoor environment: the significance of emission of formaldehyde and volatile organic compounds from newly painted indoor surfaces. Int Arch Occup Environ

| Megohmmeter check electrical circuits - average residence | 1.00 EA | 0.00 | 587.20 | 587.20 |
| Megohmmeter check electrical circuits - average residence | 1.00 EA | 0.00 | -587.20 | -587.20 |

**The following is the reccomendation of NEMA and mirrors the National and State Electrical Code Requirements. The NEMA requirements below have been adopted by Washington State Labor and Industries Chief Electrical Inspector, Ronald E Fuller. Greg Stariha with Country Financial will not pay to replace the wiring in the home that was wet as a result of the fire nor will he pay for a megohmeter check which Step Up Construction, WA L&I, NEC and NEMA consider a life safety issue.**

CMIC_000330

Step-Up
CONSTRUCTION

## CONTINUED - Life Safety

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|

**Wire, Cable, and Flexible Cords**
When any wire or cable product is exposed to water, any metallic component (such as the conductor, metallic shield, or armor) is subject to corrosion that can damage the component itself and/or cause termination failures. If water remains in medium voltage cable, it could accelerate insulation deterioration, causing premature failure. Wire and cable that is listed for only dry locations may become a shock hazard, when energized, after being exposed to water.
The following recommended actions are based upon the concept that the water contains no high concentrations of chemicals, oils, etc. If it is suspected that the water has unusual contaminants, such as may be found in some flood water, the manufacturer should be consulted before any decision is made to continue using any wire or cable products.
*Items Requiring Complete Replacement:*
 Any wire or cable that is listed for dry locations only, such as type NM-B cable, should be replaced if it has been exposed to water.
 Any cable that contains fillers, such as polypropylene, paper, etc., should be replaced if the ends of the product have been exposed to water.
*Items Which May Possibly be Reconditioned by Trained Personnel in Consultation with Manufacturer:*
 Any wire or cable product that is suitable for wet locations and whose ends have not been exposed to water should be suitable for use or continued use. A qualified person, such as an electrical contractor or others familiar with wire and cable terminology, should make the determination of the product's suitability for wet locations.
 Any wire or cable product, not containing fillers, that is suitable for wet locations and whose ends have been exposed to water, may be considered a candidate for "purging" (using an inert gas under pressure to remove water contained in the product) under engineering supervision. If this procedure is employed, the wire or cable should be tested prior to energization. As a minimum, an insulation resistance test with a megohmmeter should be cond

.

Step Up Construction strongly urges Greg Stariha of Country Financial to reconsider his stance on the meghometer testing.  Any future fire, electrical damage, damage to electrical devices ( laptops, t.v.'s, etc. ), electrical shock, etcetera, will not be considered the liability or responsibility of Step Up Construction.

.

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Residential supervision - per hour | 42.60 HR | 0.00 | 56.84 | 2,421.38 |

One hour a day for direct on-site supervision.  This includes site safety inspections and weekly site safety classes as required by OSHA/WISHA.

| Residential supervision - per hour | 21.30 HR | 0.00 | -56.84 | -1,210.69 |

Greg Stariha of Country Financial has refused to pay one hour a day for site supervision.  We have removed half of the site supervision for Mr. Stariha, however,  it should be noted that project delays are likely to occur as a result of so little on site supervision.  The 2.5 hrs a week we have left in the estimate will be devoted to site safety and holding weekly safety meetings as required by OSHA/WISHA/L&I.  Step Up Construction will not be held liable for construction delays as a result of the reduction in supervisory hours demanded by Greg Stariha.  Step Up Construction  will inform the homeowners of the possibility of delays resulting from this lack of supervision as it could mean additional ALE cost and additional time spent out of their home.

Totals: Life Safety                                                                                                                   1,210.69

2012-10-09-0836REV                                                               12/3/2012          Page: 32

CMIC_000331



**Step-Up**
CONSTRUCTION

### Cleaning

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Final cleaning - construction - Residential | 2,450.00 SF | 0.00 | 0.24 | 588.00 |
| Clean window unit (per side) 10 - 20 SF | 18.00 EA | 0.00 | 11.71 | 210.78 |
| Interior and exterior | | | | |
| Clean window unit (per side) 21 - 40 SF | 4.00 EA | 0.00 | 17.62 | 70.48 |
| Interior and exterior SGD glass surfaces | | | | |
| Clean window screen | 9.00 EA | 0.00 | 8.44 | 75.96 |
| Removal and cleaning of window screens | | | | |
| Cleaning Technician - per hour | 3.00 HR | 0.00 | 31.24 | 93.72 |
| Additional labor required due to hiegth of second story windows | | | | |
| Cleaning Technician - per hour | 8.00 HR | 0.00 | 31.24 | 249.92 |
| Labor to broom clean and wash exterior stairs, paitio, deck, and driveway post construction. One worker 8 hrs | | | | |
| Cleaning Technician - per hour | 4.00 HR | 0.00 | -31.24 | -124.96 |
| Less siding work approved by Greg Stariha means less exterior cleaning needed. This credit reflects that. This amount is taken away from the line item above it. | | | | |
| Cleaning Technician - per hour | 8.00 HR | 0.00 | 31.24 | 249.92 |
| Two workers 4 hours each to remove construction and demo related debris from the yard, shrubs, bushes, dirt and landscaping bark and debris stagging area next to the driveway. This worker will also go over all of these areas with a magnet broom to ensure the complete removal of all metalic debris (such as nails and screws) | | | | |
| Cleaning Technician - per hour | 8.00 HR | 0.00 | -31.24 | -249.92 |
| Less siding work approved by Greg Stariha means less exterior cleaning needed. This credit reflects that. This amount is taken away from the line item above it. | | | | |
| Cleaning Technician - per hour | 10.75 HR | 0.00 | 31.24 | 335.83 |
| 15 minutes of daily site cleanup as required to meet OSHA standards. 2 months and/or duration of the project | | | | |

Totals: Cleaning     1,499.73

### Deck

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| R&R Deck guard rail - treated lumber | 6.00 LF | 0.87 | 22.38 | 139.50 |
| R&R Deck / Exterior guard rail - Newel post - Labor only | 1.00 EA | 14.49 | 73.39 | 87.88 |
| Sand wood | 360.00 SF | 0.00 | 2.79 | 1,004.40 |
| Sand deck boards, facia, between built in benches and ballusters, risers and/or treads and stringers | | | | |
| Stain/finish deck | 728.00 SF | 0.00 | 0.56 | 407.68 |

CMIC_000332

**Step-Up**
CONSTRUCTION

**CONTINUED - Deck**

| DESCRIPTION | QNTY | REMOVE | REPLACE | TOTAL |
|---|---|---|---|---|
| Two coats | | | | |
| Painter - per hour | 16.00 HR | 0.00 | 48.00 | 768.00 |
| Labor to sand deck rail, ballusters, post and benches | | | | |
| Stain/finish deck handrail | 96.00 LF | 0.00 | 4.18 | 401.28 |
| Two coats | | | | |

**NOTE:** Country Financial calls out two coats of paint on the deck and handrail, which is the correct number of coats, however it is a semi transparent stain and not paint. The deck and handrail will need to be sanded and not pressure washed.

| | | | | |
|---|---|---|---|---|
| Totals: Deck | | | | 2,808.74 |

| | |
|---|---|
| **Line Item Totals: 2012-10-09-0836REV** | **44,885.51** |

## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 8,054.72 | SF Walls | 7,449.71 | SF Ceiling | 15,504.43 | SF Walls and Ceiling |
| 7,241.34 | SF Floor | 804.59 | SY Flooring | 1,538.93 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 1,694.48 | LF Ceil. Perimeter |
| | | | | | |
| 7,241.34 | Floor Area | 7,568.50 | Total Area | 7,528.17 | Interior Wall Area |
| 6,824.73 | Exterior Wall Area | 1,216.42 | Exterior Perimeter of Walls | | |
| | | | | | |
| 1,687.05 | Surface Area | 16.87 | Number of Squares | 196.01 | Total Perimeter Length |
| 61.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

CMIC_000333

**Step-Up**
**CONSTRUCTION**

## Summary

| | | | |
|---|---|---|---:|
| Line Item Total | | | 44,885.51 |
| Overhead | @ | 10.0% | 4,488.73 |
| Profit | @ | 10.0% | 4,488.73 |
| Sales Tax | @ | 9.400% | 5,063.21 |
| **Replacement Cost Value** | | | **$58,926.18** |
| Less Deductible | | | (1,000.00) |
| **Net Claim** | | | **$57,926.18** |

Bernie Williams
Estimator

CMIC_000334

 **Step-Up**
CONSTRUCTION

## Recap by Room

**Estimate: 2012-10-09-0836REV**

| | | |
|---|---:|---:|
| General Conditions | 2,068.45 | 4.61% |
| **Area: Main Level** | | |
| Bathroom | 713.30 | 1.59% |
| Stairs | 963.75 | 2.15% |
| Entry Clst | 153.35 | 0.34% |
| Garage | 281.50 | 0.63% |
| Pantry | 466.29 | 1.04% |
| Entertainment Room | 3,016.91 | 6.72% |
| Entry/Hallway | 329.81 | 0.73% |
| Living Room | 989.23 | 2.20% |
| Dining Room | 966.56 | 2.15% |
| Kitchen | 822.12 | 1.83% |
| **Area Subtotal: Main Level** | 8,702.82 | 19.39% |
| **Area: Upper Level** | | |
| Bedroom 2 | 819.69 | 1.83% |
| Closet Bdrm 2 | 186.18 | 0.41% |
| Bathroom | 42.21 | 0.09% |
| Recreation Room | 2,969.26 | 6.62% |
| Laundry Room | 365.54 | 0.81% |
| Bedroom 1 | 623.43 | 1.39% |
| Walk-in Closet Bdrm 1 | 251.41 | 0.56% |
| Master Bath | 1,054.10 | 2.35% |
| Walk-in Closet | 13.59 | 0.03% |
| Master Bedroom | 1,469.94 | 3.27% |
| **Area Subtotal: Upper Level** | 7,795.35 | 17.37% |
| **Area: Roof** | | |
| Roof | 4,796.26 | 10.69% |
| **Area Subtotal: Roof** | 4,796.26 | 10.69% |
| **Area: Attic** | | |
| Attic | 4,914.29 | 10.95% |
| **Area Subtotal: Attic** | 4,914.29 | 10.95% |
| **Area: Crawl** | | |
| Crawlspace | 374.50 | 0.83% |

CMIC_000335

**Step-Up**
CONSTRUCTION

| | | |
|---|---|---|
| Area Subtotal: Crawl | 374.50 | 0.83% |
| Gutters | 254.24 | 0.57% |
| **Area: NE Elevation (Rear)** | | |
| NE Elevation(s) Rear | 2,976.64 | 6.63% |
| Area Subtotal: NE Elevation (Rear) | 2,976.64 | 6.63% |
| **Area: SE Elevation (Side)** | | |
| SE Elevation(s) | 4,508.34 | 10.04% |
| Area Subtotal: SE Elevation (Side) | 4,508.34 | 10.04% |
| Shed | 1,035.81 | 2.31% |
| Scaffolding | 1,555.60 | 3.47% |
| GC-Site Protection | 384.05 | 0.86% |
| Life Safety | 1,210.69 | 2.70% |
| Cleaning | 1,499.73 | 3.34% |
| Deck | 2,808.74 | 6.26% |
| **Subtotal of Areas** | 44,885.51 | 100.00% |
| **Total** | 44,885.51 | 100.00% |

CMIC_000336



**Step-Up**
CONSTRUCTION

## Recap by Category

| O&P Items | | | Total | % |
|---|---|---|---:|---:|
| CLEANING | | | 4,580.10 | 7.77% |
| GENERAL DEMOLITION | | | 5,860.22 | 9.95% |
| DOORS | | | 157.40 | 0.27% |
| DRYWALL | | | 1,391.65 | 2.36% |
| ELECTRICAL | | | 208.86 | 0.35% |
| MISC. EQUIPMENT - COMMERCIAL | | | 9.15 | 0.02% |
| HEAVY EQUIPMENT | | | 672.00 | 1.14% |
| FLOOR COVERING - CARPET | | | 5,164.44 | 8.76% |
| FLOOR COVERING - VINYL | | | 550.00 | 0.93% |
| FLOOR COVERING - WOOD | | | 50.00 | 0.08% |
| PERMITS AND FEES | | | 375.00 | 0.64% |
| FENCING | | | 414.32 | 0.70% |
| FINISH CARPENTRY / TRIMWORK | | | 425.65 | 0.72% |
| FRAMING & ROUGH CARPENTRY | | | 905.27 | 1.54% |
| HAZARDOUS MATERIAL REMEDIATION | | | 134.42 | 0.23% |
| HEAT, VENT & AIR CONDITIONING | | | 514.35 | 0.87% |
| INSULATION | | | 2,529.86 | 4.29% |
| LABOR ONLY | | | 1,601.37 | 2.72% |
| LIGHT FIXTURES | | | 115.00 | 0.20% |
| MOISTURE PROTECTION | | | 9.30 | 0.02% |
| PLUMBING | | | 549.10 | 0.93% |
| PAINTING | | | 11,736.20 | 19.92% |
| SCAFFOLDING | | | 1,555.60 | 2.64% |
| SIDING | | | 2,428.21 | 4.12% |
| SOFFIT, FASCIA, & GUTTER | | | 496.95 | 0.84% |
| TEMPORARY REPAIRS | | | 290.13 | 0.49% |
| WATER EXTRACTION & REMEDIATION | | | 925.39 | 1.57% |
| EXTERIOR STRUCTURES | | | 1,235.57 | 2.10% |
| **O&P Items Subtotal** | | | **44,885.51** | **76.17%** |
| Overhead | @ | 10.0% | 4,488.73 | 7.62% |
| Profit | @ | 10.0% | 4,488.73 | 7.62% |
| Sales Tax | @ | 9.400% | 5,063.21 | 8.59% |
| **Total** | | | **58,926.18** | **100.00%** |

CMIC_000337

= Crawl space insulation and smoke seal

CMIC_000338

Main Level

Main Level



CMIC_000339

Upper Level





CMIC_000341

2012-10-09-0836REV

12/3/2012

Page: 42

Roof

Attic



CMIC_000343



NE Elevation (R

37' 3"
2' 9"
4' 8"
2' 9"
4' 8"
NE Elevation(s) Rear
18' 10"
2' 9"
4' 8"
5' 2"
6' 10"
2' 9"
2' 9"

CMIC_000344

NE Elevation (Rear)

SE Elevation (Side)

Page: 46

12/3/2012

SE Elevation (S' ` `

SE Elevation(s)

18' 10"

17' 7"

17' 1"

31' 6"

2' 8"

4'

6' 10"

9' 6"

5'

4' 2"

9' 3"

4' 4"

4'

7' 10"

18' 10"

2012-10-09-0836REV

CMIC_000345

NW Elevation (Side)

Page: 47

12/3/2012

NW Elevation

18' 10"

4' 11"

17'

17'

35' 6"

NW Elevation (Side)

2012-10-09-0836REV

**CMIC_000346**

# Exhibit No. 8

From: Reed, Robin
Sent: Thursday, February 21, 2013 8:42 AM
To: 'Kyle Grinnell'
Subject: RE: kroneman air testing

Good Morning,

I have reviewed this billing with Greg Stariha.  We did not agree to this
testing prior to it being done.  It is not usually and customary for these fees
to be incurred.  At this time, we are unable to issue payment for this testing.

Thank you,

Robin Reed

Claims Representative

Country Financial

253-661-9956

fax 253-661-9918

--------------------------------------------------------------------------------

From: Kyle Grinnell [mailto:kyle@allwestadjusters.com]
Sent: Wednesday, February 13, 2013 6:24 PM
To: Reed, Robin
Cc: Kyle Grinnell
Subject: kroneman

Robin,

Let's see how this works for you.

Kyle

CMIC_000398

# Exhibit No. 9

**Step-Up**
**CONSTRUCTION**

ENVIRONMENTAL SPECIALTIES
4227 MERIDIAN SO STE C #625
PUYALLUP WA 98373

Invoice

Bill To:

Step Up Construction
2004 16th St SE
Puyallup WA 98372

| Date | Invoice No | Terms |
|---|---|---|
| 2/04/13 | 003579 | Net 30 |

| Description | Amount |
|---|---|
| Inspection & Report | 360.00 |
| Mold certificate sampling (w/ 3 ea) | 240.00 |
| VOC 8260 filt caps test | 177.00 |

**Total    $797.00**

1    Capture    Date Taken: 2/13/2013    Taken By: Bernie Williams

# Exhibit No. 10

**Allwest Adjusters, Inc.**
**4108 57th St Ct East**
**Tacoma, WA 98443**
**253.896.3700, fax 253.896.3702**
**www.AllwestAdjusters.com**
**Kyle@AllwestAdjusters.com**

June 27th, 2013

Robin Reed
Country Mutual Insurance Company
Hand delivered to FW Claims office

RE:

| | |
|---|---|
| Insured: | Karen & Keith Kroneman |
| Policy #: | A46K4374742 |
| Claim #: | 185-0027057 |
| Date of Loss: | September 29th, 2012 |
| Peril: | Fire |
| Loss address: | 9507 149th St East, Puyallup, WA 98375 |

Dear Robin,

Enclosed you will find a short (four item) list of electronics that failed because of the loss. Those items total $951.74.

Regarding ALE coverage, the insureds have also provided some additional receipts for out of pocket costs and proof of increased utilities expenditures. This portion of the claim is $457.72.

There are two submissions for replacements. Their DISH Network dvr replacement had $15.00 shipping (plus tax), and they replaced their Dyson Vacuum.

Please pay them directly without naming Allwest Adjusters, Inc.

Kindest Regards,

Kyle T. Grinnell, SR
President

RECEIVED
JUN 28 2013
Seattle Claims

CMIC_000661

KRONEMAN SUPPLEMENTAL

**Additional claim for destroyed items:**

| Item | RC |
|---|---|
| Kitchenaid Mixer K45SSWH | $349.99 |
| X-Box 360 | $239.99 |
| Wii | $189.99 |
| Coleman cot | $89.99 |
| sub-TOTAL | $869.96 |
| tax 9.4% | $81.78 |
| Total | $951.74 |

**Replacements:**

| | |
|---|---|
| Dyson cleaner | $ 452.74 |
| shipping for dvr with tax (Dish) | $ 16.41 |
| total | $ 469.15 |

**ALE:**

| | |
|---|---|
| receipts en mass | $ 138.35 |
| water increase | $ 72.91 |
| power increase | $ 246.46 |
| totals | $ 457.72 |

RECEIVED
JUN 28 2013
Seattle Claims

# Exhibit 11

1
2
3
4
5
6

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

7

8

| KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof, | NO. |
|---|---|
| Plaintiffs, | COMPLAINT |
| v. | |
| COUNTRY MUTUAL INSURANCE COMPANY, an insurance company, | |
| Defendant. | |

9
10
11
12
13
14
15
16

The plaintiffs, Karen and Keith Kroneman (the "Kronemans"), by and through their

17

attorney of record, Michael T. Watkins, allege as follows:

18

## I.   PARTIES

19

1.1    At all times material hereto, plaintiffs, the Kronemans, owned a home located at

20

9507 149th St. E., Puyallup, Washington.

21

1.2    Country Mutual Insurance Company, ("Country Mutual"), upon information and

22

belief, is an insurance company properly licensed and transacting business in King County, State

23
24
25

COMPLAINT — 1

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA 98102
206/400-6640; FAX: 206/971-5080

of Washington. At all times material hereto, Country Mutual insured the Kronemans' home pursuant to a homeowner's policy of insurance.

## II.   JURISDICTION

2.1   This court has jurisdiction over the parties in this action.

2.2   At all times material hereto, defendant Country Mutual transacted business in King County, State of Washington; therefore venue is appropriate in King County, state of Washington.

## III.   FACTS

3.1   Country Mutual issued a homeowners' policy of insurance to the Kronemans that was in force and effect on September 29, 2012.  This policy of insurance included Property Coverage that provided, *inter alia*, insurance coverage for damage to the Kronemans' residence caused by fire.

3.2   On or about September 29, 2013 an accidental fire caused property damage to the Kronemans' residence.

3.3   After the property loss the Kronemans properly submitted a claim to their insurer, defendant Country Mutual, pursuant to their homeowners' policy of insurance to repair and/or rebuild their dwelling to its pre-loss condition with like, kind, and quality materials and professional workmanship.

3.4   During the adjustment of the Kronemans' insurance claim, defendant Country Mutual failed to, *inter alia*, conduct a reasonable investigation and timely and fully pay all that was owed under the insurance contract, thereby compelling the Kronemans to retain a public adjuster and initiate this litigation to recover all amounts owed under the insurance policy.

COMPLAINT — 2

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA 98102
206/400-6640; FAX: 206/971-5080

## IV.   BREACH OF CONTRACT

4.1     Plaintiffs reallege paragraphs 1.1 through 3.4 as if fully set forth herein.

4.2     Defendant Country Mutual had a contractual duty to its insured, the Kronemans, to conduct a reasonable investigation and timely and fully pay all that was owed under the insurance contract, in accordance with its contract of insurance with the plaintiffs.

4.3     Defendant Country Mutual breached its contract of insurance with the Kronemans by failing to conduct a reasonable investigation and timely and fully pay all that was owed under the insurance contract.

## V.   WASHINGTON ADMINISTRATIVE CODE VIOLATIONS

5.1     Plaintiffs reallege paragraphs 1.1 through 4.3 as if fully set forth herein.

5.2     During the adjustment of the Kronemans' property damage claim, Country Mutual's acts and omissions violated one or more insurance claims regulatory provisions of the Washington Administrative Code 284-30-300 *et seq.*

## VI.   BAD FAITH

6.1     Plaintiffs reallege paragraphs 1.1 through 5.2 as is fully set forth herein.

6.2     During the adjustment of the Kronemans' property damage claim, Country Mutual, *inter alia*, violated one or more insurance claims regulatory provisions of the Washington Administrative Code 284-30-300 *et seq.* and failed to give equal consideration to the interests of its insureds as it did its own.  These acts and omissions of Country Mutual, as alleged herein, constituted insurance bad faith in violation of Washington statutory and decisional law.

## VII.  VIOLATION OF THE CONSUMER PROTECTION ACT

COMPLAINT — 3

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA  98102
206/400-6640; FAX: 206/971-5080

7.1    Plaintiffs reallege paragraphs 1.1 through 6.2 as if fully set forth herein.

7.2    Country Mutual's acts and omissions, as alleged above, constituted violations of the Washington Consumer Protection Act, RCW 19.86 *et seq.*

## VIII.    DAMAGES

8.1    As a direct and proximate result of the foregoing, the Kronemans have suffered, and continue to suffer, compensatory, special and general damages in an amount to be proven at trial.

WHEREFORE, plaintiffs, the Kronemans, pray for the following relief:

A.    Judgment against defendant Country Mutual for breach of contract;

B.    Judgment against defendant Country Mutual for violations of the Washington Administrative Code;

C.    Judgment against defendant Country Mutual for bad faith;

D.    Judgment against defendant Country Mutual for violations of the Washington Consumer Protection Act, RCW 19.86 *et. seq.*;

E.    Judgment against defendant Country Mutual in an amount to fairly compensate plaintiffs for all compensatory, special, general and punitive damages proximately caused by defendant Country Mutual's acts and omissions, including treble damages, breach of contract, violations of the Washington Administrative Code, insurance bad faith and violations of the Washington Consumer Protection Act;

COMPLAINT — 4

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA  98102
206/400-6640; FAX: 206/971-5080

F.    Judgment against defendant Country Mutual for attorney fees and costs as allowed by all applicable statutes and decisional law, including, but not limited to, RCW 19.86, *et. seq., Olympic Steamship v. Centennial Ins.*, 117 Wn.2d 37, P.2d 673 (1991); and

G.    For such other relief as the Court deems just and equitable.

DATED this 27th day of September, 2013.

                          LAW OFFICES OF MICHAEL T. WATKINS

                          Michael T. Watkins, WSBA #13677
                          Attorney for Plaintiffs

COMPLAINT — 5

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA  98102
206/400-6640; FAX: 206/971-5080

1
2
3
4
5
6

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

7

KAREN AND KEITH KRONEMAN,
husband and wife, and the marital
community thereof,

                            Plaintiffs,

    v.

COUNTRY MUTUAL INSURANCE
COMPANY, an insurance company,

                          Defendant.

NO.

**SUMMONS**

8
9
10
11
12
13
14

15   **TO THE DEFENDANT: COUNTRY MUTUAL INSURANCE COMPANY;**

16     A lawsuit has been started against you in the above-entitled court by the plaintiffs. Plaintiffs'

17  claim is stated in the written Complaint, a copy of which is served upon you with this Summons.

18       In order to defend against this lawsuit, you must respond to the Complaint by stating your

19  defense in writing, and serving a copy upon the person signing this Summons within 40 days

20  after the service of this Summons, excluding the day of service, or a default judgment may be

21  entered against you without notice. A default judgment is one where the plaintiff is entitled to

22  what is asked for because you have not responded. If you serve a notice of appearance on the

23  undersigned person, you are entitled to notice before a default judgment may be entered.

24
25

SUMMONS — 1

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA 98102
206/400-6640; FAX: 206/971-5080

1   You may demand that the plaintiffs' file this lawsuit with the court. If you do so, the

2   demand must be in writing and must be served upon the person signing this Summons. Within

3   14 days after you serve your demand, the plaintiff must file this lawsuit with the court, or the

4   service on you of this Summons and Complaint will be void.

5       If you wish to seek the advice of a lawyer in this matter, you should do so promptly so that

6   your written response, if any, may be served on time.

7       This Summons is issued pursuant to Rule 4 of the Civil Rules for Superior Court of the

8

9   State of Washington.

10

11      DATED this 27th day of September, 2013.

12                          LAW OFFICES OF MICHAEL T. WATKINS

13

14

15                          _____
                            Michael T. Watkins, WSBA #13677
16                          Attorney for Plaintiffs

17

18

19

20

21

22

23

24

25

SUMMONS — 2

LAW OFFICES OF
MICHAEL T. WATKINS
2825 EASTLAKE AVENUE E
SUITE 115
SEATTLE, WA  98102
206/400-6640; FAX: 206/971-5080

Exhibit 12

**COUNTRY**

**FINANCIAL**

Field Claims Center
P O Box 14151
Salem, OR 97309-5069
Fax: (866) 255-7961

October 15, 2013

MTW
Michael T Watkins
2825 Eastlake Ave E #115
Seattle, WA  98102



RECEIVED

OCT 16 2013

LAW OFFICES OF MICHAEL T. WATKINS

Re:    Claim #:      185-0027057
       Policy #:     AK4374742
       Insured:      Kroneman Karen A & Keith W
       Date of Loss: 9/29/2012

Dear MTW:

Please find the enclosed certified copy of the policy.  This certified copy was also issued
October 24, 2012 to Mr. and Mrs. Kroneman and Kyle Grinnell at the request of Mr.
Grinnell from Allwest Adjusters.

Please be informed that per your policy conditions you have one year from the date of
loss to pursue your claim.  As that one year time limitation has past, COUNTRY Financial
has closed its claim.  Please see below some important time limitations and notice
provisions contained within your policy.

## Conditions– SECTIONS 2 through 6
## (Includes Limitations)

**B.  Duties After Loss**
      In case of a loss, "we" have no duty to provide
      coverage under this policy if the failure to comply
      with the following duties is prejudicial to "us".
      These duties must be performed either by "you",
      an "insured" seeking coverage, or a representa-
      tive of either:

   1.  Give prompt notice to "us" or "our" agent;

   8.  As often as "we" reasonably require:
       **a.**  Show the damaged property;

10. Notwithstanding any other provisions in **SECTIONS 2** through **6**, all claims under this policy must be brought within one year of the date of "occurrence".

G. **Suit Against Us**
No action can be brought against "us" unless there has been full compliance with all of the terms under **SECTIONS 2** through **6** of this policy and the action is started within one year after the date of "occurrence".

This enumeration of defenses and exclusions under the policy is not meant to be, nor should it be construed as, a waiver of any other terms, provisions, conditions, definitions or exclusions which may now or hereafter apply to the insurance afforded under this policy.

Please contact me if you have any further question.

Sincerely,

COUNTRY Mutual Insurance Company®, Bloomington, IL

Robin Reed
Claims Representative
(253) 661-9956
Fax: (866) 255-7961
robin.reed@countryfinancial.com

It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| KAREN AND KEITH KRONEMAN, husband and wife, and the marital community thereof,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTRY MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>Defendant. | NO. CV 14-01223<br><br>**DECLARATION OF GARY WILLIAMS** |

I, Gary Williams, declare under penalty of perjury as follows:

1.      I am over 18 years of age and otherwise competent to make this Declaration, which is based on my personal knowledge.

2.      I am an attorney licensed in the state of Washington. I was retained as an expert by Plaintiffs in the above-captioned matter to form and express opinions regarding Defendant, Country Mutual's handling of the Kroneman claim.  All opinions herein are based on and expressed on a more probable than not basis.

**DECLARATION OF GARY WILLIAMS**-1

**WILLIAMS LAW OFFICE**
252 Blueberry Hill Drive
Quilcene, WA 98376
360.765.0729
gw@areyoucovered.com

3.      Attached to this Declaration is a true and correct copy of the expert report that I authored for this case. My report accurately sets forth my opinions, conclusions, my qualifications, the materials and data I reviewed in this case, and contains a true and correct copy of my then current curriculum vitae. My report accurately describes the Country Mutual claims file, which was produced in discovery. I hereby incorporate here by this reference all facts, opinions, and conclusions expressed in my report.

4.      The fire melted vinyl siding on the Kroneman home, but only on two sides. The claims file documents that Country Mutual only paid for the rear and right sides of the house to be resided, despite the fact that the new vinyl siding did not match the old. This is not an uncommon issue. I have personally been involved in appraisals where matching issues were at the heart of the dispute, usually resolved by siding the entire house, not just the walls which were melted. The same goes for replacing an entire slope of a damaged roof, or replacing an entire roof, or replacing several rooms of carpet when only one is damaged, or painting a whole house when painting only the damaged portion will not match. Vinyl siding cannot be painted so it often presents this issue. I obtained one summary judgment ruling where an insurer refused to side all four walls until it lost this precise issue.

5.      I have personally seen matching issues arise in property insurance cases many times over the years. Common matching issues involve vinyl siding, flooring, carpets, paint, cabinets, windows and doors, hardware and lighting. Indeed, matching issues are handled by adjusters and appraisers in many, perhaps most, substantial fire claims. Insurance companies complain, but usually understand that they have a duty to pay for repairs to bring the house back to its pre-fire condition. This includes, among other things, having four walls which are the same color. An insured's home would diminish in value if its siding was of two different colors

DECLARATION OF GARY WILLIAMS-2

**WILLIAMS LAW OFFICE**
252 Blueberry Hill Drive
Quilcene, WA 98376
360.765.0729
gw@areyoucovered.com

6.     Country Mutual refused to participate in appraisal. Country Mutual leaned heavily on the fact that the claim is in litigation, but failed to mention that no stay of appraisal was either sought or entered.

7.     Country Mutual could have obtained a stay of the litigation by agreement or motion, not by simply ignoring the insured's request for appraisal. Ignoring an appraisal demand for months waives any right to object to appraisal. The duty of good faith implied in every insurance policy requires the insurer to communicate promptly and meaningfully with the insured.

8.     I have worked as an insurance adjuster, appraiser, or insurance lawyer since 1968. I have been involved in many appraisals in Washington State, either as adjuster, counsel for a party or as one of the appraisers. In many of those appraisals (probably around 50%) there has been ongoing, parallel litigation. Often, the appraisal demand will come after litigation is initiated. There is no rule which disfavors appraisal on that basis. I have never before seen an insurer simply ignore an appraisal demand, as Country Mutual did here. I have never seen an appraisal stopped solely on the basis that litigation was pending.

9.     Property insurance policies have included appraisal clauses since at least the middle of the 19th century. There is no general rule or local custom which prevents parallel litigation in appraisal, or prevents parallel appraisal in litigation. Appraisal removes difficult damages issues from litigation, and thus helps resolve lawsuits. It can also be very helpful to the appraisal process to have parallel litigation, because the parties can, and often do, ask the court to resolve appraisal-related legal issues. Trial court judges can and do set and enforce hearing dates, remove unqualified appraisers, or rule on coverage issues which impact the amount of loss being appraised.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct:

**DECLARATION OF GARY WILLIAMS-3**

**WILLIAMS LAW OFFICE**
**252 Blueberry Hill Drive**
**Quilcene, WA 98376**
**360.765.0729**
**gw@areyoucovered.com**

Signed at Quilcene, Jefferson County, Washington, this 27th day of May, 2015.

GARY WILLIAMS WSBA # 9580
Attorney for Plaintiffs

DECLARATION OF GARY WILLIAMS-4

**WILLIAMS LAW OFFICE**
252 Blueberry Hill Drive
Quilcene, WA 98376
360.765.0729
gw@areyoucovered.com

# GARY WILLIAMS

252 Blueberry Hill Drive - Quilcene, Washington 98376
(360)765-0729 - gw@areyoucovered.com

## KRONEMAN v. COUNTRY MUTUAL INSURANCE COMPANY
### Western District of Washington, No. 2:14-cv-01223 - TSZ

### I.  Qualifications

I have qualified as a claim handling expert and have testified in both state and Federal courts in Washington. My qualifications include:

1.  Claims adjuster/supervisor from 1968 through 1975,  for Safeco, American States. Independent insurance adjuster from 1975 to 1981.
2.  Insurance law practice since 1979, both as defense and policyholder's counsel.
3.  Designed and taught a program in insurance adjusting at Pierce College.
4.  Lecture at continuing legal education seminars on insurance law, claim handling and litigation.
5.  Published both locally and nationally on claim handling, appraisal, and related insurance claim subjects.

Please see Exhibit A, my attached curriculum vitae for more detail.

### II.  Assignment

Counsel asked me to review the claim file and related documents and provide any opinions on whether Country Mutual Insurance Company (hereinafter "Country Mutual") adjusted this first party property claim within the standards and practices for claim handling in Washington.

### III. Materials Reviewed and Data Considered

I considered the insurance company's claim files, the insurance policy, documents obtained in discovery, and the Washington Unfair Claims Settlement Practices Regulations.   I also relied upon my forty six years of experience as an insurance adjuster, teacher and lawyer. I am very familiar with Washington's standards of care and practice in the adjustment of insurance claims.

My assignment here is not to form or apply legal conclusions to the facts of the adjustment, but to discuss standards of care and conduct in the insurance claim industry, and to consider whether those standards were met by Country Mutual in this claim.

### IV. Standards of Good Faith Claim Handling[1]

1.  Washington has clear standards of good faith claim handling. Claim professionals know these standards and know they are required to meet them. Claim handling standards include those found in the common law, those found in the form of statutes and administrative regulations, and standards described in case law. The claims handling regulations, for example, are clear, mandatory guidelines for insurers to follow, particularly in first party claims.  These principles are neither complex nor highly technical.

2.  The essence of good faith claim service is to remember always that the claims professional's job is to help, not hurt the damaged insured. A first party claim should not be an adversarial proceeding. The money which pays for an insurer's investigation and adjustment comes from premium dollars. Premium dollars come from policyholders, so the insurer's investigation and adjustment should benefit the policyholder who paid for it.

3.  Equal consideration is a key standard. Insurers have fiduciary or quasi-fiduciary duties to their customers, which has motivated courts to find standards within fiduciary models.  One such standard is that the insurer must give at least equal consideration in all matters to the policyholder. This standard, more than any

---

[1]This section has appeared in prior reports on similar subjects.

**March 2, 2015**
**Kroneman v. Country Mutual Insurance Company**
**Report of Gary Williams-2**

other, defines many aspects of the insurer-insured relationship.

4.  The standards of care and practice in claim handling don't vary much across the country. Industry standards are nationwide and apply regardless of fair claims acts or regulations, which do vary from state to state.  Our Unfair Claims Settlement Practices Regulations (usually called "the WACs") are a set of minimum standards promulgated by our Insurance Commissioner. They are taken from a national set of standards developed by the National Association of Insurance Commissioners. The WACs describe many of the industry standards for good faith claim handling.

5.  Some of these principles are not generally known or appreciated by the general public, who often believe an adjuster's job is to pay as little as possible. To the contrary, an adjuster's job is to pay what is owed according to the policy, no more and no less, and to do it as soon as possible.  Insurance claim adjusting is a service profession.

## V. Violations of Standards of Good Faith Claim Handling

1.  The fire melted vinyl siding on the home, on two sides. The claims file documents that the insurer only paid for the rear and right sides of the house to be resided, despite the fact that the new vinyl siding did not match the old.  This is not an uncommon issue.  It comes up often and is resolved by siding the entire house, not just the walls which were melted. In one local case, an insurer refused to side all four walls until it lost this issue on summary judgment.[2]

2.  I have personally seen matching issues arise in property insurance cases many times over the years. Insurance companies complain, but usually understand that they have a duty to pay for repairs to bring the house back to its prefire condition.  This includes, among other things, having four walls which are the same color.

3.  WAC 284-30-330(4) prohibits insurers from refusing to pay claims without conducting a reasonable investigation. It is an outgrowth of the principle that the insurer should carefully investigate the claim, in a balanced, objective

---

[2]*Bromley v. Foremost Insurance Co.*, Jefferson County Superior Court, # 08 2 00258 5.

March 2, 2015
Kroneman v. Country Mutual Insurance Company
Report of Gary Williams-3

fashion.  The insurer must treat the insured's interest at least equal to its own.

4.  WAC 284-30-330(2) forbids "[F]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies."  See, also, WAC 284-30-360(3), which requires an answer within ten working days to a pertinent communication. Despite this clear directive, Country Mutual ignored its insured's appraisal demand, even though policy required Country Mutual to appoint an appraiser and notify Kroneman within 20 days of notice.

5.  WAC 284-30-360(3) grew from the universal need for prompt and meaningful communication between insurer and insured. The absence of meaningful communications is never a good thing in the context of an insurance claim.

6.  WAC 284-30-330(7) prohibits insurers from compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings.  This regulation is based on the principle that insurers should avoid delay, and must investigate and pay claims as soon as reasonably possible.

7.  Country Mutual refused to participate in appraisal. On July 21, 2014, Kroneman demanded appraisal in writing. Country Mutual then failed to respond to the appraisal demand. Country Mutual's failure to respond to an insured's appraisal demand was in violation of WAC 284-30-360(3).

8.  Having no response from Country Mutual, on January 16, 2015, Kroneman filed a complaint with the Washington Insurance Commissioner. On February 10, 2015, Country Mutual's lawyer wrote to the Commissioner explaining that Country Mutual refused to participate in appraisal, and citing a very old case in support of its position.  Country Mutual leaned heavily on the fact that the claim is in litigation, but failed to mention that no stay of appraisal was entered. If Country Mutual wanted to avoid appraisal, it should have asked the Court for a stay. Simply ignoring an appraisal demand  constitutes a waiver to object to appraisal.

9.  The following is the appraisal clause in the policy.  Note that it has no "litigation" exception. Upon receipt of the insured's appraisal demand, Country Mutual was required to choose its own appraiser within 20 days of the insured's demand. This was not done. Instead, Country Mutual ignored the appraisal demand

**March 2, 2015**
**Kroneman v. Country Mutual Insurance Company**
**Report of Gary Williams-4**

until the Insurance commissioner forced Country Mutual to respond.

> E. Appraisal
> If "you" and "we" fail to agree on the amount of
> loss, either may demand an appraisal of the loss.
> In this event, each party will choose a competent
> and impartial appraiser within 20 days after
> receiving a written request from the other. The
> two appraisers will choose an umpire, who shall
> be competent in the trade or skill necessary to
> assess the loss. If they cannot agree upon an
> umpire within 15 days, "you" or "we" may request
> that the choice of an umpire be made by a judge
> of a court of record in the state where the "residence
> premises" is located. The appraisers will
> separately set the amount of loss. If the appraisers
> submit a written report of an agreement
> between them to "us", the amount agreed upon
> will set the amount of loss and be final. If they fail
> to agree, they will submit their differences to the
> umpire. A decision agreed to by any two will then
> set the amount of loss and be final.
> Each party will:
>   1. Pay its own appraiser; and
>   2. Bear the other expenses of the appraisal and
> umpire equally.

10.  Appraisal is voluntary until one party demands it. Once that happens, appraisal becomes mandatory. Absent a stay, Country Mutual had a clear, *contractual duty* to participate in appraisal.  When it chose to ignore the demand, it breached the policy contract.

11.  The mere fact that the parties are in litigation does not mean that an appraisal should not proceed. I have personally participated in many litigated cases where appraisal and litigation went forward concurrently.  In its response to the Insurance Commissioner, Country Mutual stated, "Washington case law supports that, in most circumstances, once suit is commenced, the appraisal clause of an insurance policy may not be invoked." That statement is simply not true, not as a matter of law nor of local practice.

12.  WAC 284-30-340 requires insurers to keep claim files which contain all notes and work papers pertaining to the claim in enough detail that pertinent events and dates of the events can be reconstructed.  Country Mutual failed to do that here,

**March 2, 2015**
**Kroneman v. Country Mutual Insurance Company**
**Report of Gary Williams-5**

because its claim file produced does not include anything which developed after the suit was filed. The claim file is thus incomplete.

13.  WAC 284-30-330(5) addresses [F]ailing to affirm or deny coverage of claims within a reasonable time after fully completed proof of loss documentation has been submitted. This regulation reflects industry standards which address promptness and the need for claim resolution.

14.  Insurers have a duty to conduct a reasonable claim investigation. Insurance company investigations are funded with premium money, so the investigation must be balanced and objective. See WAC 284-30-330(4), which forbids "[R]efusing to pay claims without conducting a reasonable investigation." Here, Country Mutual conducted a faulty investigation and concluded that there was no coverage to properly repair the Kroneman's home.

15.  Country Mutual was slow in paying a number of items. These included utilities for the rental house, personal property actual cash value and  replacement costs, bills from First Choice Restoration, and repairs to the house.  Country Mutual refused to pay for a necessary hygienist.

16.  Additional living expense (ALE) is an important coverage. It allows insureds to lead a relatively normal life while recovering from a loss.  ALE covers the necessary additional expense for the insured family to maintain its lifestyle during restoration of their home and contents.  The Kronemans had pets and children, both of which complicated their ALE claim. The Kronemans were living in a hotel because nobody could find a decent furnished rental house within the school district, which would accept pets. This is not an uncommon problem.

17.  Country Mutual's solution to the problem was unique. After finding a house which Country Mutual favored, the company applied some pressure. On October 25, 2012, Country Mutual decided it would only approve the hotel expense for one more day if the insureds rejected Country Mutual's choice of a rental house.[3]

18.  The Kronemans received an eviction notice in December, 2012, because Country Mutual was late paying the rent.

19.  Good faith claim handling does not include threatening to cut off benefits if the insured does not do exactly what the insurance company desires.

---

[3]See claim Notes 000468-9.

**March 2, 2015**
**Kroneman v. Country Mutual Insurance Company**
**Report of Gary Williams-6**

Unfortunately, ALE coverage is often a pressure point – it gives the insurer a vehicle to coerce the insureds. Coercion is not good faith claims handling.

## VI.  CONCLUSION

This claim was, and continues to be poorly handled by Country Mutual. The problems described above were not complex, but showed that the insurer considered its interests above those of the insureds. Competent claims professionals would have resolved each of these issues in favor of the insureds.

_____
GARY WILLIAMS WSBA 9580

**March 2, 2015**
**Kroneman v. Country Mutual Insurance Company**
**Report of Gary Williams-7**

# EXHIBIT A

**GARY WILLIAMS**
**252 Blueberry Hill Drive, Quilcene, WA 98376**
**360-765-0729 - areyoucovered.com**

**Education**

Juris Doctor, 1979,  University of Puget Sound School of Law, Tacoma, WA
Bachelor of Arts, English, 1967,  Central Washington University, Ellensburg, WA
Associate in Claims, 1975,  Insurance Institute of America.

**Law Practice**
- Partner,  Smith and Williams, Tacoma, Washington, 1979-1984.  General trial practice, with focus on insurance defense.
- Partner,  Williams and Cushing, Tacoma, Washington, 1984-1987. Small litigation firm with insurance defense focus. Represented many insurers and their policyholders in auto, miscellaneous liability, coverage matters.
- Williams Law Office, Port Angeles, Washington, 1987-2002. Plaintiff and defense insurance and bad faith practice. Expert witness, mediator, appraiser.
- Williams & Tassie, Port Angeles, Washington, 2002-2005. Plaintiff and defense insurance and bad faith practice. Expert witness, mediator, appraiser.
- Williams Law Office, Quilcene, Washington, 2005-present. Plaintiff insurance and bad faith practice. Expert witness, mediator, appraiser.

Admitted to practice in Washington State courts since 1979, Eastern and Western District Federal courts, Court of Appeals.

Expert witness, 1990-present.  Serve as forensic expert in insurance coverage, bad faith, legal and insurance related professional liability cases.

Martindale-Hubbell rating Av.

**Insurance Claims Professional**
- Adjuster, then Adjuster in Charge, Safeco Insurance Company, 1968-1971. Multiple line insurance claims handling.  Attended Safeco claim school.
- Adjuster, American States Insurance Company, 1971-1975. Handled fire claims, casualty claims.
- Independent Adjuster, Western States Adjustment Services, 1975-1981. Larger fire and property claims, casualty claims for various insurance

companies and self-insured entities. Attended law school during this period of time.

**Teaching**

Pierce College, Tacoma, Washington, 1981-1983.  Consulted to develop curriculum and taught courses in Insurance Claims Adjusting program.

University of Puget Sound School of Law,  Tacoma, Washington. 1984-1987. Adjunct Instructor.
- Taught Legal Writing II, a second year appellate writing and oral argument course.
- Taught Comprehensive Trial Advocacy, a year long civil and criminal trial practice course.
- Coached National and Frederick Douglas moot court teams.

Peoples Law School, Washington State Trial Lawyers Association community outreach program.  Taught insurance law, history of insurance.

Lecturer,  Continuing legal education seminars.  Trial practice, insurance law, claim practices and related topics. 1985 - present.

Chair,  WSTLA Annual Insurance Law Seminar in Seattle and Spokane, Washington, 2001, 2010. Co-chair 2011.

Faculty, National Institute for Trial Advocacy, 2003.

**Dispute Resolution**
- Judge Pro-tem, Clallam County District Court, Port Angeles, Washington, 1993-1996.
- Arbitrator,  in Clallam County Mandatory Arbitration Program, and in private insurance disputes, particularly underinsured motorist claims.  1984-present.
- Appraiser.  Serve as appraiser in property insurance appraisal proceedings. 1985-present. These usually involve damage to homes or businesses, and business interruption claims.

**Pro Bono Work**
- Chair, Pro Bono Committee, Pierce County Bar Association, Tacoma, Washington, 1983-1986.
- Founding Chair, Clallam County Pro Bono Program, 1991.

**Affiliations**
Washington State Bar Association, 1979-present.

Washington Association for Justice, 1979-present.
- Chair, Insurance Law Section, 2000-2001
- Member, Technology Committee, 1999-2004
- Member, Judicial Relations Committee, 2002-2005
- Teacher, Peoples Law School

American Bar Association, 1979-present. Tort and Insurance Practice Section.
American Association for Justice, 1979-present.
Defense Research Institute, 1980-1988.
Clallam County Bar Association, 1987-present. Past president.
Jefferson County Bar Association, 2007-present.

**Writings**

*Appraisal: Frequently Asked Questions*.  Trial News, November, 2008. Property insurance appraisal clauses are often misunderstood and misinterpreted. Common questions and issues.

*Proving Value in Homeowners Loss Claims: Strategies and Techniques for First Party Appraisals on Homeowners Coverage.* Written for WSAJ Insurance Law Seminar, 2010.

*Avoiding Exclusion Pitfalls: The Purpose of Insurance Is to Insure.* Washington State Trial Lawyers Association, Insurance Law Seminar, January, 2008.  Policy interpretation and construction can help the policyholder work around some common exclusions.

*How to Read an Insurance Policy*.  Trial News, December, 2000.  Practical and legal tips on reading and understanding insurance policies.

*Litigating the Bad Faith Case*.  A basic, beginner-level paper on prosecuting an insurance bad faith case in Washington state.  Presented to a King County Bar Association seminar.

*The Coventry Decision: A Sword for First Party Benefits?*    Discussion of *Coventry Associates v. American States Insurance Company*, 136 Wn.2d 269, 961 P.2d 933 (1998).  Written for a Washington Trial Lawyers Association seminar in 1999.

*The Good Claim File*.   A tongue in cheek look at claim file mistakes. Written for the Fifth Annual Reed McClure Insurance Law Seminar.
*Fire Insurance Claims: Combating the Arson Defense*. Protecting the innocent insured from a false accusation of arson.  Written for WSTLA Insurance Law Seminar, 2001.

*Examination Under Oath: Investigative Tool or Weapon of Mass Destruction*?  Written for the auto insurance lawyer, this paper addresses the use of the examination under oath in UIM and PIP claims.  2001.

*Combating the Insurer's Fraud Defense*, an article published in TRIAL Magazine, in October, 1998.

*Winning the Property Insurance Appraisal.*  Trial Magazine, October 2009. Appraisal, from the standpoint of policyholder's counsel.

*Is the Denial Reasonable Under IFCA?  Read the Policy for the Answer*. Addresses the new Washington Insurance Fair Conduct Act in the context of penalties for unreasonably denying claims. Written for WSAJ Insurance Law Seminar, 2010.

**Prior Testimony**

This list represents my best effort at listing cases in which I have testified, at trial or deposition, as a retained expert witness, during the last five years. I may have forgotten one or two.

*McKenna Water District v. Chicago Title*, Pierce County Superior Court No. 03-2-138873. Deposition 4/24/2004. Trial testimony  3/2/2005.

*Lim v. Greenwich Insurance Co.*, United States District Court, Western District of Washington No.  CIO-cv-00374 MJP.  Deposition 3/18/2011. Trial testimony 6/21/2011.

*Homchick v. Allstate*.  United States District Court, Western District of Washington, No. CO-5639-RJB.  Deposition 8/19/2005.

*Zander v. New Hampshire Indemnity*, United States District Court, Western District of Washington, No. CO5-5154FDB.  Deposition 5/3/2006.

*Grace Missionary Baptist Church v. GuideOne Insurance Co.*, Pierce County Superior Court No. 06-2-11029-9. Deposition May 28, 2008.  Trial testimony January 20, 21, 2009.

*Walker vs. Metropolitan*, Western District of Washington, No. Cv-12-00173JLR.  Deposition November 5, 2012.

*Wade vs. American Motorists Insurance*, King County Superior Court No. 08-2-26835-7. Deposition December 11, 2009.

*Johnson v Safeco*, King County Superior Court, No.10-2-03695-4 SEA, Deposition   September 20, 2011.

*Consemiu v. Allstate Insurance Company*, King County Superior Court, No. 10-2-10480-1 KNT. Deposition, January 3, 2013.

*Dove v. Farmers Insurance Company of Washington*, King County Superior Court, No. 10-2-18979-3 SEA, Deposition September 28, 2011.

*America Best Foods v. Alea London*, King County Superior Court, No. 05-2-07173,  Deposition November 7, 2011.

*Isilon Systems v. Twin City Insurance*, United States District Court, Western District of Washington. Deposition  March 16, 2012.

*Espinoza v. American Commerce Insurance Company*, Yakima County Superior Court, No. 11-2-02316-7   Deposition July 30, 2012.

*Harmon v. State Farm Insurance Company*, King County Superior Court No. 2:14-CV-00033, deposition January 21, 2015.

**Compensation**

$375 per hour for consultation, research, court or deposition time.
$200 per hour travel time, plus direct expenses.

**March 2, 2015**
**Kroneman v. Country Mutual Insurance Company**
**Report of Gary Williams-13**

The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT
OF WASHINGTON AT SEATTLE

KAREN AND KEITH KRONEMAN,
husband and wife, and the marital community
thereof,

                              Plaintiffs,

        v.

COUNTRY MUTUAL INSURANCE
COMPANY,

                              Defendant.

NO. CV 14-01223 TSZ

CERTIFICATE OF SERVICE

    Under penalty of perjury under the laws of the State of Washington, I declare that on this 15th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system with which will send notification of such filing to the following:

Daniel Thenell, WSBA#37297
Kirsten Curtis, WSBA#48985
Thenell Law Group
12909 SW 68th Parkway, Suite 320
Portland, OR 97223
Telephone: (503) 372-6450
dan@thenelllawgroup.com
Kirsten@thenelllawgroup.com

William Cunningham

CERTIFICATE OF SERVICE — 1

LAW OFFICES OF
MICHAEL T. WATKINS
6100 219th ST SW, SUITE 480
MOUNTLAKE TERRACE,
WA 98043
425/835-1619; FAX: 206/971-5080